## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**KRISTEN M. HARKUM, a Minor,**
By and Through Her Father, and     *
Next Friend, Joseph A. Harkum, Jr.
121 Sandy Beach Drive     *
Pasadena, Maryland  21122

    *

       **Plaintiff,**

    **v.**     *     Case Number: ___~~———~~ JFM-03-CV-562

**CHRISTOPHER BRAGA**     *
Federal Bureau of Investigation
Calverton Resident Agency     *
11700 Beltsville Drive, Suite 200
Calverton, Maryland 20705     *

**HENRY F. HANBURGER**,     *
Federal Bureau of Investigation
Annapolis Resident Agency     *
200 Harry Truman Parkway, Suite 350
Annapolis, Maryland 21401     *

**LAWRENCE S. BROSNAN**     *
Federal Bureau of Investigation
Annapolis Resident Agency     *
200 Harry Truman Parkway, Suite 350
Annapolis, Maryland 21401     *

       **Defendants.**     *

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**~~COMPLAINT AND REQUEST FOR JURY TRIAL~~ FIRST AMENDED COMPLAINT**

     Plaintiff, Kristen M. Harkum, a Minor, by and through her father and next friend, Joseph A. Harkum, Jr., by Steven A. Allen, her attorney, sues Christopher Braga, Lawrence S. Brosnan, and Henry F. Hanburger, Defendants (collectively "Defendants"), and states the following:

## INTRODUCTION AND OVERVIEW

1.       This case presents one of the greatest nightmares of a free and just society – the shooting of an innocent citizen and the near shooting of a totally blameless innocent young girl, who, because of outrageous conduct by FBI agents was compelled to incur the life altering and traumatic experience of almost being shot, being splattered with blood and glass fom the wrongful, wholly unreasonable shooting of her boyfriend who was within arms length of her at the time of the shooting and being forcibly taken into custody for no legitimate reason whatsoever.  The facts demonstrate beyond all question that the forcible seizure of 16 year old Kristen Harkum and her boyfriend, Joseph Schultz, by Agents of the FBI, and the shooting of Schultz in the face by one of the Agents, with Kristen Harkum almost being shot while seated in the zone of danger of that wrongful shooting, were altogether inexcusable and totally avoidable.  This tragedy would never have occurred if it had not been for the FBI Agents' slipshod planning of the arrest of a bank robbery suspect, for their uncoordinated execution of an admittedly inadequate arrest plan and for their staffing of the arrest team with an Agent who had a known propensity for shooting unarmed persons.

2.       The purpose of this lawsuit is to hold the three FBI Agents who are the Defendants in this case accountable for the injuries and damages that they caused young Kristen Harkum to suffer by their disregard of FBI policies, practices and procedures and by their violation of Kristen Harkum's constitutional rights.   Even after the Defendants had learned that they had seized and shot an innocent bystander, almost caused Kristen Harkum to also be shot and forced Kristen Harkum to endure a life altering nightmare, psychological, emotional and physical trauma, the FBI agents made remarks and otherwise conducted themselves with callous indifference to the consequences of their wrongdoing.  The Defendants must be taught that official misconduct in violation of the Constitution, and indifference to the consequences of that misconduct, will not be tolerated.

#52092                                                              2

## JURISDICTION

3.      This Complaint arises under the Fourth Amendment to the United States Constitution and under the authority of <u>Bivens v. Six Unknown Named Agents</u>, 403 U.S. 388, (1971).  The Complaint avers causes of action for injuries consequent upon violations of the Fourth Amendment by federal officials.

4.      This Court is vested with jurisdiction pursuant to § 1331 of Title 28 of the United States Code (28 U.S.C. § 1331).

5.      Venue is proper in this District under 28 U.S.C. § 1402(b).  The Plaintiff and the Defendants reside in Maryland.  The acts that form the basis of this lawsuit occurred in Anne Arundel County, Maryland.

## PARTIES

6.      Plaintiff, Kristen "Krissy" M. Harkum ("Krissy") is the minor child of Joseph A. Harkum, Jr.  Krissy's date of birth is September 13, 1985.  At all times relevant hereto, Krissy has resided with her parents at 121 Sandy Beach Drive, Pasadena, MD  21122, Anne Arundel County, MD.

7.      On March 1, 2002, Krissy was 16 years old.  At the time of the events which are the subject of this action, Krissy was in the eleventh grade at Northeast High School, Arundel County, Maryland.  She was a good student and had never had any prior involvement with the criminal justice system.

8.      On March 1, 2002, Krissy was arrested without probable cause.  She was also placed within the zone of danger created by Defendants' wrongful acts, seated directly next to Joseph C. Schultz ("Schultz"), in a 1995 Pontiac Grand Am automobile, which was being

operated by Krissy, when Schultz was shot in the face for no reason by Defendant Christopher Braga.

9.      Defendant Christopher Braga ("Braga") has been a Special Agent of the FBI for approximately seven years.  At all relevant times, Braga was assigned to the Violent Crimes Squad of the Calverton Resident Agency of the Baltimore Division of the FBI.  Braga and other Agents at the Calverton Resident Agency were members of the Baltimore Division Special Weapons and Tactics ("SWAT") Team.  On March 1, 2002, the Calverton Resident Agency was headed by Special Agent George S. Layton, Acting Assistant Special Agent in Charge of Violent Crimes.  At all relevant times, Braga engaged in the conduct and committed the acts alleged herein while acting under color of federal authority as a Special Agent of the FBI.

10.     Defendant Henry F. Hanburger ("Hanburger") has been a Special Agent of the FBI since 1980.  At all relevant times, he was assigned to the Annapolis Resident Agency of the Baltimore Division of the FBI.  Hanburger has been a member of the SWAT Team since 1987, and, as of March 2002, he had received extensive SWAT training.  At all relevant times, Hanburger engaged in the conduct and committed the acts alleged herein while acting under color of federal authority as an FBI agent.

11.     Defendant Lawrence S. Brosnan ("Brosnan") has been a Special Agent of the FBI since 1978.  At all relevant times, he was assigned to the Annapolis Resident Agency of the Baltimore Division of the FBI.  Until 1997, Brosnan was a Senior SWAT Team Leader of the Baltimore Division SWAT Team.  Since 1992, when he was first assigned to the Annapolis Resident Agency, Brosnan was assigned primarily to bank robbery and other violent crimes cases.  For several years, Brosnan and Hanburger were the two Agents at the Annapolis Resident Agency who were assigned primarily to bank robbery and other violent crimes cases.

At all relevant times, Brosnan engaged in the conduct and committed the acts alleged herein while acting under color of federal authority as a Special Agent of the FBI.

**FACTS COMMON TO ALL COUNTS**

**A.      The February 2000 Fatal Shooting**

12.      While shootings by FBI agents in the line of duty are a rarity, Plaintiff has been informed and therefore believes that Defendant Braga has exhibited a startling propensity for shooting unarmed persons under circumstances where no reasonable law enforcement agent would perceive it necessary or reasonable to do so.  On February 3, 2000, while Braga was participating as a member of a fugitive task force comprised of federal and local law enforcement officers, Braga shot and killed a partially clothed fugitive who was curled up in a fetal position on the floor of a closet in an apartment in Laurel, Maryland.  The members of the task force had gone to a basement apartment where the fugitive was staying.  The fugitive, wearing only his underwear, fled from the apartment, broke into an upstairs apartment occupied by a woman and a young child and tried to hide in a living room closet.

13.      Braga and other members of the task force chased the fugitive into the upstairs apartment.  When the law enforcement officers called on the fugitive to come out of the closet and he did not do so, one law enforcement officer pulled away a curtain that functioned as a closet door, exposing the fugitive who was on the floor.  "Smoke him," called out one of the law enforcement officers.  Responding to that exhortation, Braga and two others let loose a hail of bullets aimed at the fugitive.  The fugitive, who was hit by at least eight bullets, was killed instantly.  The killing of the fugitive, in which Braga was an active participant, was nothing less than an execution.

14. Other FBI agents, including Special Agents Stephen Stowe and Donald Kornek of the Calverton Resident Agency, were at the apartment complex or in the apartment when the fugitive was executed. These agents learned firsthand of the unwarranted killing and of Braga's propensity for the unreasonable and unconstitutional use of deadly force in violation of the Fourth Amendment. The circumstances of the killing were widely discussed among the FBI agents at the Calverton, Annapolis and Baltimore FBI offices. Stowe made known his upset and concern over the circumstances of the killing. As a result of these discussions, Brosnan and Hanburger, among others, became fully familiar with Braga's conduct in the killing of the fugitive and of Braga's propensity for unreasonable use of deadly force.

15. An FBI Shooting Review Board collected credible evidence that the killing of the fugitive was unjustified and objectively unreasonable. After the fugitive was already dead, however, one of the local law enforcement personnel claimed to have found a shotgun in the apartment where the killing had taken place, and, on that pretext, the Shooting Review Board whitewashed the entire incident. The agents who had participated in the raid, and those with whom they shared their experience, knew better. The whitewashing of the killing was reflective of an unfortunate and pernicious mindset, shared by the Defendants in this case, that no great harm attends a shooting by a law enforcement officer when the victim of the shooting is a criminal.

### B.     FBI Policy and Procedure

16. Recognizing that force might be required to effect the arrest of a suspected bank robber, and that the use of force carries with it the risk of harm to innocent persons, the FBI has adopted the policy that such arrests be planned carefully and thoroughly. The FBI Manual of Investigative and Operational Guidelines ("MIOG") requires that, "whenever possible,"

#52092                                          6

arresting Agents must prepare a written Operations Plan in advance and that the Operations Plan must be approved by supervisory personnel.  The Operations Plan is required to cover such subjects as execution and administration of the arrest and the equipment and communications to be employed in the arrest.

17.     On December 7, 2000, the Special Agent in Charge of the Baltimore Division implemented the MIOG policy by requiring written Operations Plans for all pre-planned operations which involve the employment of SWAT resources or may entail the use of force in making an arrest.  The Special Agent in Charge promulgated a form Operations Plan which must be completed by the Case Agent and approved by high level supervisors.  The form requires detailed information about the planned arrest.  FBI policy requires that the Case Agent set out, among other things: an established identification signal as to how the subject will be identified, who on the arrest team will have that responsibility and how it will be communicated to the arrest team; the specific assignments for each team member; the weapons and ammunition that the arrest team will be using; the use of identifying clothing, such as FBI raid jackets, that the members of the arrest team will be wearing; the plan for execution of the arrest; the plan for communications among the members of the arrest team while the arrest is being executed; and the plan for a vehicle stop in the event that a vehicle stop is planned or anticipated as a contingency.

18.     After an Operations Plan has been approved, FBI policy requires that the Agent in Charge of the arrest team give a written or oral briefing to the entire arrest team.  The briefing is to cover all of the same subjects required to be covered in the Operations Plan, including those described in the preceding paragraph.

19.     Furthermore, as a matter of well-established practice and procedure, the FBI confines the use of dynamic vehicle stops accompanied by forcible extraction of the occupants to the most extreme cases such as hostage rescue missions.  In a dynamic vehicle stop with forcible extraction, the arresting agents intercept and stop a moving vehicle; they rush the vehicle with drawn guns; and they forcibly remove the vehicle's occupants and throw them to the ground.  In all other circumstances, even when the agents intercept a vehicle containing an occupant whom the agents intend to arrest for a robbery or other violent crime, the commonly accepted procedure is for the arresting agents not to rush the vehicle but to remain in a safe location from which they order the occupants to exit the stopped vehicle with hands in full view.  This practice and procedure reflects the understanding of FBI agents and other law enforcement personnel that an arrest pursuant to a dynamic vehicle stop with forcible extraction of the occupants is extraordinarily hazardous to the persons being arrested, to the arresting agents and the public at large; that such an arrest procedure is an appropriate and reasonable means of arrest only in the most extreme circumstances; and that, in all other cases, it is objectively unreasonable to effect an arrest by means of that procedure.

C.     **The Flawed FBI Communications System**

20.     Despite the fact that FBI arrests of potentially dangerous subjects usually require careful coordination of the efforts of a large arrest team, and notwithstanding the fact that effective communications among the members of the team are frequently essential to ensure that an arrest is made upon probable cause and without endangering the life of the person to be arrested or the lives of innocent members of the public, the FBI communications system is significantly flawed.  From at least April 1999, Brosnan knew that the FBI radios were frequently inoperable and altogether unreliable and that, until the FBI revamped and replaced

its existing radio communications network, there was a high risk of serious injury and loss of life during arrests and, also, that the effectiveness and success of FBI investigations and the FBI mission would constantly be plagued and compromised.  Other FBI agents, including Braga and Hanburger, were also aware of these deficiencies and dangers.

### D.      The Bank Robbery and the Cooperation by King

21.      On Wednesday, February 20, 2002, at approximately 9:45 a.m., Ryan Grimes robbed the Allfirst Bank branch located on Fort Smallwood Road in Pasadena, Maryland. Michael Blottenberger drove the getaway vehicle, a small green Ford pick-up truck.

22.      On February 26th, Timothy King, a resident of Glen Burnie, telephoned Detective Michael Calvert of the Anne Arundel County Police Department and reported that Grimes and Blottenberger had committed the robbery.  King and Blottenberger worked together for a painting contractor, and Blottenberger occupied the basement of King's home. Calvert passed the information to Brosnan, the FBI Case Agent for the robbery investigation, and on the next day, February 27th, Brosnan met with King and enlisted his assistance.

23.      Over the next three days, King and Brosnan kept in close contact with one another.  In the early morning hours of March 1st, King telephoned Brosnan and reported that he had just been at a tavern with Blottenberger, where King said that, in view of Blottenberger's confession, he had told Blottenberger that he could no longer remain in King's basement.  King also told Brosnan that Blottenberger had left King's home without taking any of his clothing or personal effects.  Two hours later, King provided Brosnan with two BB guns that he had retrieved from the basement.  Based on his investigation, the BB guns appeared to Brosnan to be the weapons used in the robbery.

24.     Late in the morning of March 1st, King kept Brosnan informed about a series of telephone calls that he was receiving from Blottenberger.  King reported to Brosnan that Blottenberger had told him that he intended to run to North Carolina where he could hide out with relatives but that he had no money to get there and needed King to give him the clothes that he had left behind and some money to make his escape.  Brosnan instructed King to offer to assist Blottenberger but to stall Blottenberger while the FBI put together an arrest plan. When King told Blottenberger that he would meet and deliver the clothes and money to him, Blottenberger said that he would call back between 4:00 and 4:30 p.m. with instructions as to the place where the meeting would take place.  Brosnan's idea was to have a team of arresting agents on the scene when King met with Blottenberger and to make the arrest while King was handing Blottenberger a duffel bag containing Blottenberger's clothing.  Brosnan intended to have it appear that King was also being arrested so as to conceal the fact that King was he FBI informant.

E.     **Brosnan's Assembly of the Arrest Team**

25.     Shortly after noon, while Brosnan was at the Annapolis Resident Agency, Brosnan began to assemble his arrest team.  Brosnan's first step was to telephone Braga and specifically enlist Braga's participation.  Braga solicited Bradlee Sheafe and Stephen Stowe. Stowe, in turn, invited Donald Kornek to participate.  All four Agents were assigned to the Calverton Resident Agency and all but Kornek were members of the SWAT Team.

26.     A while later, Brosnan spoke to Special Agent Eric Karandy, the acting head of the Annapolis Resident Agency, and obtained Karandy's authorization for Blottenberger's arrest.  At Brosnan's request, Karandy telephoned Special Agent George Layton, the acting head of the Calverton Resident Agency, and formally requested that Layton provide Brosnan

the assistance of Braga and the other three SWAT Team members.  Layton asked to speak to Brosnan.  When Layton asked Brosnan for a copy of his Operations Plan, Brosnan admitted that he had none.  Brosnan gave Layton the verbal assurances, however, that he was intending to make only a static arrest, where Blottenberger would be arrested while he was on foot and in the process of receiving his clothing, and, further, that Brosnan would see to it that each SWAT Team member would be given his specific duties during the oral briefing.  Layton agreed to make the SWAT Team members available but insisted that Brosnan prepare a written Operations Plan and submit it for approval.

27.     Instead of remaining at the Annapolis Resident Agency while the Operations Plan was prepared and approved, and while the arrest team was briefed on the Operations Plan, Brosnan left the premises to follow King.  Brosnan asked Karandy to take care of the Operations Plan and the briefing.

**F.     The Briefing of the Agents and the Preparation and Approval of the Operations Plan**

28.     Karandy asked Hanburger to brief the members of the arrest team, and Hanburger reluctantly agreed to do so.  When the SWAT Team members arrived from Calverton, and Hanburger proceeded to give the briefing, the Operations Plan had still not been completed.  Hanburger distributed copies of a 1998 arrest photograph of Blottenberger.  He described Blottenberger as a 33 year old white male who weighed 185 pounds and was 5'11."  He also stated that Blottenberger drove a gold/silver Ford Escort and that he had been seen the previous evening in a blue station wagon.  Hanburger told the arrest team that the weapon used in the robbery had been recovered and that it was "a pellet gun." He went on to say, however, that Blottenberger should be considered armed and dangerous because he was a drug addict and was determined not to be sent back to jail.  Hanburger also informed the Agents that King was

going to meet with Blottenberger to give Blottenberger a duffel bag containing Blottenberger's clothes and some money. He also said that the arrest team would communicate with one another via a designated FBI radio channel and by Nextel wireless telephones that had been issued to each of them.

29. While the Agents who received the briefing have given various accounts as to what else occurred at the briefing, Hanburger, in a sworn statement just days after the shooting, admitted that he did not use any Operations Plan and that Blottenberger's criminal history "was not provided" to the arrest team. Hanburger also admitted that he did not give any specific assignment to any member of the arrest team; that a protocol for identifying Blottenberger was not addressed; that he made no effort to establish any signal to be given when Blottenberger was identified; and that no person was given the responsibility for positively identifying Blottenberger. Hanburger acknowledged in his sworn statement that he had "expected" that Brosnan would make the positive identification and call it out to the rest of the arrest team. Hanburger also recounted that he made no formal designation of a team leader at the briefing but that, as the events unfolded, he took on that role because "there was no one else in a position to be the coordinator."

30. After the oral briefing had been completed, and the arrest team had left the Annapolis Resident Agency to rendezvous at a staging area in Glen Burnie, Karandy remained behind in Annapolis to prepare the Operations Plan for submission to Layton. Since Brosnan had informed both Karandy and Layton that the arrest of Blottenberger was intended only to be "a static event," where Blottenberger would be seized while on foot, Karandy prepared the Operations Plan in accordance with that information. The Operations Plan, showed, on its face, that the Agents had given no thought to anything more than the most rudimentary seizure of

Blottenberger as he stood with King and that they had not taken the trouble to plan for any other eventuality.  In the section of the Plan where the Agents were to describe the execution of the plan, Karandy wrote only that King was to be followed from his home "to Glen Burnie for clothes drop."  The Operations Plan contained only blanks where information was to be inserted about the specific duties to be performed by the members of the team or about any contingencies that might be expected to occur during the operation.  The Operations Plan stated that the only weapons that would be used in the arrest would be pistols, and the Plan made no provision for the Agents to wear any identifying clothing.  In the plan, Karandy designated Brosnan as the Agent in charge of the operation and Hanburger as the alternate.

31.    At approximately 3:46 p.m., Karandy faxed the Operations Plan to Layton. Accepting at face value Brosnan's representation that there was no need to plan for anything other than a static or stationary arrest, Layton considered the situation a "no brainer."  Despite the fact that most of the form had not been filled out, and that he could not tell from the form if any thought had been given to the most basic arrangements for identifying the subject at the time of arrest, for the designation of a team leader or for individual duties to be discharged by the arresting Agents, Layton approved the Operations Plan.

G.    **The Wait for Word from King**

32.    As soon as the Agents left the Annapolis Resident Agency, they began experiencing the radio problems with which they were familiar and which they had anticipated. Brosnan, who had gone to King's house, could only reach the other Agents by means of Nextels.  At Brosnan's request, Special Agent Barry Mones of the Annapolis Resident Agency joined Brosnan as a passenger in his vehicle so that he could assist Brosnan in coordinating communications with the arrest team.  The other Agents, who were heading toward the Days

Inn staging point on Ritchie Highway, also found that their FBI radios were not working properly.  When their efforts to switch channels failed to alleviate the problems, it became apparent to all of the Agents that they would have to rely more heavily on their Nextels.

33.     Except for Brosnan and Mones, who were following King, the members of the arrest team, including the SWAT Team Agents from Calverton, remained in the vicinity of the Days Inn staging area while they waited for further word from King.  Two Anne Arundel County Detectives, E. Hodges and S. Gall, who had been asked to assist in the arrest of Blottenberger, came to the staging area and met with Hanburger.  The Detectives provided Hanburger with an Anne Arundel County radio so that he could communicate with them during the arrest operation.

34.     Shortly after 4:00 p.m., King telephoned Brosnan and informed him that Blottenberger had arranged to meet  with King to take delivery of his clothes and to obtain money at the 7-11 convenience store located at Route 648 and Marley Neck Boulevard.  King said that Blottenberger might possibly be in a car driven by his girlfriend, Lisa, who he described as being 5'11" tall and as having red hair.  Brosnan asked King for a description of the clothing that Blottenberger was wearing.   King said that he did not know but that Blottenberger could be wearing a white baseball cap.

35.     Brosnan and Mones relayed King's information to Hanburger by Nextel.  They also provided Hanburger with a description of the informant, King, and his vehicle.  They described King as a white male, 5'8" tall, who was in his mid-twenties, and who would be wearing black clothing and a white baseball cap.  They also said that King would be driving a green truck.  Hanburger passed the information to the other members of the arrest team.

**H.**     **The Surveillance of the 7-11 Store**

36.     The four SWAT Team members from Calverton departed the staging area to set up surveillance in the vicinity of the 7-11.  Hanburger, who was supposed to be providing coordination, did not accompany the Agents to the 7-11 and did not provide any other directions for the surveillance.  Instead, Hanburger, in a separate car,  joined Brosnan and Mones in following King.  King met with his employer to obtain his paycheck, and then drove to a bank to cash his paycheck, before heading to the meeting with Blottenberger.

37.     Without direction from either of the leaders of the arrest team, the other participants selected surveillance locations so distant from the 7-11 parking lot that none of them were able to identify persons entering and leaving the 7-11.  The 7-11 is located on the southeast corner of the intersection of Route 648 and Marley Neck Boulevard.  Sheafe, accompanied by Braga, parked his vehicle on the parking lot of an Italian restaurant south of the 7-11 and on the opposite side of Route 648.  Kornek, accompanied by Stowe, parked in front of a church that was on the same side of Route 648 as the 7-11 but was located north of both Marley Neck Boulevard and a free standing building containing a barber shop.

**I.**     **King's Arrival at the 7-11**

38.     Despite the fact that Brosnan and Hanburger were aware that effective communications among all participants were vital to their endeavor, and that the Agents would be required to overcome known deficiencies inherent in the FBI radio system, neither Brosnan nor Hanburger took any steps to assure that they would be able to maintain communications with King after he arrived at the 7-11.  While Nextels had been provided to the Agents, and the Agents were using Nextels as important tools in their ongoing communications, no Nextel was given to King.  Brosnan had spent a good part of the day talking to King by way of King's cell

phone without considering the fact that he was wearing out King's cell phone battery and without giving any thought to the need for King to have an operable cell phone and a backup means of communication.

39.     King drove south on Route 648, and shortly after 5:30 p.m., when he approached the intersection with Marley Neck Boulevard, he made a left turn, entered the 7-11 parking lot and parked his truck at the front door of the 7-11.  As King was making his left turn, he saw Blottenberger in a red Honda Civic being driven by Blottenberger's sister. Blottenberger and his sister were at the intersection in the westbound lane of Marley Neck Boulevard waiting to make a left turn to proceed south on Route 648.  King tried to telephone Brosnan while still in his truck, but he found that his cell phone battery was now dead.

**J.      The Agents' Failure to Observe Blottenberger**

40.     King watched as Blottenberger's sister drove the Honda two blocks south of the 7-11, turned around at a gas station and then came back.  The red Honda drove past Sheafe and Braga twice.  When the Honda passed the agents the first time, Blottenberger, who was in the passenger seat, was within a few feet of Sheafe and Braga and in full view.  Neither Sheafe nor Braga recognized Blottenberger.

41.     Blottenberger and his sister, however, were more observant than the Agents. They saw that the area around the 7-11 was swarming with late model, four-door sedans occupied by middle age men who looked like law enforcement officers.  Blottenberger concluded that the FBI must be staking out the 7-11 and that it was not safe for Blottenberger to meet with King.  After Blottenberger's sister drove the Honda past Sheafe and Braga a second time, she made a left turn at the 7-11 and left the area.

42.     King ran into the 7-11 and frantically attempted to contact Brosnan.  In the corner of the 7-11, next to the front window, but furthest from the front door, was a red emergency telephone, that had been installed by the County.  The purpose of the telephone was to enable citizens to reach the Anne Arundel County Police via a 911 operator.

### K.     Schultz's Purchase of a Slurpee at the 7-11

43.     At the same time that the Agents were at the 7-11, and King was trying to reach the Agents, 16 year old Krissy Harkum was returning home from the Marley Station Mall with her boyfriend, Joseph Schultz.  Krissy was driving a red Pontiac Grand Am that her parents had given to her as a 16th birthday present.  Krissy, who was 5'7" tall and had brown hair, was driving.  Schultz, who is of slight build and looked younger than his 20 years, was in the passenger seat.  Schultz was wearing a white baseball cap.  Krissy and Schultz decided to get refreshments at the 7-11.

44.     Krissy drove the Pontiac Grand Am onto the parking lot of the 7-11 and parked near the front door.  King's truck was parked to the right (south) of Krissy's Pontiac Grand Am, and the truck obstructed the view of Sheafe and Braga.  Schultz got out of the Pontiac Grand Am and, passing between the Pontiac Grand Am and King's truck, entered the 7-11 where he purchased a Slurpee and a snack for himself and a Mountain Dew for Krissy.  Schultz and King were in different parts of the 7-11, and neither noticed the other.  Schultz stayed only as long as it took for him to make the purchase.

45.     As Schultz exited Krissy's Pontiac Grand Am to enter the 7-11, Braga and Sheafe took special notice of the fact that the vehicle was a Pontiac Grand Am.  They also claimed to observe that the person leaving the Pontiac Grand Am and walking into the 7-11 was a white male wearing a white baseball cap.  From their vantage point, Sheafe and Braga

saw that the white male had not spent any appreciable time in the 7-11 and that he came out promptly with a Slurpee in one hand and a Mountain Dew in the other.   Karnack and Stowe drove past the 7-11 and also observed that the vehicle containing the teenage girl and the young man was a Pontiac Grand Am.   The Agents notified Hanburger and Brosnan of the make and model of the vehicle.

### L.   The Circumstances Demonstrating that Schultz was an Innocent Bystander

46.     The circumstances of Krissy and Schultz's brief visit to the 7-11 were so benign as to be persuasive evidence to any reasonably objective FBI agent that the person who stopped into the 7-11 to buy a Slurpee could not have been Blottenberger.   The entire arrest team knew that the purpose of the planned meeting between King and Blottenberger was for King to give a duffel bag of clothes and money to Blottenberger and for Blottenberger and King both to be arrested while they were standing together on the parking lot of the 7-11.   The young man who had been seen going into the 7-11 was also seen coming out <u>alone</u>.   King did not come out of the 7-11 with the young man, and the focus of the young man's interest was obviously the two drinks that he held in his hands and not any duffel bag of clothes.   Any objectively reasonable FBI agent would have known that, if the young man had been Blottenberger, he would have exited the 7-11 together with King and that he would have remained in front of the 7-11 while King retrieved the duffel bag from his truck and handed it to him.

### M.   Brosnan's Instruction to Follow, But Not Stop, the Pontiac

47.     All of the Agents conducting the surveillance, including Kornek, Stowe, Sheafe and Braga, informed Brosnan that they could not identify the passenger in the Pontiac Grand Am as Blottenberger because they were too far away from the car.

48.     Brosnan observed the Pontiac Grand Am exit the 7-11 parking lot and turn east on Marley Neck Boulevard.  At that moment, Brosnan and Mones telephoned Braga and told him that, while they wanted him to follow "the red Grand Am," the arresting team "did not know who was in the car."  Mones, who was communicating with Braga as Brosnan's adjutant, told Braga that "he did not know if the passenger was the subject, meaning Blottenberger," and that Braga should "just follow," but not stop, the Pontiac.  At Brosnan's direction, Mones gave the same message to Hanburger and the other members of the arrest team.

49.     Responding to Brosnan's instruction, a convoy of unmarked law enforcement vehicles followed behind Krissy's Pontiac Grand Am.  Krissy drove eastward on Marley Neck Boulevard.  Kornek was driving the first car with Stowe in the passenger's seat.  Sheafe was driving the second car with Braga as his passenger.  Detectives Hodge and Gall were in the third car.  Hanburger, who had delayed leaving the 7-11, soon overtook the other vehicles.

50.     King, meanwhile, had explained his plight to the 911 operator and had impressed the 911 operator with the urgent need to inform the FBI that Blottenberger and his sister had not stopped at the 7-11 and that they were driving in a red Honda Civic.  At approximately 6:00 p.m., the 911 operator got in touch with Detectives Hodge and Gall.  While King was still on the line, the 911 operator told the Detectives that Blottenberger was in his sister's car and that the car was a red Honda Civic.  The Detectives remarked that they were familiar with the Honda Civic and had earlier seen the Honda Civic "go by once or twice."  The Detectives called Hanburger on the County radio that they had previously given him, and they passed along the message.

N.     **Hanburger's Order to "Take Down" the Pontiac Grand Am**

51.     Stowe radioed that the driver of the Pontiac Grand Am "was not driving very fast."  Sheafe and Braga contacted Stowe and told him that they were attempting to catch up.  As soon as Sheafe and Braga reached Kornek and Stowe, Stowe contacted Hanburger by FBI radio and told Hanburger that the Pontiac Grand Am would soon be approaching a red light.  Stowe asked Hanburger if he wanted the members of the SWAT Team in the first two FBI vehicles to stop the Pontiac Grand Am.  After a brief pause, Hanburger ordered the Agents to "Take them down."  Hanburger knew that Stowe was asking for permission to effect a dynamic stop with forcible extraction of the occupants, and by his response, he gave them the authority to do so.

52.     Any reasonable FBI agent in Hanburger's position would have known that there was no probable cause for a forced stop of the Pontiac Grand Am, or for a seizure of the occupants, and that the stop of the vehicle and the seizure of the occupants that Hanburger was ordering and authorizing was violative of the constitutional rights of Krissy and Joseph Schultz, guaranteed by the Fourth Amendment to the Constitution of the United States, to be free from unreasonable searches and seizures.  Hanburger understood from the outset of the mission that it was Brosnan's function to identify Blottenberger.  Hanburger knew that no one who participated in the surveillance of the 7-11, including Brosnan, had been able to identify the young man as Blottenberger.  Hanburger also knew that Brosnan, the leader of the arrest team, had ordered that the Pontiac Grand Am be followed but not stopped.  While other Agents have since tried to make much of the fact that the young man seen exiting the 7-11 had been wearing a white baseball cap, Hanburger, significantly, has since admitted in a sworn statement that he knew only that the person who had left the 7-11, and was a passenger in the Pontiac Grand Am,

was a young white male and that, at the time he ordered and authorized the arrest, had not heard any radio or Nextel transmission in which any Agent had said that the young man was wearing any cap. Even more egregiously, Hanburger had just received word from King, as relayed by the Anne Arundel County Detectives, that Blottenberger was riding around in a Honda and, therefore, was not in the Pontiac Grand Am that the FBI was following. Krissy's rights, and Joseph Schultz's rights to be free of an arrest without probable cause, and the fact that the arrest ordered by Hanburger was without probable cause, was clearly established at the time, within the specific context of the facts of this case, and it was clear to any reasonable FBI Agent in Hanburger's position that, in the situation he confronted, his order and authorization for the arrest was unlawful.

53.     Any reasonable FBI Agent in Hanburger's position would also have known: that a dynamic vehicle stop of the Pontiac Grand Am with forcible extraction of the occupants was violative of FBI practice and procedure and was objectively unreasonable and excessive; that such an arrest, under the circumstances confronting Hanburger and the other FBI Agents who were following the Pontiac Grand Am, violated the rights of the occupants of the Pontiac Grand Am, guaranteed by the Fourth Amendment to the Constitution of the United States, to be free of excessive force by FBI Agents and other law enforcement officers in effecting an arrest or other seizure; and that, under the circumstances known to Hanburger, a dynamic vehicle stop of the Pontiac Grand Am with forcible extraction of the occupants was objectively unreasonable. No reasonable FBI Agent in the same circumstances would have concluded that a threat existed justifying the use of that particular level of force. Krissy's rights and Joseph Schultz's rights to be free from such excessive force were clearly established at the time, within the specific context of the facts of this case, and it was clear to any reasonable FBI Agent in Hanburger's

position that his order and authorization for the dynamic vehicle stop of the Pontiac Grand Am with forcible extraction of the occupants amounted to an order for the use of excessive and unlawful force in the situation he confronted.

### O.    The Forced Stop of the Pontiac and the Seizure of Krissy Harkum and Joseph Schultz

54.    After stopping for the red light, Krissy began to make a right turn onto Fort Smallwood Road.  As Krissy was completing her turn, Kornek, who was driving the vehicle immediately behind her, moved out to the left and pulled alongside her.  Stowe, who was in the passenger seat, brandished his automatic assault rifle and signaled to Krissy to stop.  As Krissy moved the Pontiac Grand Am to the right and began stopping, Kornek moved the front of his vehicle past the Pontiac Grand Am and angled the front right of his vehicle in front of the left front of the Pontiac.  Sheafe, with Braga in the passenger seat, stopped behind the Pontiac.

55.    At all times, from the time that Krissy drove away from the 7-11 until her Pontiac Grand Am was intercepted by the FBI Agents, Krissy drove the Pontiac Grand Am in a reasonable manner.  Krissy made no effort to flee or to evade the vehicles that were intercepting her.  Notwithstanding the fact that the FBI vehicles were <u>unmarked</u>, and that the FBI Agents were <u>not</u> wearing any distinctive clothing such as FBI raid jackets, Krissy immediately obeyed Stowe's order to stop.  No objectively reasonable FBI Agent in the position of Kornek, Stowe, Sheafe or Braga could have been of the belief that the driver of the Pontiac Grand Am was attempting to flee or evade the stop.  The short distance between the point where Krissy began to make her right turn and the point where the Pontiac Grand Am came to a complete stop is undisputable physical evidence that Krissy was driving reasonably and that she stopped promptly upon being told to do so.  No reasonably objective FBI Agent could have concluded otherwise.

56.     As soon as the vehicles came to a stop, the four FBI Agents rushed out of their vehicles, each with an automatic assault rifle, and stormed the Pontiac Grand Am for the specific purpose of forcibly extracting the occupants.  Sheafe and Stowe have subsequently admitted under oath that no more than five seconds passed between the time that they jumped out of their FBI vehicles and the time that Braga shot Joseph Schultz.

57.     Stowe jumped out of the passenger side of the first FBI vehicle, ran in front of the Pontiac Grand Am while putting on his body armor and took up a position immediately next to Joseph Schultz.  Braga ran from the passenger side of the second FBI vehicle and stationed himself behind Stowe.  Kornek exited the driver's side of the first FBI vehicle, ran behind that vehicle and stopped next to Krissy.  As Sheafe began to exit from the driver's side of the second FBI vehicle to take up a position behind Kornek, he heard Braga shoot Joseph Schultz, who at the time was seated within arms length of Krissy.

58.     Remarkably, neither Hanburger nor the Agents themselves had designated a leader for the execution of the dynamic vehicle stop.  As Braga, Stowe and Kornek ran to the Pontiac, they all shouted orders to the occupants.  In their first round of orders, the three Agents shouted, "Show me your hands," "Show your hands," "Keep your hands where we can see them" and other words to the same effect.  Stowe and Braga aimed their assault rifles at Joseph Schultz's head, and Kornek terrorfyingly aimed his assault rifle at Krissy's head.  Joseph Schultz, who saw a rifle pointed at his head, made sure that he followed the instructions promptly.  Joseph Schultz put his hands out in front of him, showing that he had nothing in them.  The doors to the Pontiac Grand Am were locked, and the windows were up.

59.     When Stowe tried the door handle on the passenger side and Kornek tried the handle on the driver's side, they found that the doors were locked.   The three Agents then shouted at Joseph Schultz and Krissy to "Unlock the door" and to "Open the door."

60.     Carefully complying with the Agents' commands, Joseph Schultz kept his hands where the Agents could see them and moved both his hands to his right so that he could unlock the door.   As Joseph Schultz was moving his empty and outstretched hands to his right, and demonstrating clearly that he was fully complying with the Agents' commands, Braga shot Joseph Schultz in the face.   Braga's bullet came in contact with a part of the vehicle as it was traveling toward Joseph Schultz, and, if it had not been for that fortuitous circumstance, Braga would probably have blown off Joseph Schultz's head.   Krissy could also have been shot with the bullet which Braga had fired, either after the bullet struck Schultz, or ricocheted off the part of the vehicle with which it came into contact.

61.     Braga's bullet entered Joseph Schultz's face, shattering his cheek and doing substantial damage to the inside of Joseph Schultz's face and mouth.   As a result of the shooting, Krissy's face and body were showered with Joseph Schultz's blood and shattered glass.   Joseph Schultz, who was covered in blood, began rocking back and forth, holding his face and screaming in pain at the top of his voice.   Braga reached into the Pontiac Grand Am, unlocked the door and forcibly pulled Joseph Schultz from the vehicle.   Braga threw Joseph Schultz to the ground and handcuffed him.   Kornek forcibly removed Krissy from the driver's side of the Pontiac Grand Am and forcibly pushed her to the ground.   Krissy was subsequently handcuffed and moments later, the Agents forced Krissy to bend over the trunk of the Pontiac Grand Am, when she saw Joseph Schultz on the ground, screaming in pain.   Sixteen year old Krissy, as described by Kornek, was "crying hysterically."

62.     Any reasonable FBI Agent in the position of Braga, or in the position of the other three Agents who participated in the dynamic stop of the Pontiac Grand Am and the forcible extraction of the occupants, would have known: that their actions, under the circumstances, were violative of FBI practice and procedure and were objectively unreasonable and excessive; that such an arrest, under the circumstances confronting the Agents at the time, violated the constitutional rights of the occupants of the Pontiac Grand Am guaranteed by the Fourth Amendment to the Constitution of the United States to be free of excessive force by FBI Agents and other law enforcement officers in effecting an arrest or other seizure; and that the forced vehicle stop of the Pontiac Grand Am and forcible extraction of the occupants was, under the circumstances then present and known to the Agents, objectively unreasonable.  No reasonable FBI Agent in the same circumstances could have concluded that a threat existed justifying the particular use of that level of force.  Krissy's rights and the rights of Joseph Schultz to be free from such excessive force were clearly established at the time, within the specific context of the facts of this case, and it was clear to any reasonable FBI Agent in the position of Braga and the other three Agents that the dynamic vehicle stop of the Pontiac Grand Am with the forcible extraction of Krissy Harkum and Joseph Schultz amounted to excessive and unlawful force.

63.     No reasonable FBI Agent in Braga's position would have believed that the use of deadly force against the occupants of the Pontiac Grand Am was justified.  No reasonable FBI Agent in Braga's position would believe that he had sound reason to believe that the occupants posed a threat of serious physical harm to Braga or others.  Any reasonable FBI Agent in Braga's position would have known that the occupants in the Pontiac Grand Am posed no threat, immediate or otherwise, to Braga or anyone else.  A reasonable FBI Agent in

Braga's position could not have believed the occupants to be in possession of a weapon or otherwise to pose a threat to anyone at the time Braga shot into the Pontiac Grand Am and struck Joseph Schultz.  Braga knew that neither Joseph Schultz, nor Krissy were attempting to flee or to resist arrest.  Braga saw that Joseph Schultz's hands were in full view, that they were obviously empty and that Joseph Schultz was following Braga's commands to the letter.  Krissy Harkum's and Joseph Schultz's rights not to be subjected to deadly force, within the specific context of the facts of this case, were clearly established at the time, and it was clear to any reasonable FBI Agent in Braga's position that the use of deadly force, in the situation he confronted, was unlawful.

### P.     The Callous Indifference of Brosnan and the Other Agents

64.     Brosnan arrived on the scene a few minutes after Joseph Schultz was shot, blood and glass splattered onto Krissy Harkum and Krissy was forcibly extracted from the Pontiac Grand Am and taken into custody.  King, who had seen the FBI vehicles leave the vicinity of the 7-11 and drive eastward on Marley Neck Boulevard, decided to follow the FBI cars to see where they were traveling.  When King happened on the scene of the shooting, he stopped his truck and spoke to Brosnan.  Brosnan brought King over to the place where Joseph Schultz was lying in a pool of blood and asked if the man on the ground was Blottenberger.  King replied that, "It's not even the f_ _ _ _ _ _ car I told you about."  King exclaimed that he had passed the word to the arrest team that Blottenberger was in a Honda Civic but that the Agents had intercepted a Pontiac Grand Am instead.

65.     A few minutes later, while King was standing around, Brosnan approached King and told King that he should not be concerned.  "This s_ _ _ happens every day," Brosnan said.

66.     After Joseph Schultz was flown away by helicopter to the Shock Trauma facility at the University of Maryland Medical Center in Baltimore, Braga and the other agents who had participated in the vehicle stop and forced extraction convened in Hanburger's vehicle. The four Agents were seen laughing.

Q.     **Kristen Harkum's Injuries**

67.     As a direct and proximate result of each of the Fourth Amendment violations alleged herein, Krissy Harkum suffered deprivation of her liberty, severe emotional trauma, psychological/psychiatric injury, unfathomable distress and severe and permanent physical injuries resulting from this life altering event.  Among other things, Krissy Kristen Harkum has suffered severe emotional and psychological/psychiatric injuries.   She suffers from clinical depression and anxiety for which she receives regular mental health care treatment.  As a result of the severe emotional and psychological/psychiatric injuries which she incurred, Krissy has developed eating disorders, sleep disorders, has recurring dreams and nightmares about the events of March 1, 2002, has lost the energy which she enjoyed as a healthy and happy teenager before March 1, 2002, and is no longer able to attend school as before, losing the once in a lifetime experience and, by associated with one's last years in high school.  Krissy Harkum and her family have also suffered pecuniary injuries including incurred large medical expenses and lost income and will continue to incur medical expenses in the future.  Krissy will also have significant loss of earnings in the future because of her injuries.

## COUNT ONE
### (Bivens Action - Defendant Braga)

68.     Plaintiff Harkum realleges paragraphs 1 through 67 of this Complaint as if set forth in full herein.

69.    As alleged above in paragraphs 55 through 64, Defendant Braga knowingly, willfully, deliberately, intentionally and unreasonably violated Krissy Harkum's rights, guaranteed by the Fourth Amendment to the Constitution of the United States, to be free from unreasonable searches and seizures.

70.    As a direct and proximate result of Defendant Braga's violation of Krissy Harkum's rights under the Fourth Amendment, as alleged above, Krissy Harkum suffered multiple injuries, including loss of liberty, severe emotional, psychological/psychiatric and physical injuries, pain and suffering and financial loss.

WHEREFORE, Plaintiff Kristen Harkum, a Minor, by and through her father, and next friend, Joseph A. Harkum, Jr., prays for:

A.    The award of compensatory damages in the amount of $5,000,000.00 (Five Million Dollars);

B.    The award of punitive damages in the amount of $5,000,000.00 (Five Million Dollars);

C.    The costs of these proceedings; and

D.    Such other and further relief that the Court may deem just and proper.

## COUNT TWO
### (Bivens Action - Defendant Hanburger)

71.    Plaintiff Harkum realleges paragraphs 1 through 70 of this Complaint as if set forth in full herein.

72.    As alleged above in paragraphs 47 through 54, Defendant Hanburger knowingly, willfully, deliberately, intentionally and unreasonably violated Krissy Harkum's rights, guaranteed by the Fourth Amendment to the Constitution of the United States, to be free from unreasonable searches and seizures.

73.     As a direct and proximate result of Defendant Hanburger's violation of Krissy Harkum's rights under the Fourth Amendment, as alleged above, Krissy Harkum suffered multiple injuries, including loss of liberty, severe emotional, psychological/psychiatric and physical injuries, pain and suffering and financial loss.

WHEREFORE, Plaintiff Kristen Harkum, a Minor, by and through her father, and next friend, Joseph A. Harkum, Jr., prays for:

A.     The award of compensatory damages in the amount of $5,000,000.00 (Five Million Dollars);

B.     The award of punitive damages in the amount of $5,000,000.00 (Five Million Dollars);

C.     The costs of these proceedings; and

D.     Such other and further relief that the Court may deem just and proper.

## COUNT THREE
### (Bivens Action - Defendant Brosnan)

74.     Plaintiff Harkum realleges paragraphs 1 through 73 of this Complaint as if set forth in full herein.

75.     As a direct and proximate result of Braga's known propensity for shooting unarmed persons under circumstances where no reasonably objective FBI Agent would conclude that it is reasonable or lawful to do so, as a direct result of Brosnan placing Braga in a situation where he was likely to cause constitutional injury, and as a direct and proximate result of Brosnan's deliberate failure to place appropriate and necessary controls upon the members of the arrest team, and his deliberate failure to assure appropriate and essential means of communication among the members of the arrest team and with King, Krissy Harkum faced a

pervasive and unreasonable risk of harm from deprivation of her Fourth Amendment right to be free of unreasonable searches and seizures.

76.     By the affirmative acts that Brosnan intentionally committed, and by his intentional failure to take necessary corrective action, Brosnan demonstrated that he was deliberately indifferent to Krissy Harkum's Fourth Amendment rights and that he tacitly authorized the deprivation of those rights as alleged above.

77.     As a direct and proximate result of the violations of Krissy Harkum's Fourth Amendment rights to which Brosnan was deliberately indifferent and tacitly authorized, as alleged above, Krissy Harkum suffered multiple injuries, including loss of liberty, severe emotional, psychological/psychiatric and physical injuries, pain and suffering and financial loss.

WHEREFORE, Plaintiff Kristen Harkum, a Minor, by and through her father, and next friend, Joseph A. Harkum, Jr., prays for:

A.     The award of compensatory damages in the amount of $5,000,000.00 (Five Million Dollars);

B.     The award of punitive damages in the amount of $5,000,000.00 (Five Million Dollars);

C.     The costs of these proceedings; and

D.     Such other and further relief that the Court may deem just and proper.

_____/s/_____
Steven A. Allen, Federal Bar No. 00607
HODES, ULMAN, PESSIN & KATZ, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland  21204
(410) 339-6769
(410) 825-2493 (FAX)

Attorney for Plaintiff.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury upon any issue triable by a jury in this case.

_____/s/_____
Steven A. Allen