IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

KRISTEN M. HARKUM,       *

     Plaintiff,         *

    v.               *     Case No. JFM-03-00562

CHRISTOPHER BRAGA, *et al.*,   *

     Defendants.      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MOTION OF SPECIAL AGENT LAWRENCE S. BROSNAN TO DISMISS COUNT THREE FOR FAILURE TO STATE A CLAIM

Defendant Special Agent Lawrence S. Brosnan ("Agent Brosnan"), by his undersigned

counsel, moves this Court to dismiss Count Three of the Complaint pursuant to Fed. R. Civ.

P. 12(b)(6).  The grounds for this motion are that:

1.    Plaintiff's allegations concern an allegedly unreasonable seizure of Plaintiff's automobile by federal law enforcement agents passenger;

2.    Count Three of Plaintiff's Complaint does not state a viable claim against Agent Brosnan, who did not expressly or tacitly authorize the seizure of the automobile;

3.    Plaintiff does not allege facts to show either (a) that a reasonable person in Agent Brosnan's position would have known that he violated Plaintiff's clearly-established constitutional rights, or (b) that Agent Brosnan was deliberately indifferent to a pervasive and unreasonable risk of harm from some specified source; and

4.     under well-established authorities, the doctrine of qualified immunity entitles Agent Brosnan to immediate dismissal with prejudice of Count Three of the Complaint.

Additional grounds for this motion are set forth in the accompanying memorandum, which is incorporated herein by reference.

WHEREFORE, Special Agent Lawrence S. Brosnan respectfully requests that this Court dismiss Count Three of the Complaint with prejudice.

Respectfully submitted,

_____/s/_____
John A. Bourgeois (Bar No. 11834)
Geoffrey H. Genth (Bar No. 08735)
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
(410) 752-6030
(410) 539-1269 (facsimile)

Counsel for Special Agent Lawrence S. Brosnan

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

KRISTEN M. HARKUM,                    *

        Plaintiff,                    *

    v.                    *    Case No. JFM-03-00562

CHRISTOPHER BRAGA, *et al.*,          *

        Defendants.                    *

*     *     *     *     *     *     *     *     *     *     *     *     *

## **ORDER**

UPON CONSIDERATION of Special Agent Lawrence S. Brosnan's Motion to Dismiss Count Three of the Complaint, the memorandum of law in support thereof, any opposition thereto, the record in this case, and the applicable law, it is this _____ day of _____ 2003:

ORDERED that Special Agent Lawrence S. Brosnan's Motion to Dismiss Count Three of the Complaint be and hereby is GRANTED; and it is further

ORDERED that all claims against Special Agent Lawrence S. Brosnan be and hereby are DISMISSED WITH PREJUDICE.

_____
J. Frederick Motz
United States District Judge

03212/0/00078506.WPDv1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| KRISTEN M. HARKUM, | * | |
| Plaintiff, | * | |
| v. | * | Case No. JFM-03-00562 |
| CHRISTOPHER BRAGA, *et al.*, | * | |
| Defendants. | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## MEMORANDUM IN SUPPORT OF LAWRENCE S. BROSNAN'S MOTION TO DISMISS COUNT THREE FOR FAILURE TO STATE A CLAIM

Defendant Special Agent Lawrence S. Brosnan, by his undersigned counsel, submits the following points and authorities in support of his motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Count Three of the Complaint:

### I.    Introduction

Agent Brosnan was one of numerous agents of the Federal Bureau of Investigation ("FBI") who were involved in an arrest operation in the afternoon and early evening hours of March 1, 2002 in Pasadena, Maryland. The operation's goal was to capture Michael Blottenberger, a fugitive bank robber and drug addict who was considered armed and dangerous. Based on information received from an informant, FBI agents staked out a 7-11 convenience store where they expected Blottenberger to rendezvous with the informant. The FBI agents were told that Blottenberger might be wearing a white baseball hat. At the last

second, the FBI's informant reported that Blottenberger was a passenger in a red car being driven by his sister.

By tragic coincidence, Plaintiff Kristen M. Harkum, accompanied by Joseph Schultz – who was wearing a white baseball cap – was driving a red car that entered the parking lot of the 7-11 store. When the red car later exited the parking lot, federal agents followed the car in government vehicles. As the consequence of mistaken identity, Special Agents Christopher Braga, Donald Kornek, Bradlee Sheafe, and Stephen Stowe – acting on an order by Special Agent Henry Hanburger – eventually stopped the red car. Believing that Mr. Schultz was reaching for a weapon, Agent Braga fired a gunshot that injured Mr. Schultz.

Although Agent Brosnan was the agent in charge of the arrest operation, he did not arrive at the shooting scene until several minutes after the shooting occurred. Agent Brosnan did not expressly or tacitly authorize his colleagues to stop Ms. Harkum's car, or to use force against the car's occupants. Agent Brosnan's role was essentially supervisory and to handle the informant; due to telecommunications failures, he did not learn of the seizure and shooting until after they occurred.

Pursuant to the rights articulated in *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S. Ct. 1999 (1971) ("*Bivens*"), Ms. Harkum has filed a seventy-seven paragraph, three-count Complaint against Agents Braga, Hanburger, and Brosnan. Counts One and Two are against Agents Braga and Hanburger, respectively. Count Three seeks recovery from Agent Brosnan. Plaintiff asserts that each of those three law-enforcement officers personally violated Plaintiff's right to be free from unreasonable

searches and seizures under the Fourth Amendment of the U.S. Constitution. Plaintiff seeks $10 million in compensatory and punitive damages from each Defendant.

Although the Complaint's invective and gratuitous allegations contribute to a lack of precision, Plaintiff evidently asserts in Count Three that a reasonable person in Agent Brosnan's position would have known that he was violating Plaintiff's established Fourth Amendment rights by allegedly:

(1)    enlisting Agent Braga as a member of the arrest team,
despite the fact that Agent Brosnan was aware that the
FBI Shooting Review Panel had, in Plaintiff's
characterization, "whitewashed" an incident in which
Agent Braga had shot a fugitive in the course of an
arrest in February 2000 (*see* Complaint, ¶¶ 12-15, 75);

(2)    failing "to place [unspecified] appropriate and
necessary controls upon the members of the arrest team"
(*id.*, ¶ 75); and

(3)    proceeding with the March 1, 2002 arrest operation
despite the fact, at least since April, 1999, FBI radios
were known to be "unreliable" (*see id.*, ¶¶ 20, 75).

The allegations of Count Three do not overcome Agent Brosnan's qualified immunity or state a viable *Bivens* claim based on his direct or supervisory conduct. Accordingly, this Court should grant Agent Brosnan's motion, and dismiss Count Three of the Complaint with prejudice.

## II.    Applicable Legal Standard

A motion to dismiss is governed by Rule 12(b)(6) of the Federal Rules of Civil Procedure. The purpose of such a motion is to test the legal sufficiency of the complaint.

*Talley v. Farrell*, 156 F. Supp.2d 534, 539 (D. Md. 2001).   In considering a motion to dismiss, the court accepts as true all well-pleaded allegations and views the complaint in the light most favorable to the plaintiff. *De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991).[1] While the court assumes *arguendo* the truth of the complaint's allegations, the court may ignore its legal conclusions. *District 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085 (4th Cir. 1979).

Thus, a trial court should grant a motion to dismiss where the plaintiff has failed to plead specific facts that would entitle him or her to relief. *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1059 (D. Md. 1991).   Accordingly, "[a] complaint may be dismissed if the law does not support the conclusions argued, or where the facts alleged are not sufficient to support the claim presented." *Id.* "The presence . . . of a few legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged do not support the legal conclusion." *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001) (affirming dismissal of "deliberate indifference" claim because "the facts alleged in the complaint cannot support a finding of deliberate indifference").

## III.   The Allegations Of The Complaint

The Complaint alleges the following pertinent facts:[2]

---

[1]   "[O]f course, this doesn't mean that [the facts are alleged in the complaint] are true." *Patton v. Pryzbylski*, 822 F.2d 697, 698 (7th Cir. 1987).

[2]   Although Agent Brosnan contests the accuracy of a number of the Complaint's factual allegations, the truth of those allegations is assumed for purposes of this motion only.

Agent Brosnan has been a Special Agent of the FBI since 1978. Complaint, ¶ 11. At all relevant times, he was assigned to the Annapolis office of the FBI's Baltimore Division. *Id.* Since 1992, Agent Brosnan has been assigned primarily to bank robbery and other violent crime cases. *Id.* Plaintiff alleges that, from at least April, 1999, Agent Brosnan has known that FBI radios are "unreliable" and that, "until the FBI revamped and replaced its existing radio communications network, there was a high risk of serious injury and loss of life during arrests." *Id.*, ¶ 20.

Agent Braga has been an FBI agent since approximately 1996. Complaint, ¶ 9. The FBI Shooting Review Board allegedly "whitewashed" an incident that occurred in February, 2000, and in which Agent Braga shot a half-naked fugitive who had fled law enforcement personnel by breaking into an apartment occupied by a woman and young child. *Id.*, ¶ 12-15.[3] By way of purported hearsay from other FBI agents concerning that February, 2000 incident, Agent Brosnan was allegedly familiar with the facts of the shooting incident and "Braga's propensity for unreasonable use of deadly force." *Id.*, ¶ 14.

Apart from the February, 2000 incident, the Complaint does not allege that Agent Braga engaged in any unreasonable uses of force before the events at issue in the instant lawsuit. Nor does the Complaint allege that Agent Brosnan had any first-hand knowledge of the February, 2000 incident. Indeed, the Complaint does not allege that Agent Brosnan's

---

[3]     Given Plaintiff's use of the term "whitewash," it can be reasonably inferred that Plaintiff alleges that the FBI Shooting Review Board concluded after investigation that Agent Braga had acted appropriately and that the pertinent circumstances justified the February, 2000 shooting.

purported hearsay understanding came from any person who actually witnessed the February, 2000 shooting. *See* Complaint, ¶ 14.

On February 20, 2002 – two years after the earlier shooting involving Agent Braga – Michael Blottenberger and an accomplice robbed the Allfirst Bank at 8493 Fort Smallwood Road in Pasadena, Maryland. Complaint, ¶ 21. Six days later, on February 26, 2002, Agent Brosnan became involved in the investigation of that bank robbery. *Id.*, ¶ 22. On February 27, 2002, Agent Brosnan met with Timothy King, who had reported to the Anne Arundel County police department that his co-worker and tenant, Mr. Blottenberger, had committed the bank robbery. *Id.* Agent Brosnan recruited Mr. King to serve as a confidential informant, and kept in close contact with Mr. King over the next three days. *Id.*, ¶¶ 22-23.

During the morning of March 1, 2002, Mr. King telephoned Agent Brosnan and told him that he had just been at a tavern with Mr. Blottenberger, where he had informed Mr. Blottenberger that he was no longer welcome to live in Mr. King's house in light of Blottenberger's confession to Mr. King that he had been involved in the bank robbery. Complaint, ¶ 23. Mr. King further told Agent Brosnan that Mr. Blottenberger had left Mr. King's house without taking any of his personal effects. *Id.* Two hours later, Mr. King supplied Agent Brosnan with two "BB" guns that he had retrieved from his basement, where Mr. Blottenberger had been living. *Id.*

Late in the morning of March 1, 2002, Mr. King reported to Agent Brosnan the substance of a number of telephone conversations that Mr. King had with Mr. Blottenberger.

Complaint, ¶ 24.   Among other things, Mr. King informed Agent Brosnan that Mr.

Blottenberger "intended to run to North Carolina where he could hide out with relatives."

*Id.*  Mr. King further reported that Mr. Blottenberger had asked Mr. King to deliver to him

clothes and money so that he could "make his escape."  *Id.*

Agent Brosnan asked Mr. King to assist Mr. Blottenberger, but to stall him while the

FBI put together an arrest plan.  Complaint, ¶ 24.  In turn, Mr. King told Mr. Blottenberger

that he would provide clothes and money to Mr. Blottenberger.  *Id.*  Mr. Blottenberger told

Mr. King that he would call Mr. King between 4:00 and 4:30 that afternoon and direct Mr.

King to a meeting-place.  *Id.*  Agent Brosnan's goal was to place a team of arresting agents

on site at the designated meeting-place, and to arrest Mr. Blottenberger while Mr. King was

handing Mr. Blottenberger a duffel bag containing clothing.  *Id.*

Shortly after noon on March 1, 2002, Agent Brosnan began to assemble the arrest

team.  Complaint, ¶ 25.  He telephoned Agent Braga at the FBI's Calverton office to solicit

his assistance.  *Id.*  Agent Braga, in turn, recruited Agents Sheafe and Stowe of the Calverton

office to serve on the arrest team.  *Id.*  Agent Stowe then asked Agent Kornek, also of the

Calverton office, to join the arrest team.  *Id.*

Thereafter, Agent Brosnan sought and obtained from his supervisor, Special Agent

Eric Karandy – acting head of the Annapolis office – authorization for Mr. Blottenberger's

arrest.  Complaint, ¶ 26.[4]  Agent Karandy then telephoned the head of the Calverton office,

---

[4]       Plaintiff's Complaint neglects to mention that the United States Attorney's
Office for the District of Maryland also gave Agent Brosnan express authority to arrest

Special Agent George Layton, to request that he authorize Agents Braga, Sheafe, Stowe, and Kornek to participate in the arrest team. *Id.* Agent Layton agreed to make those agents available, and asked Agent Brosnan to prepare a written operations plan and submit it for approval. *Id.*

Agent Brosnan's supervisor, Agent Karandy, undertook to prepare the written operations plan and to brief the arrest team, so that Agent Brosnan could conduct surveillance on Mr. King in anticipation of Mr. King's rendezvous with Mr. Blottenberger. Complaint, ¶ 27. Agent Brosnan and Special Agent Barry Mones of the FBI's Annapolis office traveled to Mr. King's house in Curtis Bay. *Id.*, ¶¶ 32-33.

Agent Karandy asked Agent Hanburger to brief the members of the arrest team, which he did. Complaint, ¶ 28. Agent Hanburger distributed to Agents Braga, Sheafe, Stowe, and Kornek a copy of a 1998 arrest photograph of Mr. Blottenberger and described him to be a 33-year-old white male, 5' 11" tall, who weighed 185 pounds. *Id.* Agent Hanburger described two vehicles that Mr. Blottenber was known to use. *Id.* Agent Hanburger informed the members of the arrest team that a "pellet gun" that had been used in the bank robbery had been recovered, and that Mr. Blottenberger was a drug addict who was determined not to be sent back to jail and should be considered "armed and dangerous." *Id.*

Agent Hanburger further informed the members of the arrest team that Mr. King was going to meet with Mr. Blottenberger to provide Mr. Blottenberger a duffel bag containing

---

Mr. Blottenberger.

clothes and money.  Complaint, ¶ 28.  Agent Hanburger instructed the agents that the members of the arrest team would communicate with each other by way of a designated FBI radio channel and Nextel direct wireless telephones that had been issued to each of them. *Id.*  Agent Brosnan was not present at the briefing.  *Id.*, ¶ 27.

After the members of the arrest team left to rendezvous at a staging area in Glen Burnie, Maryland, the head of the FBI's Annapolis office, Agent Karandy, prepared a written operations plan for submission to the head of the FBI's Calverton office, Agent Layton. Complaint, ¶ 30.  In preparing the operations plan, Agent Karandy relied on Agent Brosnan's statement that the arrest of Mr. Blottenberger "was intended only to be 'a static event,' where Blottenberger would be seized on foot."  *Id.*  At approximately 3:46 p.m., Agent Karandy faxed the operations plan to Agent Layton, who approved it.  *Id.*, ¶ 31.  Agent Brosnan neither prepared the operations plan nor approved it.  *Id.*, ¶¶ 30-31.

The members of the arrest team gathered at the Glen Burnie staging area near the Day's Inn on Ritchie Highway, to await word from Agents Brosnan and Mones regarding the location of the planned rendezvous between Mr. King and Mr. Blottenberger.  Complaint, ¶¶ 32-33.  Agents Brosnan and Mones experienced difficulty in transmitting from their FBI radio, and therefore communicated with members of the arrest team by the back-up Nextel direct telephones.  *Id.*, ¶ 32.  Similarly, the members of the arrest team experienced difficulties with their FBI radios.  *Id.*  Detectives from the Anne Arundel County police department joined the members of the arrest team at the Glen Burnie staging area.  *Id.*, ¶ 33.

They provided Agent Hanburger with an Anne Arundel County police department radio so that he could communicate with them. *Id.*

Shortly after 4:00 p.m., Mr. King telephoned Agent Brosnan and informed him that he was going to deliver the duffel bag of clothes and money to Mr. Blottenberger at a 7-11 store on Route 648 and Marley Neck Boulevard in Pasadena, Maryland. Complaint, ¶ 34. Mr. King told Agent Brosnan that Mr. Blottenberger might arrive in a car driven by his girlfriend, Lisa. *Id.* Mr. King further told Agent Brosnan that Mr. Blottenberger might be wearing a white baseball cap. *Id.*

Agents Brosnan and Mones relayed Mr. King's information to Agent Hanburger by Nextel direct telephone. Complaint, ¶ 35. They also told Agent Hanburger that the informant, Mr. King, was a white male, 5'8" tall, in his mid-20's, who would be dressed in black clothing and a white baseball cap, and would be driving a green truck. *Id.* Agent Hanburger conveyed this information to the other members of the arrest team. *Id.*

With Agents Brosnan and Mones following him, Mr. King met with his employer to obtain a paycheck, and then drove to a bank to cash his paycheck before meeting up with Mr. Blottenberger at the 7-11. Complaint, ¶ 36. Members of the arrest team departed the Glen Burnie staging area to set up surveillance in the area of the 7-11. *Id.*

At approximately 5:30 p.m., Mr. King turned his truck into the parking lot of the 7-11 store and parked in front of the store's door. Complaint, ¶ 39. As he turned into the parking lot, Mr. King observed Mr. Blottenberger in a red Honda Civic being driven past the 7-11 by his sister. *Id.* Mr. King tried to call Agent Brosnan to report this information, but

found that the battery of the cellular telephone that he had been using to communicate with Agent Brosnan had died. *Id.*

After Mr. Blottenberger's sister drove her red car past the 7-11 two times, Mr. Blottenberger concluded that the 7-11 was being staked out by law enforcement, and left the area. Complaint, ¶¶ 40-41. Mr. King, seeing Mr. Blottenberger leave the area in the red car being driven by his sister, and unable to use his dead cellular telephone to alert Agent Brosnan, went into the 7-11 and used a telephone to call the Anne Arundel County police 911 operator. *Id.*, ¶ 42.

Mr. King explained the situation to the 911 operator, who patched Mr. King through to the Anne Arundel County detectives who were part of the arrest team. Complaint, ¶ 50. Mr. King informed the detectives that Mr. Blottenberger had not stopped at the 7-11 store, but was a passenger in the red Honda Civic that his sister was driving. *Id.* The detectives responded that they had seen the red car "go by once or twice," and then called Agent Hanburger on the Anne Arundel County police radio that they previously supplied to him and passed along the message. *Id.*

While Mr. King was in the 7-11 trying to call the Anne Arundel County police, Ms. Harkum drove into the 7-11 lot and parked her red car next to Mr. King's truck. Complaint, ¶¶ 43-44. Her boyfriend, Mr. Schultz, who was wearing a white baseball cap, was in the passenger seat. *Id.*, ¶ 43. Mr. King's truck obstructed the arrest team members' view of the scene. *Id.*, ¶ 44. Mr. Schultz got out of Ms. Harkum's car, walked between Mr.

King's truck and Ms. Harkum's car, and went into the 7-11 where Mr. King was using the telephone. *Id.*, ¶ 44. Shortly thereafter, Mr. Schultz exited the 7-11. *Id.*

Members of the arrest team noted that a white male wearing a white baseball cap had exited a red car that was parked next to Mr. King's truck, and gone into the 7-11 where Mr. King was to meet Mr. Blottenberger. Complaint, ¶ 45. They reported that information to Agent Brosnan. *Id.* They further informed Agent Brosnan that they could not identify the white male in the white baseball cap as Mr. Blottenberger, because they were too far away to make a positive identification. *Id.*, ¶ 47.

Agent Brosnan observed Ms. Harkum's red car leave the 7-11 parking lot and travel east on Marley Neck Boulevard. Complaint, ¶ 48. Agents Brosnan and Mones called Agent Braga on his Nextel direct telephone and instructed Agent Braga that, while the arrest team "'did not know who was in the car,'" Agent Braga should "'just follow,' but not stop" the red car. *Id.* At Agent Brosnan's direction, Agent Mones provided the same information and instructions to the other members of the arrest team. *Id.*

Agents Kornek and Stowe thereafter followed Ms. Harkum's car east-bound on Marley Neck Boulevard. Complaint, ¶ 49. In turn, they were followed by Agents Sheafe and Braga in a second car. *Id.* The Anne Arundel County detectives followed in a third car. *Id.* Agent Hanburger, who had delayed leaving the 7-11, was in the fourth and last vehicle. *Id.*

As Ms. Harkum's red car approached a red light, Agent Stowe contacted Agent Hanburger on the FBI radio and asked him whether the agents in the first two cars should

stop the red car. Complaint, ¶ 51. Agent Hanburger responded that Stowe should "take them down." *Id.* The Complaint does not allege that Agent Brosnan was asked for permission to stop Ms. Harkum's car, or that Agent Brosnan issued the order to stop the car.

After stopping at the red light, Ms. Harkum turned right onto Fort Smallwood Road. Complaint, ¶ 54. Agents Kornek and Stowe, in the first car, pulled to the left and alongside of Ms. Harkum's car and signaled for her to stop. *Id.* As she pulled over, Agents Kornek and Stowe pulled ahead of her and stopped their car at an angle in front of Ms. Harkum's car. *Id.* Agents Sheafe and Braga, in the second car, stopped their car behind Ms. Harkum's car. *Id.*

Agents Braga, Stowe, and Kornek positioned themselves around Ms. Harkum's car, and ordered Ms. Harkum and Mr. Schultz to show them their hands. Complaint, ¶¶ 57, 58. Because the car doors were locked, the agents allegedly instructed Ms. Harkum and Mr. Schultz to unlock and open the door. *Id.*, ¶ 59. When Mr. Schultz allegedly reached for the door, Agent Braga fired one shot, which struck part of the car and caused injury to Mr. Schultz's face. *Id.*, ¶ 60. Ms. Harkum was showered with broken glass and Mr. Schultz's blood. *Id.*, ¶ 61. She was forcibly removed from the car, pushed to the ground, and was hand-cuffed. *Id.* She was crying hysterically. *Id.*

The Complaint does not allege any involvement by Agent Brosnan, or communications to or from him, between the time he gave the order "'just follow,' not stop"

the red car, and some time after the shooting.[5]  As Plaintiff's Complaint alleges, Agent

Brosnan did not arrive at the scene until "a few minutes after" Mr. Schultz had been injured.

Complaint, ¶ 64.

Thereafter, Mr. King arrived on the scene.  Complaint, ¶ 64.  Agent Brosnan escorted

Mr. King to where Mr. Schultz was receiving medical attention and allegedly asked Mr. King

whether the man was Mr. Blottenberger.  *Id.*  Mr. King allegedly responded:  "It's not even

the [expletive deleted] car I told you about," and informed Agent Brosnan that he had passed

word to the members of the arrest team that Mr. Blottenberger was in a red Honda Civic but

the members of the arrest team had intercepted a red Grand Am instead.  *Id.*  A few minutes

later, while Mr. King was standing around, Agent Brosnan allegedly told Mr. King that he

should not be concerned, and that "this [expletive deleted] happens every day."  *Id.*, ¶ 65.[6]

---

[5]      Due to problems with both the FBI radio and the back-up Nextel direct
telephones, Agent Brosnan did not communicate with the other members of the arrest
team at any time between giving the order to follow the red car and the eventual shooting.

[6]      In addition to being inaccurate, Plaintiff's inflammatory description of the
alleged interchange between Agent Brosnan and Mr. King is irrelevant to the issues in
this case.  Agent Brosnan knew immediately upon observing the injured person that it
was not Blottenberger and so informed the other officers at the scene; Agent Brosnan
wanted Mr. King to determine whether Mr. Schultz was a known associate of
Blottenberger's.  Mr. King was understandably upset that Mr. Schultz, an innocent
bystander, had been wounded in an operation in which Mr. King was involved.  Agent
Brosnan attempted to console Mr. King and to reassure him that he was not responsible
for what had happened.  Agent Brosnan adamantly denies that he said anything remotely
similar to "this [expletive deleted] happens all the time."

**IV.   To Overcome A Police Officer's Qualified Immunity A Plaintiff Must Show That A Reasonable Person In The Officer's Position Would Have Known That His Conduct Violated A Clearly-Established Constitutional Right**

In our civil society, courts must balance citizens' fundamental rights against the need for law enforcement officers to "perform their duties free from the specter of endless and debilitating lawsuits." *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991).  To strike an appropriate balance, the Supreme Court has crafted the doctrine of qualified immunity. Under that doctrine, a law enforcement officer is immune from suit if a reasonable person in the officer's position would not have known that his conduct violated a particular citizen's clearly-established statutory or constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

A clearly-established right is one whose "contours . . . must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987).  The question is "whether a reasonable officer could have believed [the challenged action] to be lawful, in light of clearly established law and the information the . . . officer[] possessed." *Id.* at 641, 107 S. Ct. at 3040.  Defendants are immune unless, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the challenged actions were lawful.

"[I]f officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986).  Thus, the doctrine of qualified immunity allows for "reasonable error . . . because officials should

03212/0/00078506.WPDv1                          -15-

not err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S. Ct. 534, 537 (1991).

"The purpose of the qualified immunity defense . . . is to allow government officials 'the freedom to exercise fair judgment' without 'being blinded by liability derived from newly invented rights or new, unforeseen applications of pre-existing rights.'" *Cromer v. Brown*, 88 F.3d 1315, 1324 (4th Cir. 1996) (quoting *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir.) (*en banc*), *cert. denied*, 516 U.S. 994, 116 S. Ct. 530 (1995)). Qualified immunity "protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'" *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001) (citation omitted), *cert. denied*, ___ U.S. ___, 123 S. Ct. 621 (2002).

The Fourth Circuit's rulings have reflected a particular concern for the need to protect reasonable discretionary judgments by law enforcement officers. In *Gooden v. Howard County*, 954 F.2d 960 (4th Cir. 1992), for example, the Fourth Circuit observed that errors by law enforcement officials are "inevitable" but insufficient to establish liability. *Id.* at 967. "If every mistaken [action] were to subject police officers to personal liability under § 1983, those same officers would come to realize that the safe and cautious course was to take no action. The purposes of immunity are not served by a police force intent on escaping liability to the cumulative detriment of those duties which communities depend upon such officers to perform." *Id.* More recently, the Fourth Circuit recognized that the "concerns behind the immunity defense are especially salient in the context of street-level police work,

which frequently requires quick and decisive action in the face of volatile and changing circumstances." *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994).

"So long as the officer's action, viewed from the perspective of the officer at the time, can be seen within the range of reasonableness, then no liability will attach." *Pinder*, 54 F.3d at 1173.

In *Pritchett v. Alford*, 973 F.2d 307 (4th Cir. 1992), the Fourth Circuit established a three-part test for the application of qualified immunity.  To analyze the applicability of the defense, a trial court must:

      (1)    identify "the specific right allegedly violated";

      (2)    determine "whether at the time of the alleged violation that right was clearly established"; and

      (3)    if so, determine "whether a reasonable person in the officer's position would have known that doing what he did would violate that right.

*Id.* at 312.

In identifying the specific right allegedly violated, a trial court should not examine the alleged right at its "most general or abstract level," but should rather "determin[e] the right at the level of its application to the specific conduct being challenged." *Taft v. Vines*, 70 F.3d 304, 310 (4th Cir. 1995), *rehearing en banc*, 83 F.3d 681 (4th Cir. 1996).  "The right allegedly violated must be articulated in a 'particularized' and 'relevant' way." *Cromer*, 88 F.3d at 1325 (citing *Anderson v. Creighton*, 483 U.S. at 640, 107 S. Ct. at 3039).  The inquiry "must be made on the basis of the information actually possessed by the officer at

-17-

the critical time, or that was then reasonably available to him, and in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions." *Taft*, 70 F.3d at 310. In doing so, the court should not concern itself with whether an officer adhered to police procedures, because the sole touchstone is whether, "confronted with the facts of th[e] case, reasonable police officers should have known that clearly established constitutional law prohibited the methods used." *Taft*, 83 F.3d at 684 (*en banc*).

In determining the reasonableness of the officer's understanding, the court must view the circumstances "through the lens of the officer's perception at the time of the incident in question." *Rowland v. Perry*, 41 F.3d at 173. Thus, a court should not entertain a plaintiff's bid to second-guess the officer's conduct "with the greater leisure and acquired wisdom of judicial hindsight." *Gooden*, 954 F.2d at 965. The officer's "subjective motives are irrelevant to the qualified immunity inquiry." *Lopez v. Robinson*, 914 F.2d 486, 489 (4th Cir. 1990).

It is well established that trial courts should determine the applicability of qualified immunity "at the earliest possible stage in litigation." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). This is so because qualified immunity is an immunity from suit "rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526-527, 105 S. Ct. 2806, 2815 (1985). Thus, "if the plaintiff fails to allege 'a violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.'" *Turner v. Dammon*, 848 F.2d 440, 443 (4th Cir. 1988) (quoting *Mitchell*, 472 U.S. at 526, 105 S. Ct. at 2816).

**V.     To Allege A Viable Claim Of Supervisory Liability, A Plaintiff Must Allege Facts Demonstrating That The Defendant Was Deliberately Indifferent To A Pervasive Risk Of Harm From A Specified Source**

A plaintiff seeking to establish supervisory liability in a *Bivens* action must bear "a heavy burden of proof," separate and apart from the need to overcome the doctrine of qualified immunity. *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984), *cert. denied*, 470 U.S. 1035, 105 S. Ct. 1413 (1985). In a *Bivens* suit, there is no *respondeat superior* or imputed liability. *Trulock*, 275 F.3d at 402. "Instead, liability is personal, based upon each defendant's own constitutional violations." *Id.*

A supervisor cannot be held liable for the acts of a subordinate except upon "proof of [his] direct culpability in causing the injury either by directly authorizing it or by expressly or tacitly condoning by inaction a known pattern of comparable coworker conduct." *McWilliams v. Fairfax County Bd. of Supervisors*, 72 F.3d 1191, 1197 (4th Cir.) (citation omitted), *cert. denied*, 519 U.S. 819, 117 S. Ct. 72 (1996). To state a viable claim of supervisory liability, a plaintiff must allege facts demonstrating that:

> (1)     the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

> (2)     the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and

> (3)     an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.) (citations omitted), *cert. denied*, 513 U.S. 813, 115 S. Ct. 67 (1994).

The "pervasive and unreasonable risk of harm" cannot be generalized but must emanate from "some specified source." *Slakan*, 737 F.2d at 373. "[I]n establishing deliberate indifference, a plaintiff '[o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents.'" *Randall v. Prince George's County, Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (quoting *Slakan*, 737 F.2d at 373). Rather, there must be allegations and proof that "the conduct is widespread, or at least has been used on several different occasions." *Shaw*, 13 F.3d at 799. Proof of "documented widespread abuses" is necessary. *Slakan*, 737 F.2d at 373. Ultimately, "'[t]he proper question is whether [a supervisor] acted wantonly, obdurately, or with deliberate indifference to the pervasive risk of harm.'" *Nichols v. Maryland Correctional Inst'n – Jessup*, 186 F. Supp.2d 575, 583 (D. Md. 2002) (quoting *Moore v. Winebrenner*, 927 F.2d 1312, 1315 (4th Cir.), *cert. denied*, 502 U.S. 828, 112 S. Ct. 97 (1991)).

## VI. Discussion:  The Allegations Of Count Three Do Not State A Constitutional Violation, Establish Potential Supervisory Liability, Or Overcome Agent Brosnan's Qualified Immunity

When the Complaint's factual allegations are viewed in light of the pertinent decisions of the Supreme Court and the Fourth Circuit, it is crystal clear that Plaintiff falls far short of stating a viable *Bivens* claim against Agent Brosnan and that Agent Brosnan is entitled to immediate dismissal. Agent Brosnan did not authorize Plaintiff's stop or seizure. Indeed, Agent Brosnan did not have any involvement with or communication to or from the other

members of the arrest team from the time that he gave the order to follow the red car, until minutes after the shooting had occurred. Plaintiff's claim against Agent Brosnan is untenable.

In an attempt to generate potential liability where none exists, Plaintiff articulates three theories of liability against Agent Brosnan. As discussed below, each theory is meritless. In the final analysis, Plaintiff cannot rationally allege that Agent Brosnan should have known that he was somehow engaged in a constitutional violation, or that he was deliberately indifferent to a pervasive risk of such a violation.

> ### A.   Plaintiff Has Failed To Allege Facts Showing That Agent Brosnan Is Potentially Liable For Enlisting Agent Braga As A Member Of The Arrest Team

Plaintiff's allegation about Agent Brosnan's inclusion of Agent Braga on the arrest team is meritless. The inclusion of Agent Braga did not violate anyone's clearly-established constitutional rights. Nor was Agent Brosnan's alleged enlistment of Agent Braga an actionable instance of "deliberate indifference."

Plaintiff has failed to assert a factual basis for Agent Brosnan's alleged knowledge of Agent Braga's alleged prior conduct. Agent Brosnan and Agent Braga worked at different FBI offices. Agent Brosnan worked in Annapolis. Complaint, ¶ 11. Agent Braga worked in Calverton. *Id.*, ¶ 9. Agent Brosnan left the SWAT Team in 1997. *Id.*, ¶ 11. Agent Braga's involvement in the SWAT shooting incident in Laurel, Maryland occurred in 2000. *Id.*, ¶ 12. Plaintiff's assertion that Agent Brosnan was "fully familiar with" Agent Braga's conduct in the 2000 incident is a conclusion without a specific factual basis.

Moreover, Plaintiff's characterization of Agent Braga's alleged "propensity for unreasonable use of deadly force" cannot fairly be drawn from the Complaint's allegations. Plaintiff cites *one* prior shooting incident – which Plaintiff evidently concedes the FBI Shooting Review Board found to be justified after an investigation. *See* Complaint, ¶ 15. One incident does not describe a "propensity," which is defined to be "a natural inclination or tendency" and synonymous with "bent, leaning, disposition, penchant, [and] proclivity." *Websters Encyclopedic Unabridged Dictionary of the English Language* (1989), p. 1153. A plaintiff cannot satisfy her significant burden in a supervisory liability case by simply "pointing to a single incident or isolated incidents." *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980), *cert. denied*, 450 U.S. 929, 101 S. Ct. 1387 (1981). On a motion to dismiss, the Court is to consider the allegations of fact – not unwarranted deductions of fact. *Mylan Laboratories*, 770 F. Supp. at 1059.[7]

In sum, Plaintiff fails to offer any specific facts to support her allegation that a reasonable person, knowing the facts available to Agent Brosnan on the afternoon of March 1, 2002, would have somehow concluded that including Agent Braga on the arrest team created a "pervasive and unreasonable" risk of harm. The facts alleged in the Complaint do not provide any basis for Plaintiff or this Court to second-guess Agent Brosnan's alleged

---

[7]     Like all of Plaintiff's allegations against Agent Brosnan, the assertions concerning the inclusion of Agent Braga seem improperly premised on a negligence theory. As set forth in sections IV. and V. of the memorandum, the legal requirements for a *Bivens* action based on supervisory liability are substantially higher than those of a common-law action for negligence, and rightly so.

staffing decision.  Because the factual allegations of the Complaint do not suggest that the

inclusion of Agent Braga on the arrest team was beyond "the range of reasonableness," "no

liability will attach."  *Pinder*, 54 F.3d at 1173.

> **B.**    **Plaintiff's Vague Allegation About The Absence Of "Appropriate
> And Necessary Controls Upon The Members Of The Arrest Team"
> Does Not Set Forth A Potentially Viable Constitutional Claim**

Plaintiff  asserts,  rather  mysteriously,  that  Agent  Brosnan  violated  Plaintiff's

constitutional  rights  when  Agent  Brosnan  allegedly  failed  "to  place  appropriate  and

necessary controls upon the members of the arrest team."  Complaint, ¶ 75.  Agent Brosnan

assumes that this allegation is meant to encompass Plaintiff's claim that the operations plan

and briefing for the arrest of Michael Blottenberg were somehow deficient.  That allegation,

however, does not provide a basis for potential *Bivens* liability on the part of Agent Brosnan.

Notwithstanding  Plaintiff's  vague  allegations,  Agent  Brosnan  adhered  to  FBI

procedures.  In any event, such adherence is not the relevant issue in this case.  The relevant

question is whether, "confronted with the facts of th[e] case, reasonable police officers

should have known that clearly established constitutional law prohibited the methods used."

*Taft*, 83 F.3d at 684.

Contrary to Plaintiff's conclusory allegation, Agent Brosnan's planning of the arrest

operation was well within the range of reasonableness under the circumstances.  Agent

Brosnan did not act with "deliberate indifference" to any "pervasive" or "widespread" risk.

Indeed, the Complaint fails to allege even a *single* prior incident which would have put Agent

Brosnan  on  objective  notice  that  his  planning  of  the  operation  fell  below  any  clearly-

established constitutional standard. Indeed, the fact that his supervisor, Agent Karandy, prepared the written operations plan (Complaint, ¶¶ 27, 30), and the fact that another FBI supervisor, Agent Layton, reviewed and approved the written operations plan (*id.*, ¶ 31), dispel the notion that the planning of the operation purportedly was defective in the eyes of other reasonable agents faced with the same information.

Agent Brosnan's planning of the arrest operation is precisely the type of reasonable discretionary police conduct that qualified immunity protects from challenge. Plaintiff's theory of inadequate "controls" is a weak attempt at circumvent the rule against imposing vicarious liability in *Bivens* actions. Plainly, this Court should reject Plaintiff's allegations concerning Agent Brosnan's planning of the arrest operation.

### C.     Plaintiff's Allegations About The FBI Radio System Are Meritless As A Matter Of Law

The frailty of Plaintiff's claims against Agent Brosnan is typified by Plaintiff's attempt to elevate criticism of the FBI's radio system's reliability into an alleged constitutional violation. Evidently, in Plaintiff's view, a reasonable person in Agent Brosnan's position would have known that the U.S. Constitution clearly required Agent Brosnan and his FBI colleagues to suspend arrest operations "from at least April, 1999" forward – until the reliability of the FBI's radio system could be improved. It is a genuine understatement to observe that Plaintiff's allegation is incorrect.

Although the Complaint asserts generally that the FBI's communications system was "flawed" since at least 1999 (Complaint, ¶ 20), it does not allege any specific failure of the

system (much less, pervasive failures) that resulted in any specific constitutional violation(s). Even assuming that the FBI's system was flawed, it can hardly be said that making arrests while using FBI radios, backed up by government-issued Nextel direct wireless telephones, was a clearly-established constitutional violation as of March 1, 2002.

As the pertinent authorities demonstrate, neither Plaintiff nor this Court is entitled to view the circumstances in 20/20 hindsight. *See Rowland*, 41 F.3d at 167. Rather, the legal inquiry is focused exclusively on the facts and circumstances known to Agent Brosnan at the time, and in view of the exigencies of the situation. *Taft*, 70 F.3d at 310.

A reasonable person in Agent Brosnan's position would not have known (or, for that matter, even suspected) that, by merely organizing and participating in an arrest operation using the FBI's radio system (supplemented by Nextel direct telephones), he was violating anyone's clearly-established Fourth Amendment rights. It can hardly be said that Agent Brosnan somehow displayed "deliberate indifference" simply by performing his duties with the FBI radio system and FBI-issued back-up Nextel direct telephones.[8]

In the final analysis, Plaintiff's allegation about the communications systems is not only unfounded but also reckless.

---

[8]     More absurd is Plaintiff's assertion that Agent Brosnan violated Ms. Harkum's clearly-established rights by failing to anticipate that the cellular telephone that Mr. King had been successfully using to communicate with Agent Brosnan would die at a critical moment in the operation, and by failing to supply Mr. King with an FBI radio or Nextel direct telephone. The failure of Mr. Kings' cellular telephone battery did not constitute a violation of Ms. Harkum's rights by Agent Brosnan.

## VII.   **Conclusion**

Plaintiff's factual allegations do not come close to overriding Agent Brosnan's qualified immunity or establishing potential direct or  supervisory liability on Agent Brosnan's part.  Indeed, Count Three of the Complaint is a sterling example of a *Bivens* claim that this Court, in accordance with Supreme Court and Fourth Circuit precedents, should dismiss at the outset.  For all the reasons stated, Agent's Brosnan's motion should be granted.

Respectfully submitted,


_____/s/_____
John A. Bourgeois (Bar No. 11834)
Geoffrey H. Genth (Bar No. 08735)
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland  21202-3201
(410) 752-6030
(410) 539-1269 (facsimile)

Counsel for Special Agent Lawrence S. Brosnan