IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| JOSEPH C. SCHULTZ, | * | |
| Plaintiff | * | |
| v. | * | |
| | | JFM-03-CV-00556 |
| CHRISTOPHER BRAGA, | * | |
| Et al., | | |
| | * | |
| Defendants. | | |

\* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| KRISTEN HARKUM, | * | |
| Plaintiff | * | |
| v. | * | |
| | | JFM-03-CV-00562 |
| CHRISTOPHER BRAGA, | * | |
| Et al., | | |
| | * | |
| Defendants. | | |

\* \* \* \* \* \* \* \* \*

**DEFENDANT CHRISTOPHER BRAGA'S CONSOLIDATED MOTION TO
DISMISS COUNT ONE OF THE SCHULTZ AND HARKUM COMPLAINTS
BASED ON QUALIFIED IMMUNITY AND MOTION TO STRIKE CERTAIN
PORTIONS OF THE COMPLAINTS PURSUANT TO RULE 12(F)**

Defendant Christopher Braga, by and through his attorneys, Andrew C. White and

Susan Q. Amiot of the Law Offices of Andrew C. White, LLC, moves this Court: (1)

pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, to dismiss the Count One

of the Complaints in the above-captioned cases based on the doctrine of qualified

immunity, and (2) pursuant to Rule 12(f), to strike certain portions of the Complaints.  In

support of this motion, Defendant Braga respectfully refers the Court to his

Memorandum of Points and Authorities filed simultaneously with this motion.

Respectfully Submitted,

_____/s/_____

Andrew C. White (Fed. Bar No. 08821)
Susan Q. Amiot (Fed. Bar No. 22457)
Law Offices of Andrew C. White, LLC
201 North Charles Street -- Suite 2600
Baltimore, MD 21202,
Attorneys for Defendant Christopher Braga

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| JOSEPH C. SCHULTZ, | * | |
| Plaintiff | * | |
| v. | * | |
| | | JFM-03-CV-00556 |
| CHRISTOPHER BRAGA, | * | |
| Et al., | * | |
| Defendants. | | |

       *     *     *     *     *     *     *     *     *

| | | |
|---|---|---|
| KRISTEN HARKUM, | * | |
| Plaintiff | * | |
| v. | * | |
| | | JFM-03-CV-00562 |
| CHRISTOPHER BRAGA, | * | |
| Et al., | * | |
| Defendants. | | |

    *     *     *     *     *     *     *     *     *

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT CHRISTOPHER BRAGA'S CONSOLIDATED MOTION TO
DISMISS COUNT ONE OF THE SCHULTZ AND HARKUM COMPLAINTS
BASED ON QUALIFIED IMMUNITY AND MOTION TO STRIKE CERTAIN
PORTIONS OF THE COMPLAINTS RULE 12(F)**

## I.    INTRODUCTION

Defendant Christopher Braga, by and through his attorneys, Andrew C. White and

Susan Q. Amiot of the Law Offices of Andrew C. White, LLC, respectfully submits this

Memorandum of Points and Authorities in support of his Consolidated Motion to Dismiss

Count One of the Schultz and Harkum Complaints Based on Qualified Immunity and Motion to Strike Certain Portions of the Complaints Pursuant to Rule 12(f).

These two lawsuits arise from a terrible and unfortunate chain of coincidences arising on March 1, 2002, from a manhunt by federal and state law enforcement officers for Michael Blottenberger, a known violent felon who had recently robbed an Allfirst bank branch in Pasadena, Maryland.   In the early evening hours of March 1, 2002, agents with the Federal Bureau of Investigation ("FBI") expected that Blottenberger, along with a female companion, would travel to a 7-11 store at the intersection of Maryland Route 648 and Marley Neck Boulevard in Glen Burnie to meet with an individual who, unbeknownst to Blottenberger, was providing information to the FBI.   Agents expected that Blottenberger would travel to the store by car to meet with the informant as part of a plan to leave Maryland following the armed bank robbery.   Agents were told that Blottenberger would likely be wearing a white baseball cap.

At approximately 5:30 p.m., FBI agents were conducting surveillance of the 7-11 when plaintiffs Schultz and Harkum drove into the 7-11 parking lot and parked next to the informant's truck.   Both Schultz and Harkum matched the general physical description of Blottenberger and his female companion, and Schultz was wearing a white baseball cap.   Schultz entered the 7-11 while the driver (Harkum) stayed in the car.   After Schultz left the store, he and Harkum drove off as agents watched from a distance.

Believing that the Schultz was Michael Blottenberger, and in accordance with instructions from supervising agents, the surveillance agents, including Special Agent Braga, followed Harkum's car, and eventually stopped it at the intersection of Marley Neck Boulevard and Fort Smallwood Road.   In the course of the stop, agents instructed

the occupants to show their hands.  Instead, Schultz reached for his left waist area to unbuckle his seat belt.  Believing that Schultz was reaching for a gun, Special Agent Braga – in a split-second decision -- fired a single shot for his and his fellow officers' safety.  The shot struck the car window and then a portion of the seat belt mechanism before hitting Schultz in the right cheek.

Schultz and Harkum have each brought an action under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), claiming that three of the numerous FBI Agents involved in the Blottenberger investigation that day -- Special Agents Lawrence S. Brosnan, Henry F. Hanburger, and Christopher Braga -- violated their Fourth Amendment rights.  The plaintiffs each seek identical damages in the amount of $10 million against each of these agents in their individual capacities.

The events of March 1, 2002 were a terrible and nearly catastrophic tragedy, and Special Agent Braga deeply regrets that the plaintiffs suffered injury.  As tragic as this incident was, however, the law entitles law enforcement agents like Special Agent Braga and his colleagues to the protection of qualified immunity from lawsuits such as these where actions undertaken in the line of duty are reasonable under the circumstances.  As the Fourth Circuit has noted, "[b]eing the subject of an armed felony stop at night by numerous law enforcement officers most certainly is 'terrifying,'" and persons put in such situations are "entitled to our empathy – and our sympathy," yet where "there is no evidence that the officers violated any clearly established rights," the officers are immune from suit.  *Taft v. Vines*, 70 F.3d 304, 320-21 (4th Cir. 1995).[1]

---

[1]      In *Taft*, a petition for a rehearing en banc regarding this decision was granted, and in an *en banc*, *per curiam* decision, the Fourth Circuit adopted Part II(A) of the panel decision concerning probable cause as well as Judge Diana Motz's dissent concerning excessive force.  *Taft v. Vines*, 83 F.3d 681, 684 (4th Cir.

3

At this preliminary stage, Special Agent Braga asks this Court to dismiss the plaintiffs' Complaints under Rule 12(b)(6) of the Federal Rules of Civil Procedure and the well-established doctrine of qualified immunity. The plaintiffs' allegations can be separated into five different theories as the bases for their claim that the three agents violated their Fourth Amendment rights:

(1)     the agents failed to follow FBI procedures in forming a proper Operations Plan for the arrest;

(2)      the agents set out to arrest a suspected bank robber with a "flawed" FBI communication system;

(3)     the agents lacked probable cause to stop Harkum's car in violation of the Fourth Amendment;

(4)     the arresting agents used excessive force when they "rushed" Harkum's car with their weapons drawn; and

(5)     Special Agent Braga used excessive force when he shot Schultz.[2]

Each of these claims should be dismissed as to Agent Braga.

As the plaintiffs are aware and acknowledge in their complaint, Special Agent Braga was simply a member of the arrest team in this case. He was not the case agent, nor did he create, play a role in, or have responsibility for, the Operations Plan created for the Blottenberger surveillance and arrest. Therefore, he cannot be held liable based on the plaintiffs' first theory.

As for the "flawed" communication system theory of liability, Special Agent Braga did not design or have responsibility for the FBI's radio system. It also cannot be said that as of March 1, 2002, there was a clearly established constitutional right to be

---

1996). All citations to the panel decision, 70 F.3d 304, in this Memorandum are to the portions that were adopted by the en banc decision.

[2]     The plaintiffs' complaints are identical in almost every respect, with the exception that Harkum does not claim physical injury, but only emotional injury.

free from investigation or seizure by FBI agents using a radio system that did not work

perfectly across all terrain.  Indeed, the Complaints recognize, as they must, that the FBI

had been using the same method of radio communication for over three years.  Use of an

imperfect communications system does not give rise to a new constitutional right to be

free from investigation or arrest by agents using that system.  Because there is not a

clearly established constitutional right not be investigated and/or arrested by agents using

a purportedly "flawed" radio system, the doctrine of qualified immunity protects the

agents in this case.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (officers are

protected from civil liability where their conduct does not violate "clearly established

statutory or constitutional rights of which a reasonable person would have known");

*Wilson v. Layne*, 526 U.S. 603 (1999) (affirming the Fourth Circuit's *en banc* ruling that

officers who brought members of the media into a home during an attempted execution of

an arrest warrant were entitled to the protections of qualified immunity because at that

time, there was no clearly established right to be free from seizures by officers

accompanied by the media).

   With respect to the plaintiffs' claim that the agents lacked probable cause for the

stop of Harkum's car, courts have repeatedly made clear that in cases where law

enforcement officers mistakenly, but reasonably, arrest the wrong individual, the officers

are entitled to qualified immunity.  *See Hill v. California*, 401 U.S. 797, 803 (1971);

*Thompson v. Prince William County*, 753 F.2d 363, 364-65 (4th Cir. 1985).  Where the

mistake includes discrepancies in physical descriptions, but the arrestee is nevertheless in

the same location at the same time the suspect is expected to be, courts have consistently

held that, as a matter of law, the officers' mistakes are reasonable and therefore immune

from suit.  *See, e.g., Taft v. Vines*, 83 F.3d 681 (4th Cir. 1996) (per curiam); *Hill*, 401 U.S. at 803 (1971)); *Mensh v. Dyer*, 956 F.2d 36 (4th Cir. 1992); *Thompson*, 753 F.2d at 364-65 (4th Cir. 1985); *Blackwell v. Barton*, 34 F.3d 298, 304 (5th Cir. 1994).  Furthermore, the drawing of weapons in effectuating an arrest of an individual thought to be armed, dangerous and a serious threat to law enforcement officers (as the bank robbery suspect in this case was, *see* Complaint at ¶ 26), is not a violation of the Fourth Amendment. *See Taft*, 70 F.3d at 320-21; *Mensh*, 956 F.2d at 38.

The plaintiffs' remaining theory against the agents is that Special Agent Braga used excessive force when he fired the single shot at Mr. Schultz.  A law enforcement officer does not automatically violate the Fourth Amendment when using deadly force. Instead, an officer is immune from suit in situations where he has "probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).  In this case, Agent Braga had probable cause to use deadly force against the man who he believed to be Michael Blottenberger. Moreover, both plaintiff Harkum and the plaintiffs' prior attorney admitted, in statements made to various media outlets in the immediate aftermath of this incident, that plaintiff Schultz was reaching for his waistband at the moment he was shot by Agent Braga. These public statements are irreconcilable with the current claim that Mr. Schultz was shot while his hands were in the air and this conflict in and of itself reveals that Agent Braga acted reasonably.

For these reasons, each of the claims against Special Agent Braga should be dismissed.[3]

_____

In the alternative, Agent Braga asks this Court, pursuant to Rule 12(f), to issue an Order striking certain impertinent terms and phrases, such as "whitewash" and "execution," from the Complaints because such terms and phrases are not only unnecessary to the plaintiffs' *Bivens* actions but also because they are intentionally inflammatory, scandalous, and highly prejudicial to Defendant Braga and the other FBI agents involved in this case. The Complaints are generally argumentative, conclusory, and based on several assumptions devoid of any basis in fact. They are also replete with inflammatory terms and phrases, and they spin a false and misleading historical tale about Defendant Braga -- all of which is designed solely to prejudice the Defendants.

## II.   STATEMENT OF FACTS[4]

On February 20, 2002, Ryan Grimes robbed the Allfirst Bank located at 8493 Fort Smallwood Road in Pasadena, Maryland, and Michael Blottenberger drove the getaway vehicle (a green Ford pick-up truck). Complaint at ¶ 19.[5] On February 26, 2002, Timothy King notified a local law enforcement officer that he knew who had committed the bank robbery. King and Blottenberger both worked for a painting contractor, and Blottenberger rented the basement of King's house. *Id*. at ¶ 20. On February 27, the FBI

---

[3]     It is important to note that dismissal of the Plaintiffs' cases will not leave Plaintiffs without any remedies. The Plaintiffs have not brought any suit against the FBI or the United States, which they could bring under the Federal Tort Claims Act. Such an option is still open to the Plaintiffs.

[4]     At this early stage of the litigation, in determining whether the Plaintiffs have stated a claim upon which relief can be granted, all well-pleaded allegations should be viewed in a light most favorable to the plaintiff. *See De Sole v. United States,* 947 F.2d 1169, 1171 (4th Cir.1991). Accordingly, this Statement of Facts focuses on the allegations in the Complaints. For simplicity, all references to "the Complaint" are to the paragraph numbers in Schultz's Complaint in Case No. JFM-03-CV-00556.

[5]     The man who robbed the bank was wearing a ski mask and brandishing what appeared to be a large, silver semiautomatic pistol. He ordered everyone in the bank to the floor and demanded money from two tellers, shouting "Give me your money … you've got ten seconds or I'll blow your [expletive] brains out." *See* Affidavit of Agent Brosnan prepared for the arrest warrant of Blottenberger and attached to the Operations Plan, at 1 (attached hereto as Ex. 2). Witness interviews indicated that the robber could have been Blottenberger. *Id*. at p. 4.

case agent assigned to this investigation, Special Agent Lawrence S. Brosnan, met with King, and the two kept in close contact with him over the next few days. *Id*. at ¶ 21. Special Agent Brosnan is assigned to the Annapolis Resident Agency of the FBI. *Id*. at ¶ 9.

In the early morning hours of March 1, 2002, King contacted Brosnan and advised that he (King) had told Blottenberger he could no longer live in his basement and that Blottenberger had left without taking any of his personal belongings. Agent Brosnan then went to King's basement and retrieved two "BB" guns that appeared to be those used in the bank robbery, based on the descriptions provided by witnesses and bank surveillance photographs. *Id*. at ¶ 21.

Late in the morning of March 1, King advised Brosnan that Blottenberger had told King that he planned to leave the area that day and move to North Carolina.. *Id*. at ¶ 22. Agent Brosnan and King agreed that King would arrange to meet with Blottenberger to give Blottenberger money and clothes before he left town, and the FBI agents planned arrest Blottenberger at that time. *Id*.

Soon after his late morning conversation with King on March 1, Agent Brosnan began to organize an arrest plan. The acting head of the Calverton Resident Agency (Special Agent George Layton) assigned Special Agents Christopher Braga, Bradlee Sheafe, Stephen Stowe, and Donald Kornek – all of the Calverton Resident Agency of the FBI -- to assist in the search for and arrest of Blottenberger. *Id*. at ¶ 24.[6]  Agent Braga

---

[6]     The Complaint alleges that Brosnan "specifically enlist[ed]" the assistance of Braga, who "solicited" the other three agents. Complaint at ¶ 23. While the Complaint is technically correct in this regard, it is important to note that SA Brosnan in an unrelated phone conversation initiated by SA Braga about a different investigation, asked SA Braga whether he was available that afternoon to assist in the Blottenberger case. In any event, the Complaint acknowledges that the proper "chain of command" within

has been with the FBI for approximately seven years and has been assigned to the Violent Crimes Squad.  Previously, Agent Braga had served on the FBI's SWAT Team.  *Id*. at ¶ 7.[7]

At about 4 p.m. on March 1, 2002, King informed Agent Brosnan that he had arranged the meeting and that it would take place at the 7-11 convenience store at the intersection of Maryland Route 648 and Marley Neck Boulevard.  *Id*.  at ¶ 32.  The agents, therefore, had only approximately four hours (from about noontime until 4 p.m.) to organize an arrest team to capture Blottenberger before he left town.  While Brosnan was out in the field keeping in close contact with King (*see id*. ¶ 31), Special Agent Eric Karandy, acting head of the Annapolis Resident Agency (Special Agent Brosnan's supervisor), followed FBI procedures and prepared an Operations Plan for the arrest.  *Id*. at ¶¶ 14-15, 25.  The Operations Plan prepared by Karandy included the FBI form required by the Special Agent in Charge (*see* Complaint at ¶ 15), which referred to an arrest warrant drafted by Agent Brosnan and Blottenberger's criminal history.  *See* Ex. 3 (the Operations Plan dated March 1, 2002).[8]

Special Agent Henry F. Hanburger, who was assigned to the Annapolis Office and who handled most of the bank robbery and violent crime cases in that area with Agent Brosnan, briefed the members of the arrest team.  Complaint at ¶¶ 8-9, 27-29. Agent Hanburger provided the agents copies of a 1998 arrest photograph of Blottenberger and gave them a physical description of the suspect and the cars he could be driving.

---

the FBI was followed, as the acting heads of the Annapolis and Calverton Resident Agencies each approved the assigning of these agents to the arrest team.  *Id*.  at ¶ 24.

[7]     Agent Braga is also a Marine Corps Infantry Officer and decorated veteran of the 1991 Gulf War, a husband, and father of three young children.

[8]     It is also important to note that the arrest warrant was reviewed and approved by an Assistant United States Attorney.

Based on information known to the FBI at that time, their suspect was a 33 year old white male, who was five feet, eleven inches tall, weighed approximately 185 pounds, and often wore a white baseball cap.  *Id*. at ¶¶ 26, 32.  The agents were aware of two cars that Blottenberger had previously been seen driving:  a gold/silver Ford Escort and a blue station wagon.  *Id*. at ¶ 26.  Hanburger also informed the agents that Blottenberger should be considered "armed and dangerous because he was a drug addict and was determined not to be sent back to jail."  *Id*. at ¶ 26.  Finally, Agent Hanburger instructed the agents that they should communicate with each other using a designated FBI radio channel as well as their government-issued Nextel wireless telephones.  *Id*.

At about 3:45 p.m. (*before* Agent Brosnan received word from King that he had established a time and location for the rendezvous with Blottenberger), Agent Karandy had finalized the Operations Plan, and faxed it to Agent Layton, who approved it.  *Id*. at ¶¶ 29, 32.  The Operations Plan designated Agent Brosnan as the agent in charge of the operation, and Hanburger as the alternate.  *Id*. at ¶ 28.

When King called Agent Brosnan at about 4 p.m. to advise him of the rendezvous location, he also advised that Blottenberger might be with his girlfriend, a white female named "Lisa" who was five feet, eleven inches tall and had red hair.  *Id*. at ¶ 32.[9]  King also advised that he did not know what Blottenberger would be wearing, except that he could be in a white baseball cap.  *Id*. at ¶ 32.  King did not provide any information regarding what type of car the couple would be driving.  Agent Brosnan relayed this information to Agent Hanburger.  *Id*. at ¶ 33.  Agent Brosnan also provided Agent

---

[9]     In actuality, King did not provide a height description of "Lisa" as 5'11".  Nevertheless, the height of the female driver is irrelevant, as Harkum never got out of the car.

Hanburger a description of King and stated that King would be in a green truck.   The agents on the arrest team thereafter took up surveillance posts near the 7-11.  *Id*. at ¶ 35.[10]

Shortly after 5:30 p.m.,[11] King drove his truck into the 7-11 parking lot.  As he was approaching the 7-11 from Route 648, he saw Blottenberger also approaching from Marley Neck Boulevard.  Blottenberger was in a red Honda Civic driven by his sister.  *Id*. at ¶ 37.  King tried to call Agent Brosnan from his cell phone, but found that his cell phone battery was now dead.  *Id*.   King ran into the 7-11, where there was an emergency telephone linked to the Anne Arundel County 911 operator.  *Id*. at 40.[12]  King explained to the 911 operator that he needed to get in touch with the FBI with a description of a suspect and the car in which he was riding. *Id*. at ¶ 48.  The 911 operator contacted two Anne Arundel County Detectives who were assisting the FBI arrest team that day, and according to the Complaint, "[w]hile King was still on the line, the 911 operator told the Detectives that Blottenberger was in his sister's car and that car was a red Honda Civic." The Complaint then alleges that the Detectives contacted Agent Hanburger on the County radio they had given to him, and "they passed along the message." *Id*. [13]

---

[10]  The Complaint implies there was some sort of error on the part of the agents for taking up surveillance posts away from the 7-11 parking lot.  Complaint at ¶ 35.   It is intuitive, however, that in order to conduct effective surveillance, without tipping off a suspect, agents necessarily need to be somewhat removed from the location.

[11]  Between the time of his conversation with Agent Brosnan at 4 p.m. and 5:30 p.m., King went to obtain a check from his employer and to the bank to cash it, all the while followed by Agent Brosnan. Complaint at ¶ 34.

[12]  The Complaint states that King "ran" into the 7-11 and "frantically" tried to call 911 after he pulled into the 7-11 shortly after 5:30 p.m.  The 911 tape and transcript, however, establish that King did not call 911 until 5:58 p.m., after he had waited for Blottenberger and had seen him drive by the 7-11 without stopping.  *See* Ex. 4 (Transcript of 911 call).

[13]  The Complaint fails to specify exactly what the County Detectives told Agent Hanburger.  The Anne Arundel County 911 and radio recordings reveal that just as the Detectives were trying to contact Hanburger, he was already on the radio to them stating that the agents were following a small red car:

    FBI 1 (Agent Hanburger): "we're looking for a female driver in a small red car"
    D125 (County Detective): *"[B]elieve* it's going to be a red Honda Civic male passenger,
              female driver."

In the meantime, and while the FBI arrest team was watching the 7-11 for a white male in a white hat in a car with a white female, the plaintiff, Joseph Schultz, and his girlfriend, Kristen Harkum drove into the 7-11 parking lot in a red Pontiac Grand Am and parked next to King's green truck. *Id*. at ¶¶ 41-42. Harkum, a white female, was driving the car, and Schultz, a white male, was in the front passenger seat, wearing a white baseball cap. *Id*. at ¶ 41. Schultz went inside the 7-11. Agents Sheafe and Braga (who were together in one surveillance car) as well as Agents Kornek and Stowe (in another surveillance car) all noticed Schultz, his girlfriend, and their car. The agents notified Hanburger and Brosnan of their observations. *Id*. at ¶ 43. At this point, therefore, according to the Complaint, FBI agents were faced with a situation where a couple matching the description of Michael Blottenberger and his female companion drove to the 7-11, and parked right next to the informant's truck. The male than left the car and entered the 7-11; the female companion did not enter the store and instead stayed in the car.[14]

Agents Braga, Sheafe, Stowe, Kornek, Brosnan, and Hanburger were all in communication at this point. *Id*. at ¶ 45-46. The Complaint alleges that another Agent,

---

*See* Transcript of police radio traffic (attached as Ex. 5). Contrary to the allegations in the Complaint that "Hanburger had just received word from King, as relayed the Anne Arundel County Detectives, that Blottenberger was riding around in a Honda and, therefore was not in the Pontiac that the FBI was following," *id*. at ¶ 50, Hanburger did not "know" that Blottenberger was not in the small red car that the FBI was following. Rather, the Detective's statement that he "believe[d]" it would be a red Honda Civic – also a small red car -- *corroborated* the agents' belief that they were following the suspect, as did the Detective's statement that there was a male passenger and female driver.

[14]      The Complaint argues that "[a]ny objectively reasonable FBI agent would have known that if [Schultz] had been Blottenberger, he would have exited the 7-11 together with King and that he would have remained in front of the 7-11 while King retrieved the duffel bag from his truck and handed it to him." Complaint at ¶ 44. It is intuitive, however, that any well-trained FBI agent, or any person who watches television, would believe that a bank robbery suspect would not walk out into the open to make such an exchange – especially one that suspected he was being watched. Additionally, this Court can also take notice of the obvious inference that a fugitive looking to get out of town would leave a driver waiting in a running vehicle in case the need arose to leave the scene quickly. This is *precisely* the situation that the agents faced in this case.

Special Agent Barry Mones, communicated messages among the agents.  Specifically, Brosnan, via Mones, communicated to Braga, Hanburger, and the rest of the arrest team that they did not know who was in the red car, but the agents should follow it.  *Id*. at ¶ 46. The agents followed Brosnan's instructions.  As Harkum's red car pulled out of the 7-11 parking lot, it turned east on Marley Neck Boulevard.  The agents followed.   Agents Kornek and Stowe followed behind Harkum's car as it traveled east on Marley Neck Road.  Agents Sheafe and Braga also began following Harkum's car, although they were initially slowed by traffic.  Behind Sheafe and Braga were two Anne Arundel County Detectives, followed by Hanburger.  *Id*. at ¶ 47.   Sheafe and Braga's car caught up with Kornek and Stowe's car at the intersection of Marley Neck Boulevard and Fort Smallwood Road.  Stowe used the FBI radio to advise Hanburger that the red car was approaching a red light (at the intersection of Marley Neck Boulevard and Fort Smallwood Road).  Stowe asked Hanburger if the agents should stop the red car; and Hanburger answered with instructions, according to the Complaint, to "take them down." *Id*. at ¶ 49.[15]

After stopping at the red light, Ms. Harkum turned right onto Fort Smallwood Road.  Complaint, ¶ 52.  Agents Kornek and Stowe, in the first car, pulled to the left and alongside of Ms. Harkum's car and signaled for her to stop.  *Id*.  As she pulled over, Agents Kornek and Stowe pulled ahead of her and stopped their car at an angle in front of Ms. Harkum's car.  *Id*.  Agents Sheafe and Braga, in the second car, stopped their car behind Ms. Harkum's car.  *Id*.

---

[15]     While the allegations in the complaint should be accepted as true at this juncture, in reality, when Harkum's car was stopped at the light at Fort Smallwood Road, Agent Stowe asked whether they should stop the car.  Agent Hanburger waited for a response from Agent Brosnan, and hearing none, instructed the agents to stop it if they thought they could.

Consistent with the information about Blottenburger's potential for violence, the agents approached Harkum and Schultz with their weapons drawn.  Special Agent Stowe ran to the front passenger side of Harkum's car, where Schultz was seated, Agent Kornek ran to the driver's side of the car.  Special Agent Braga ran to the passenger side, behind Agent Stowe and behind Schultz's passenger seat. *Id*. at ¶ 55.  The agents shouted at Harkum and Schultz to show their hands.  According to the Complaint, Agents Stowe and Braga pointed their weapons at Schultz, and Agent Kornek pointed his weapon at Harkum.[16]  Agents Stowe and Kornek tried to open the doors, but they were locked.  The complaint alleges that agents then shouted to Schultz and Harkum to unlock and/or open the doors. *Id*. at ¶¶ 56-57.  According to the Complaint, Schultz "kept his hands where the Agents could see them and moved both his hands to his right so that he could unlock the door." *Id*. at ¶ 58.[17]  At that moment, according to the Complaint, Agent Braga fired a single shot, which hit part of the vehicle before hitting Schultz in the face. *Id*.

Agent Braga immediately reached through the broken passenger window, unlocked the door, pulled Schultz from the vehicle, and handcuffed him.  Complaint at ¶ 59.[18]  The Complaint fails to mention that Agent Sheafe, who is a trained medic, administered first aid to Schultz until an ambulance and helicopter arrived to transport him to Maryland Shock Trauma.  It was not until King later arrived at the scene that the agents had any reason to know that the white male passenger in the car wearing the white baseball cap was not Michael Blottenberger. *Id*. at ¶ 63.  The Complaint concludes with

---

[16]     Here, the plaintiffs are slightly mistaken.  Only Agent Braga was watching Schultz.  In accordance with FBI training and procedures, Agent Stowe was watching the driver, Harkum.

[17]     As explained in Section III below, the Plaintiffs make these allegations after Ms. Harkum made contradictory statements in public immediately following the incident – i.e. that Schultz was reaching to unfasten his seat belt when he was shot.

[18]     Schultz's seat belt was still fastened.  Agent Braga was able to pull Schultz out of the car without unfastening the seat belt because in this particular car model, the seat belt was attached to the door.

allegations that after the shooting, four agents, including Agent Braga, were later seen laughing in a car.  *Id.* at ¶ 64.[19]

The Complaint is prefaced by several allegations about Agent Braga's history and asserts that he "has exhibited a startling propensity for shooting unarmed persons."  *Id*. at ¶ 10.  Yet this "propensity" arises from a *single* incident two years earlier.  According to the Complaint, on February 3, 2000, while Special Agent Braga was participating as a member of the FBI fugitive task force, he shot and killed a fugitive in Laurel, Maryland. *Id*.  The Complaint alleges that when members of the task force found the fugitive in a closet, an unnamed officer called out "Smoke him" and Braga and two other officers "let loose a hail of bullets aimed at the fugitive."  *Id*. at ¶ 11.  The Complaint argues that the "killing of the fugitive … was nothing less than an execution."  *Id*.  The Complaint further asserts that Agent Stowe (who was present in the house during this incident) made known his concern over the killing, and therefore Agents Brosnan and Hanburger became "fully familiar with … Braga's propensity for unreasonable use of deadly force."  *Id*. at ¶ 12.  The Complaint further alleges that the February 2000 shooting was "whitewashed" when a local law enforcement officer "claimed" to have found a shotgun in the fugitive's house after the shooting, and "on that pretext" the FBI Shooting Review Board determined it was justified.  *Id*.[20] The Complaint then alleges that the "whitewashing of the [February 2000] killing was reflective of an unfortunate and pernicious mindset,

---

[19]    The relevance of this observation is unclear.  The evidence will establish, however, that Agent Braga felt absolutely terrible about what happened, and that over an hour after the shooting, one of his fellow agents told a funny story about the agent's dog in an effort to provide momentary relief from the tense situation.

[20]    Notably, the Complaint acknowledges that the Shooting Review Board determined the use of deadly force in those circumstances was justified.  No matter what spin the Plaintiffs try to put on that incident, the fact remains that as far as the agents knew, including Agents Brosnan and Hanburger, the shooting was deemed justified and Agent Braga was not removed from his usual duties.

shared by the Defendants in this case, that no great harm attends a shooting by a law

enforcement officer when the victim of the shooting is a criminal." *Id.* Completely aside

from the fact that these statements are totally untrue, these inflammatory terms are

irrelevant to the plaintiff's *Bivens* claims and should be stricken from the Complaint. *See*

Section IV below.

### III.   THE DOCTRINE OF QUALIFIED IMMUNITY REQUIRES THAT THE COURT DISMISS ALL THE CLAIMS AGAINST AGENT BRAGA.

#### A.   Rule 12(b)(6) Provides that Claims Should Be Dismissed Where the Law Does Not Support the Conclusions Argued or the Facts Alleged Are Not Sufficient to Support the Claim Presented.

The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint.

*Talley v. Farrell*, 156 F. Supp. 2d 534, 539 (D. Md. 2001) (Blake, J.) (citing *District 28,*

*United Mine Workers of America, Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085 (4th

Cir. 1979)). In considering a motion to dismiss, a court is to accept as true all well-

pleaded allegations and should view the complaint in a light most favorable to the

plaintiff. *See De Sole v. United States,* 947 F.2d 1169, 1171 (4th Cir.1991); *Patton v.*

*Przybylski*, 822 F.2d 697, 698 (7th Cir. 1987) (On a Rule 12(b)(6) motion, the court must

"take as true the facts stated in the complaint; of course, this doesn't mean they are

true."). While the Court must recognize the complaint's factual allegations, the Court

may ignore the pleading's legal conclusions as well as unwarranted and baseless factual

conclusions. *Wellmore*, 609 F.2d at 1085. Where the plaintiff can prove no set of facts

that would entitle him to relief, a Rule 12(b)(6) motion to dismiss should be granted.

*Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1059 (D. Md. 1991).

Accordingly, "[a] complaint may be dismissed if the law does not support the conclusions

argued, or where the facts alleged are not sufficient to support the claim presented." *Id.*

**B.   The Doctrine of Qualified Immunity Requires that Claims Should Be Dismissed at the Earliest Possible Stage.**

To be successful in a *Bivens* claim, a plaintiff must prove a violation of a clearly established, specific constitutional right.  *Pritchett v. Alford*, 973 F.2d 312 (4th Cir. 1992) (plaintiff must specify the allegedly violated right); *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (right must be clearly established at the time of the incident).  A plaintiff must also overcome a claim of qualified immunity, which protects "'all but the plainly incompetent or those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

The purpose of qualified immunity is to ensure that government officials performing discretionary functions can "perform their duties free from the specter of endless and debilitating lawsuits."  *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991).  "[Q]ualified immunity is designed to shield officers not only from liability but from the burdens of litigation," and therefore its establishment at the earliest stage possible is encouraged. *Pritchett*, 973 F.2d at 313; *see also Hunter*, 502 U.S at 227 ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage on litigation.").  Without qualified immunity, there is a substantial risk that the fear of personal liability and harassing litigation will "unduly inhibit officials in the discharge of their duties."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  To this end, the determination of qualified immunity is not to be left to the jury because "the purpose of qualified immunity is to remove most civil liability actions, except those where the official clearly broke the law, from the legal process well in advance of the submission of facts to a jury."  *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991); *see also Hunter*, 502 U.S. at 228 (finding that the trial court incorrectly placed the question of

immunity in the hands of the jury, and stating "immunity ordinarily should be decided by the court long before trial.").

      **C.    Law Enforcement Officers Are Entitled to the Protections of Qualified Immunity Where Their Conduct Does Not Violate Clearly Established Constitutional Rights of Which a Reasonable Officer Would Have Known.**

      The defendants in this case are entitled to qualified immunity for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In *Pritchett*, the Fourth Circuit set forth a three-part test for determining whether qualified immunity will bar a suit.  To analyze the applicability of the defense, a trial court must:

    (1)    identify "the specific right allegedly violated";

    (2)    determine "whether at the time of the alleged violation that right was clearly established"; and

    (3)    if so, determine "whether a reasonable person in the officer's position would have known that doing what he did would violate that right.

973 F.2d at 312.

      In determining the specific constitutional right allegedly violated, courts must not simply examine the constitutional right at its most general or abstract level, but rather must "determin[e] the right at the level of its application to the specific conduct being challenged." *Taft v. Vines*, 70 F.3d 304, 310 (4th Cir. 1995) (citing *Pritchett*, 973 F.2d at 312).  Put another way, "[f]or the purpose of determining whether a defendant is entitled to qualified immunity, the plaintiff's rights *must be clearly established under the particular circumstances confronting the official at the time of the questioned action.*"

*Slattery*, 939 F.2d at 216 (emphasis added) (citing *Anderson*, 483 U.S. 635 (1987)).  The question is not whether an officer adhered to police procedures, but rather whether, "confronted with the facts of th[e] case, reasonable police officers should have known that clearly established constitutional law prohibited the methods used."  *Taft*, 83 F.3d at 684 (*en banc*).

As for the third prong, the determination of the reasonableness of the action taken "must be made on the basis of information actually possessed by the officer at the critical time, … or that was then reasonably available to him, … and *in light of any exigencies of time and circumstance* that reasonably may have affected the officer's perceptions."  *Pritchett*, 973 F.2d at 312 (citations omitted; emphasis added).  Whether a reasonable officer would have known that the alleged conduct (assuming the facts in the complaint as true) violated the right claimed by the plaintiff may be subject to determination by the court as a matter of law.  *Id.* at 313.

Thus, the qualified immunity inquiry "must be filtered through the lens of the officer's perception at the time of the incident in question."  *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994).  Importantly, this inquiry must not result in a "second-guessing" of the officer's actions "with the benefit of 20/20 hindsight."  *Id*. at 174.  "[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable or more reasonable interpretation of the events can be constructed five years after the fact."  *Hunter*, 502 U.S. at 228.  In this light, the doctrine accommodates for "reasonable error … because officials should not err always on the side of caution because they fear being sued."  *Id.*, at 229 (internal quotations and citation omitted).

**D.      The Doctrine of Qualified Immunity Protects Agent Braga for His
Conduct in the Line of Duty on March 1, 2002.**

In this case, even assuming the truth of the facts alleged in the complaints, the

plaintiffs have failed to state a claim upon which relief can be granted with respect to

each of their theories of recovery against Agent Braga.

### 1.    The Operations Plan.

The plaintiffs' Complaints acknowledge that Agent Braga did not prepare the

Operations Plan, nor was he responsible for briefing the arrest team on the arrest plan.

Therefore, to the extent the plaintiffs claim that they were subjected to an unreasonable

seizure based on the allegedly defective Operation Plan, that claim should be dismissed

as to Agent Braga.  Furthermore, claims that agents violated FBI procedures with respect

to the creation of the Operations Plan are irrelevant to whether qualified immunity

applies in a *Bivens* action.  *See Taft*, 83 F.3d at 684 (focus is not whether officers violated

police procedures but rather whether reasonable police officers in a particular case should

have known that clearly established constitutional law prohibited the methods used.)

### 2.    The Communications System.

Plaintiffs' allegations concerning the FBI radio communications system must fail

inasmuch as they simply allege that the radio system was "flawed."  In advancing this

novel theory of constitutional liability, plaintiffs have not alleged any specific failure of

the system that resulted in any specific constitutional violation.  Nor do they even allege

that there is a clearly established constitutional right to be investigated only by law

enforcement agencies with perfect communications systems.

The plaintiffs acknowledge, as they must, that that the FBI radio system had been

in place since April 1999, *see* Complaint at ¶ 18, and that the agents used Nextel phones

as an alternate means of communication.[21]  The plaintiffs do not allege or cite to even a single prior instance where a failure of the FBI communications system resulted in injury to anyone, nor do they identify any Fourth Circuit or Supreme Court case establishing that agents who work with a less-than-perfect radio system, violate the Fourth Amendment.  Therefore, even assuming the FBI communications system was "flawed," it cannot be said that in using it, the agents violated a "clearly established" right.

The Supreme Court has made clear that a novel interpretation or application of the Fourth Amendment cannot form the basis for recovery in a *Bivens* action.  In *Wilson v. Layne*, 526 U.S. 603 (1999), a team of U.S. Marshals and local officers allowed members of the media to accompany them when they executed an arrest warrant at the suspect's home.  *Id*. at 607-08.  The Court found that the officers violated the Fourth Amendment by bringing unnecessary third parties to execute the warrant.  *Id*. at 614.  The Court, however, also found that the officers were entitled to the protection of qualified immunity, explaining  -- as it had in *Anderson* -- that the "right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."  *Id*. at 615 (citing  *Anderson*, 483 U.S. at 681).  The Court noted that media "ride-alongs" had become fairly common practice, and at the time of the incident, there "were no judicial opinions holding that this practice became unlawful when [third parties] entered a home."  *Id*. at 616.  Also important to the Court's conclusion was the fact that the U.S. Marshals Service and the local Sheriff's Office had "ride-along" policies that did not expressly prohibit the media from entering a home.  *Id*. at 617.  The Court concluded that "the state of the law … was at best undeveloped, and it was not

---

[21]     With this acknowledgement, this Court can certainly take notice of the fact that the Baltimore Division of the FBI has made hundreds, if not thousands, of arrests over this period using this very same communications system.

unreasonable for law enforcement officers to look and rely on their formal ride-along policies." *Id*.

The same reasoning applies here.  Even assuming that the FBI communications system was "flawed," *and* even assuming that this Court finds that the use of such a system equates to a *per se* constitutional violation*,* the Agents cannot be held liable in this case because such a right was not clearly established at the time of this unfortunate incident.  Similar to the ride-along policies in *Wilson*, here, the Baltimore Division of the FBI had been operating with the same radio system since at least 1999.  As a matter of law, it was not unreasonable for the agents to rely on a prior practice used by the entire Baltimore Division of the FBI, especially where no Fourth Circuit or Supreme Court decision has addressed this issue.  *See Wilson v. Layne*, 141 F.3d 111 (4th 1998) ("The law is clearly established such that an officer's conduct transgresses a bright line, for purposes of qualified immunity, when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state."), *aff'd,* 526 U.S. 603.  Therefore, to the plaintiffs' claims regarding the communications system should be dismissed.

### 3.   Mistaken Identity.

The plaintiffs next claim that Agent Braga violated their constitutional rights because the FBI stopped the wrong car.  The law is well settled, however, that "the qualified immunity doctrine protects police officers that mistakenly make an arrest, so long as that arrest is supported by probable cause."  *Taft*, 70 F.3d at 310; *see also Graham v. Connor*, 490 U.S 386, 396 (1989) (an arrest based on probable cause does not violate the fourth amendment, even if the wrong person is arrested).

In this case, the plaintiffs do not assert that the agents did not have probable cause to arrest Michael Blottenberger. They claim instead that the agents did not have probable cause to stop Harkum's car under the circumstances. This claim ignores the fact that the agents had probable cause to believe Michael Blottenberger was the white male, wearing the white baseball cap who, with a female companion, drove to the 7-11 in a car that parked next to the truck of a confidential informant, at the time the expected rendezvous was to occur. As a matter of law, the agents had such probable cause and cannot be held liable for their reasonable mistake.

The Fourth Circuit has consistently ruled that qualified immunity protects officers in cases involving mistaken identity. *See, e.g., Mensh v. Dyer*, 956 F.2d 36 (4th Cir. 1992); *Thompson v. Prince William County*, 753 F.2d 363, 364-65 (4th Cir. 1985). "[I]t is precisely in such a case of genuinely mistaken identity that the doctrine of qualified immunity is designed to protect police officers from civil liability." *Taft*, 70 F.3d at 312.

In *Taft*, local police officers stopped a vehicle driven by a female and which was carrying four children on an order from police headquarters. This order was based solely on the fact the car had just left a mobile home park where James Wooten resided, and Wooten was believed to have just committed a murder. *Id.* at 308. As in the present case, the police officers in *Taft* ordered the occupants out of Ms. Taft's car at gunpoint. *Id.* at 308-09.

The district court granted summary judgment in favor of the officers on the basis of qualified immunity. A panel of the Fourth Circuit affirmed that decision as to the claim that the officers lacked probable cause to stop the car. Judges Murnaghan and Young ruled that the district court erred in granting qualified immunity as to the

excessive force claims, and Judge Diana Motz dissented on that point.  The Fourth Circuit thereafter granted a petition for a rehearing *en banc* and in a *per curiam* opinion (1) adopted the panel's decision (relating to qualified immunity on the officers' decision to stop the car) and (2) ruled that the officers were entitled to qualified immunity as to the excessive force claims, adopting Judge Motz's dissent in the panel decision on that issue. *Taft*, 83 F.3d 681, 684 (4th Cir. 1996).

In ruling that the stop of Ms. Taft's car was protected by qualified immunity, the Fourth Circuit held that "the law is well settled that a vehicular stop is justified where the police officers have a reasonable suspicion of criminal activity based on articulable facts. 70 F.3d at 311 (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977); *Terry v. Ohio*, 392 U.S. 1 (1968)).  The court ruled that this standard "was certainly" met because the officers' decision to stop the car was based "expressly on an order from police headquarters" and that order was given "because it was believed that the car was carrying the suspected murderer, Wooten." *Id*.  The court also noted "the exigencies of the circumstances compelled [the officers] to act immediately before the car could get away." *Id*. at 312.  Thus, the court concluded, "a reasonable officer in those circumstances would have certainly felt justified in stopping the car on such information." *Id*.

In the present case, Agents Braga, Stowe, Sheafe and Kornek received an order from Agent Hanburger to stop the plaintiffs' car and all involved believed that the car contained Michael Blottenberger.[22]  More importantly, the agents in the present case had information beyond simply the "place and time" information affirmed as sufficient in *Taft*.  The agents in this case stopped Ms. Harkum's car at gunpoint based on location,

---

[22]        *See Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987) (exigent circumstances exist where a violent suspect is in a car).

time, *and* the fact that the occupants met the general descriptions of Michael

Blottenberger and his female companion.  Thus, under *Taft,* the agents are entitled to

qualified immunity with respect to the decision to stop Ms. Harkum's car, and approach

the car with their weapons drawn.  *See also Mensh*, 956 F.2d at 38 (finding qualified

immunity where the officers arrested the wrong individual in his home at gunpoint).

This conclusion is supported by a plethora of cases from the Supreme Court, the

Fourth Circuit and other circuits holding that mistakes as to identity will not remove the

cloak of qualified immunity from police officers acting reasonably within the line of

duty.  *See, e.g., Hill v. California*, 401 U.S. 797, 803 (1971)(discrepancies in weight and

height did not invalidate mistaken arrest of wrong individual); *Thompson v. Prince*

*William County*, 753 F.2d 363, 364-65 (4th Cir. 1985)(ruling that details which with

hindsight might have alerted police that the arrestee might not be the person sought will

not invalidate arrest, and stating that "it simply demands too much to expect police

officers, on the basis of slight discrepancies … to abandon obtention or execution of a

warrant on someone who, for other strong indications … meets the warrant's

description."); *Mensh v. Dyer*, 956 F.2d 36 (4th Cir. 1992) (officers entitled to qualified

immunity where they mistakenly arrested an individual on a warrant in his home at

gunpoint, despite using a poor copy of a photograph, the wrong address, birth date, and

social security number); *Rodriguez v. Farrell*, 280 F.3d 1341, 1349 (11th Cir. 2002), *cert.*

*denied,* 123 S.Ct. 1482 (2003)(qualified immunity protects officers making a mistaken

arrest where the targeted individual used the plaintiff's name as a past alias and despite

physical discrepancies between the two);  *Young v. City of Little Rock*, 249 F.3d 730 (8th

Cir. 2001) (ruling that trial court should have granted qualified immunity where one

officer realized that the wrong woman had been arrested by looking at a photograph attached to an arrest warrant, and the officers nevertheless detained arrestee over the weekend), *cert. denied* 534 U.S. 1129 (2002); *Blackwell v. Barton*, 34 F.3d 298, 304 (5th Cir. 1994) (qualified immunity granted where the suspect and arrestee were of "same height and weight, sex, race, age, nickname," but had different eye color, and the arrestee was present at the location where the suspect was expected to be found); *Patton*, 822 F.2d at 699-700 (7th Cir. 1987) (ruling that the defendant officer was entitled to qualified immunity even though only the name, race, and year of birth of person arrested during a traffic stop matched person named in arrest warrant, and the address and birth date, which were provided to the officer but he failed to notice them, differed); *Gero v. Henault*, 740 F.2d 78 (1st Cir. 1984) (qualified immunity granted where officers who had seen photographs of suspect arrested the wrong man and where officers failed to check for scars that suspect had but arrestee did not); *Debellis v. Kulp*, 166 F.Supp. 2d. 255, 269 (E.D. Pa. 2001)  (even where officers had only a "bare" description of runaway teenager – that she was between 5'4" and 5'7" and up to 145 pounds -- they were entitled to qualified immunity where the teenager they mistakenly arrested was 5'2" or 5'3" and 90 pounds, but was in the same geographic location where the runaway teenager had been reported as seen).

The law therefore recognizes that not every investigation, nor every arrest, is perfect.  Indeed, in this case, the Agents were tragically mistaken in their belief that Schultz was Blottenberger and that Harkum was his girlfriend.  Under the circumstances, however, 20-20 hindsight and the observations of talented attorneys will not transform an

honest mistake in the search for a violent felon into a viable *Bivens* action upon which relief can be granted.

As one court has explained, "[f]ederal qualified immunity recognizes that police work is difficult, that the investigation of crimes requires exercise of judgments that should not ordinarily be second-guessed, that an investigating officer must make educated guesses about investigative leads that may turn out to be blind alleys or completely erroneous, and that the investigative law enforcement officer should not be chilled in taking aggressive lawful action to attempt to solve crimes, even if mistakes are made." *Morales v. Busbee*, 972 F.Supp. 254, 262 (D.N.J. 1997) (citing *Maltby v. Winston,* 36 F.3d 548, 555-58 (7th Cir.1994); *Simkunas v. Tardi,* 930 F.2d 1287, 1291-92 (7th Cir.1991)).

### 4.  Excessive Force.

The plaintiffs' remaining claim against Agent Braga is that he violated their Fourth Amendment rights by firing a single shot, which resulted in injury to plaintiff Schultz's right cheek.   According to the Complaints, Schultz was shot as his hands were in the air and he was reaching to unlock his door in accordance with agents' commands. Complaint at ¶ 60.  Clearly the linchpin of the plaintiffs' argument is the claim that Schultz's hands were in view of all agents at the time the shot was fired. This claim stands in direct and irreconcilable contradiction however, to statements made by both plaintiff Harkum and the plaintiffs' prior attorney, Joseph Asensio, in the immediate aftermath of the shooting.  Specifically, Ms. Harkum told a television news reporter in a live interview that Mr. Schultz was reaching to unfasten his seat belt when he was shot.  Likewise, Attorney Asensio also told reporters for the Baltimore Sun and

the Annapolis Capital on March 4, 2002, that Schultz was shot as he reached for his seat belt. He added that he had previously spoken with Schultz, who was "conscious and able to communicate." *See* FBI fired As Victim Unbuckled, Lawyer Says," *Baltimore Sun*, March 5, 2002; "Attorney: Man Shot by FBI Reaching for Seat Belt," The Capital (Annapolis), March 5, 2002 ; "FBI Apologizes for Mistaken Shooting in Md.," *Washington Post*, March 7, 2002 (referencing Harkum's interview with WBFF Channel 45 in which she states that Schultz was reaching for his seat belt when shot); "Tragic Coincidences in Shooting, FBI Says," *Baltimore Sun*, March 8, 2002. (All four articles are attached hereto as Ex. 1).

These public pronouncements are in direct contradiction to the assertions now made by the plaintiffs in the pending complaint, and we respectfully submit that they render the new claims unreliable. More importantly, at this stage, the prior statements establish that the plaintiffs cannot clear the hurdle of qualified immunity as a matter of law. As the Fourth Circuit made clear in Slattery *v. Rizzo*, 939 F.2d 213 (4th Cir. 1991):

> If a reasonable officer *could have found* probable cause to believe that [the plaintiff] presented a serious threat of personal harm at the time that [the officer] pulled the trigger, then *as a matter of law*, the [officer] is entitled to qualified immunity.

*Id*. at 216 (emphases added); *see also McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) ("Regardless of whether probable cause actually existed, if a reasonable officer possessing the same particularized information as [the officer] *could* have … believed that his conduct was lawful, then [the officer] is entitled to qualified immunity.")

In this case, Ms. Harkum, who was seated with inches of Mr. Schultz, previously observed that he was reaching for his seatbelt when he was shot. If plaintiff Harkum

previously thought that Mr. Schultz was reaching for his waist area at that time, it cannot be said that Agent Braga was not, or could not have been, confronted with the same actions prior to firing his weapon at Mr. Schultz.  Given these contradictory statements, the plaintiffs simply cannot prove that Agent Braga's conduct was objectively unreasonable, and this claim should be dismissed .[23]

## IV.   THE COURT SHOULD STRIKE THE MANY INFLAMMATORY AND SCANDALOUS ALLEGATIONS IN THE COMPLAINT BECAUSE THEY ARE IRRELEVANT, UNNECESSARY, AND DESIGNED TO PREJUDICE THE DEFENDANTS.

Pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, a court may strike from any pleading, including a complaint, "any redundant, immaterial, impertinent, or scandalous matter."  A district court has "considerable discretion," in granting a motion to strike matter that is "both immaterial and prejudicial."  *See Alvarado-Morales v. Digital Equipment Corp.,* 843 F.2d 613, 618 (1st Cir. 1988); *Hare v. Family Publications Service, Inc.*, 342 F. Supp. 678, 685 (D. Md. 1972) (Miller, J.); *see also Talbot v. Robert Matthews Distributing Co.*, 961 F.2d 654, 665 (7th Cir. 1992) (district court did not abuse its discretion in granting motion to strike); *In re "Agent Orange" Product Liability Litigation*, 475 F. Supp. 928, 936 (E.D. N.Y.  1979) (noting district court's discretion to strike material from the complaint).

The complaints in this case include several terms and allegations that are irrelevant to the events of March 1, 2002 and are designed solely to prejudice the defendants.  In particular, the complaints include an entire section describing an incident that occurred on February 3, 2000 involving Agent Braga.  On that date, Agent Braga

---

[23]    Question of the objective reasonableness of the officer's conduct, the second part of the multi-part inquiry for qualified immunity, is for the Court to decide, not the jury. *Park v. Shifflett*, 250 F.3d 843, 853 (4th Cir. .2001).

was a member of multi-agent arrest team that was searching for a dangerous fugitive.  In the course of attempting to apprehend the fugitive, the suspect was shot and killed after refusing to comply with orders and appeared to be reaching for a weapon.

In an attempt to link that incident to the matter involved in these complaints, the plaintiffs have revised history and make absurd and scandalous allegations.  Instead of recognizing that the prior incident was completely investigated by the FBI and found to be a justified shooting, the plaintiffs now baldly claim that the shooting was covered up and that the investigation resulted in a "whitewash."  They go on to reach the unsubstantiated conclusion that, given this "whitewash," Agents Brosnan and Hanburger were "fully familiar with Braga's conduct in the killing of the fugitive and of Braga's propensity for unreasonable use of deadly force" (¶ 12)).  This entire section of the Complaint (paragraphs 10-13) should be stricken as conclusory, irrelevant, and inflammatory.  Case law supports this proposition.

In *Talbot v. Robert Matthews Distributing Co.*, 961 F.2d 654 (7th Cir. 1992), the district court struck a statement in a complaint that the defendants had intentionally caused a salmonella outbreak at a dairy farm or allowed it to continue in order to consummate a fraudulent scheme against the plaintiffs.  *Id*. at 664.  The Seventh Circuit affirmed the district court's decision to strike this language under Rule 12(f), noting that "[a]llegations may be stricken as scandalous if the matter bears no possible relation to the controversy or may cause the objecting party prejudice."  *Id*.  The district court had found that the allegations "were devoid of any factual basis" and were based upon a "rumor from [an] employee," and the court of appeals found that the lower court "did not abuse its discretion in striking the paragraphs as scandalous."  *Id*. at 665.

30

Similarly, here, the allegations concerning the February 2000 incident and its alleged "whitewash" are devoid of any factual basis, based on rumor, and are in the end, irrelevant. Maintaining these baseless allegations in the Complaint will result in inefficient and needless discovery on an issue that is unrelated to this plaintiff's *Bivens* claim, and ultimately require a mini-trial on an unnecessary issue.[24]   Therefore, paragraphs 10 through 13 of the Complaint should be stricken.

In the alternative, the Court should strike the following specific allegations:

·   That Agent Braga has exhibited a "startling propensity for shooting unarmed persons" (¶ 10);

·   That in the February 2000 incident, an unnamed officer shouted "Smoke him" and that Agent Braga and others (unnamed) "let loose a hail of bullets" (¶ 11);

·   That the February 2000 shooting was "nothing less than an execution" (¶ 11) (*see also* ¶ 12, alleging the fugitive was "executed");

·   That the Shooting Review Board "whitewashed" the incident (¶13); and

·   That "[t]he whitewashing of the killing was reflective of an unfortunate and pernicious mindset … that no great harm attends a shooting by a law enforcement officer when the victim of the shooting is a criminal." (¶ 13).

Other courts have exercised discretion and struck inflammatory terms similar to "whitewashing" and "execution."  *See, e.g.,* Bureerong *v. Uvawas,* 922 F. Supp. 1450 (C.D. Ca. 1996) (striking the term "slave sweatshop" from a complaint as immaterial,

---

[24]      *See also Fisher v. Goord*, 981 F. Supp. 140, 178 (W.D. N.Y. 1997) (striking the complaint in its entirety because it was "rambling, 'scatter shot' …and, at times, read[] more like a cheap dime store novel or a script for a tabloid television show than a pleading in a federal lawsuit" and because "it contain[ed] numerous false, misleading, irrelevant, highly inflammatory and prejudicial statements and allegations"); *Carone v. Whalen*, 121 F.R.D. 231, 233-34 (M.D. Penn. 1988) (striking complaint in its entirety because it was "vexatious in nature," fell squarely "with[in] the definition of 'immaterial, impertinent, and scandalous matter,'" and evidenced the plaintiff's "vengeful and vindictive temperament"); *Martin v. Hunt*, 28 F.R.D. 35, 35-36 (D. Mass. 1961) (striking the complaint in its entirety because it contained matters of an "evidentiary nature," and was argumentative, redundant and verbose, and contain[ed] certain material which is both impertinent and scandalous.").

scandalous, and highly prejudicial notwithstanding that several defendants in that case

had pleaded guilty to criminal slavery charges); *Hughes v. Kaiser Jeep Corp.*, 40 F.R.D.

89 (D. S.C. 1966)(striking the term "deathtrap" in an automobile products liability case

as being unnecessary, argumentative and prejudicial); *Alvarado-Morales v. Digital

Equipment Corp.,* 843 F.2d 613 (1st Cir. 1988)(affirming district court's decision to strike

as superfluous the terms "concentration camp," "tortured," and "brainwashed as well as

the allegation that the defendants should be compared to "Chinese communists in

Korea").

Defendant Braga asks that the Court also strike the following statements

contained in the complaint:

- That the March 1, 2002 incident was the "greatest nightmare of a free and just society" (¶ 1);

- That "[t]he defendants must be taught that official misconduct in violation of the Constitution, and indifference to the consequences of that misconduct, will not be tolerated" (¶ 2); and

- That "[i]f it had not been for the fortuitous circumstance [of the bullet hitting the window and seat belt], … Braga would probably have blown off Plaintiff Schultz's head" (¶ 58).

Much like the statements discussed previously, these argumentative statements are

inflammatory, superfluous, and are not substantive elements of the cause of action or

necessary to the complaints. As such, they should be stricken pursuant to Rule 12(f).

## V.   CONCLUSION

Agent Christopher Braga respectfully requests the Court to dismiss Count One of

the plaintiffs' Complaints pursuant to Rule 12(b)(6) and the doctrine of qualified

immunity. In the alternative, the Court should strike paragraphs 10 through 13 and the

other allegations listed above in Section IV above pursuant to Rule 12(f).

The original signature page will be maintained by undersigned counsel.

Respectfully submitted,


_____/S/_____
Andrew C. White
Federal Bar No. 08821


_____/S/_____
Susan Q. Amiot
Federal Bar No. 22457

Law Offices of Andrew C. White, LLC
201 North Charles Street
Suite 2600
Baltimore, MD 21201
(410) 576-2200
*Attorneys for Defendant Braga*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this _____ day of _____, 2003, I sent a copy of the foregoing pleadings via First Class U.S. Mail, postage prepaid, to:

Arnold M. Weiner
Robert J. Weltchek
Barry L. Gogel
Wiener & Weltchek
2330 West Joppa Road
Lutherville, Maryland  21093

*Attorneys for Plaintiff Schultz*

Steven A. Allen
Hodes, Ulman, Pessin & Katz, PA
Suite 400
901 Dulaney Valley Road
Towson, MD 21204

*Attorneys for Plaintiff Harkum*

_____/s/_____
Susan Q. Amiot

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

JOSEPH C. SCHULTZ,                              *

    Plaintiff                              *

    v.                                          *
                               JFM-03-CV-00556
CHRISTOPHER BRAGA,                              *
    Et al.,
                                       *

    Defendants.

         *    *    *    *    *    *    *    *    *

KRISTEN HARKUM,                                 *

    Plaintiff                              *

    v.                                          *
                                JFM-03-CV-00562
CHRISTOPHER BRAGA,                              *
    Et al.,
                                       *

    Defendants.

        *    *    *    *    *    *    *    *    *

## <u>ORDER</u>

Upon motion of Defendant Christopher Braga to dismiss the Complaints pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure in the cases captioned above, and having considered any opposition thereto, the court hereby determines that it will grant Defendant Braga's Motion.

THEREFORE, it is hereby ORDERED that:

1. The Complaint in Case Number JFM-03-CV-0056 is hereby dismissed with prejudice;

2.   The Complaint in Case Number JFM-03-CV-0562 is hereby dismissed with

prejudice;

3.  Defendant Braga's Motion to Strike pursuant to Rule 12(f) is hereby denied as

moot; and

4.   The Clerk of the Court shall send copies of this Order to all counsel of record.


_____
J. FREDERICK MOTZ
United States District Judge