IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JOSEPH C. SCHULTZ                              *

        Plaintiff,                               *

   v.                                                      *

CHRISTOPHER BRAGA, *et al.*                    *

        Defendants.                           *          Case No.: JFM-03-CV-556

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X          Case No.: JFM-03-CV-562
                                                                    **(CONSOLIDATED FOR**
KRISTEN M. HARKUM                              *          **MOTIONS, DISCOVERY**
                                                                    **AND TRIAL)**
        Plaintiff,                               *

   v.                                                      *

CHRISTOPHER BRAGA, *et al.*                    *

        Defendants.                           *

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**KRISTEN M. HARKUM'S CONSOLIDATED MEMORANDUM
IN OPPOSITION TO THE MOTIONS TO DISMISS AND STRIKE
FILED BY DEFENDANTS BRAGA, HANBURGER AND BROSNAN**

Steven A. Allen, #00607
Robert S. Campbell, #25731
HODES, ULMAN, PESSIN & KATZ, P.A.
901 Dulaney Valley Road
Suite 400
Towson, Maryland  21204
(410) 339-6769
(410) 825-2493 (Facsimile)

*Attorneys for Plaintiff,*
*Kristen M. Harkum*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .......................................................................... ii

TABLE OF CITATIONS AND AUTHORITIES ................................. iv

INTRODUCTION ................................................................................1

THE FACTS ALLEGED IN THE COMPLAINT...................................3

    A.      Background ...........................................................................3
    B.      The February 2002 Bank Robbery.....................................4
    C.      Brosnan's Selection of Braga As His First
          Choice for the Arrest Team.................................................6
    D.      Brosnan and Hanburger's Failure to Follow
          FBI Policies and Procedures Governing the
          Planning and Execution of Arrests That May
          Entail the Use of Force .......................................................6

          1.      FBI Policies and Procedures –
                 Operations Plans and Limitations
                 On The Use of Dynamic Vehicle
                 Stops With Forcible Extraction..........................6
          2.      Brosnan and Hanburger's Deliberate
                 Failure to Follow FBI Policies and
                 Procedures..........................................................8

    E.      The Wait for Word From King ........................................11
    F.      The Surveillance At The 7-11 Store .................................12
    G.      The Absence of Probable Cause ......................................13
    H.      Hanburger's Specific Instructions to
          Seize the Grand Am and Its Occupants,
          Notwithstanding the Receipt of Specific
          Information That Blottenberger Was in a
          Different Vehicle ..............................................................15
    I.      The Interception and Storming of the Pontiac ................17
    J.      Braga's Unwarranted Use of Deadly Force
          In Firing His Assault Rifle At The Vehicle ....................18
    K.      Defendants' Post Shooting Demonstration
          Of Their Callous Indifference to
          Plaintiffs' Rights .............................................................20
    L.      Kristen Harkum's Injuries...............................................21
    M.      The Counts of the Complaint...........................................22

RULE 12(b)(6) STANDARD .............................................................................23

DEFENDANTS ARE NOT ENTITLED TO THE
PROTECTION OF FEDERAL QUALIFIED IMMUNITY
UNDER THE FACTS OF THIS CASE ................................................................24

SEIZURES UNDER THE FOURTH AMENDMENT .........................................26

THERE WAS NO PROBABLE CAUSE TO JUSTIFY
THE AGENTS' SEIZURE AND ARREST OF KRISTEN ..................................27

EXCESSIVE FORCE UNDER THE FOURTH AMENDMENT ........................32

DEFENDANTS ARE NOT ENTITLED TO DISMISSAL
OF KRISTEN HARKUM'S COMPLAINT ..........................................................33

SUPERVISORY LIABILITY UNDER *BIVENS* ..................................................37

    A.    Hanburger's Unwarranted Order
            To Seize  The Pontiac Grand Am ...................................................39
    B.    Hanburger and Brosnan Are Also Liable
            For the Reckless and Indifferent Manner
            in Which They Supervised The Acts Which
            Resulted in the Violations of Kristen
            Harkum's Constitutional Rights ....................................................40

DEFENDANT BRAGA'S MOTION TO STRIKE
SHOULD BE DENIED .......................................................................................43

CONCLUSION...................................................................................................46

## TABLE OF CITATIONS AND AUTHORITIES

**CASES**                                                                    **PAGE**

*All American Insurance Co. v. Broeren Russo Construction, Inc.*
112 F. Supp. 2d 723, 729 (C.D. Ill. 2000) ............................................................43

*Avery v. County of Burke*
660 F.2d 111, 114 (4th Cir. 1981) ........................................................................38

*Beck v. Ohio*
379 U.S. 89, 91 (1964)..........................................................................................28

*BeVier v. Hucal*
806 F2d 123, 128 (7th Cir. 1986) .........................................................................30

*Bivens v. Six Unknown Named Agents*
403 U.S. 388 (1971)..................................................................................2, 26, 46

*Brower v. County of Inyo*
489 U.S. 593, 596-97 (1989) ................................................................................27

*California v. Hodari D.*
499 U.S. 621, 627-28 (1991) ................................................................................26

*Celotex Corp. v. Catrett,*
477 U.S. 317, 322 (1986).......................................................................................24

*Clem v. Corbeau*
284 F.3d 543, 549 (4th Cir. 2002) ..................................................................25, 33

*Coates v. Daugherty*
973 F.2d 290, 293-94 (4th Cir. 1992) ...................................................................34

*Comet Enterprises Ltd. v. Air-A-Plane Corp.*
128 F.3d 855, 860 (4th Cir. 1997) ........................................................................23

*Conley v. Gibson*
355 U.S. 41, 45-46 (1957) ....................................................................................23

*Correctional Services v. Malesko*
534 U.S. 61, 70 (2001)............................................................................................2

*DeVentura v. Keith*
169 F. Supp. 2d 390, 395 (D. Md. 2001) ..............................................................37

*Edwards v. City of Goldsboro*
178 F.3d 231, 243-44 (4th Cir. 1999) ..................................................................23

*Figg v. Schroeder*
312 F.3d 625, 635 (4th Cir. 2002) ..................................................................26, 28

*Gary-Hopkins v. Prince George's County*
309 F.3d 224, 230 (4th Cir. 2002) ..................................................................33, 34

*Goehring v. United States*
870 F. Supp. 106 (D. Md. 1994) *appeal dismissed,*
96 F.3d 1438. 1996 WL 511429 (4th Cir. 1996) ....................................34, 35, 36

*Gomez v. Toledo*
446 U.S. 635, 640-41 (1980) .............................................................................25

*Graham v. Connor*
490 U.S. 386, 395 n.10 (1989)...............................................................26, 32, 33

*Hill v. California*
401 U.S. 797, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971)....................................31, 32

*Ibarra v. United States*
120 F.3d 472, 473 (4th Cir. 1997) .......................................................................23

*Johnson v. Sullivan*
764 F. Supp. 1053 1055-56 (D.Md. 1991).............................................................24

*Jones v. Buchanan*
325 F.3d 520, 523 (4th Cir. 2003) ..................................................................25, 34

*Kane v. Hargis*
987 F.2d 1005, 1008 (4th Cir. 1993) ....................................................................34

*Kebe v. Brown*
161 F. Supp. 2d 634, 639 (D. Md. 2001) ..............................................................27

*Lewis v. Boucher*
35 Fed. Appx. 64, 2002 WL 939556 (4th Cir. May 9, 2002) ................................34

*Lynn v. O'Leary*
____ F. Supp. 2d ____, 2003 WL 21251977 (D.Md. May 8, 2003) ....................36

*Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police*
72 F. Supp. 2d 560, 569 (D. Md. 1999).................................................................44

*Michigan v. De Fillippo*
443 U.S. 31, 37 (1979)..............................................................................28

*Milstead v. Kibler*
243 F.3d 157, 161 (4th Cir.), *cert. denied*, 534 U.S. 888 (2001)...........26

*Miltier v. Beorn*
896 F.2d 848, 851 (4th Cir. 1990) ..........................................................39

*Morton v. Town of Wagram*
2001 WL 68232 (M.D.N.C Jan. 19, 2001) ..............................................45

*National Credit Union Admin. v. First Union Capital Markets Corp.*
189 F.R.D. 158, 162 (D. Md. 1999).........................................................43

*North Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*
200 F. Supp. 2d 551, 554 (E.D.N.C. 2001)..............................................43

*Orpiano v. Johnson*
632 F.2d 1096 (4th Cir. 1980), *cert. denied*, 450 U.S. 929, 101 S. Ct.
1387, 67 L. Ed. 2d 361 (1981) .................................................................37

*Pritchett v. Alford*
973 F.2d 307, 314 (4th Cir. 1992) ..........................................................28

*Rizzo v. Goode*
423 U.S. 362, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976)............................38

*Rogers v. Pendleton*
249 F.3d 279, 290 (4th Cir. 2001) ..........................................................30

*Rowland v. Perry*
41 F.3d 167, 173 (4th Cir. 1994) ............................................................33

*Saucier v. Katz*
533 U.S. 194, 200-01 (2001) ...................................................................25

*Sensormatic Security Corp. v. Sensormatic Electronics Corp.*
249 F. Supp. 2d 703, 707 (D. Md. 2003)..................................................23

*Sevigny v. Dicksey*
846 F.2d 953, 956 (4th Cir. 1988) ...............................................27, 30, 31

*Shaw v. Stroud*
13 F.3d 791, 798 (4th Cir. 1994) ..................................................37, 39, 43

*Slakan v. Porter*
737 F.2d 368 (4th Cir. 1984), *cert. denied*, 470 U.S. 1035,
105 S. Ct. 1413, 84 L. Ed. 2d 796 (1985) ........................................37, 38

*Spell v. McDaniel*
591 F. Supp. 1090, 1109-10 (E.D.N.C. 1984) ........................................38

*Swierkiewicz v. Sorema*
N.A., 534 U.S. 506, 514 (2002) ...........................................................23

*Taylor v. Waters*
81 F.3d 429, 434 (4th Cir. 1996) ........................................................28

*Trulock v. Freeh*
275 F.3d 391, 405 (4th Cir. 2001) ...........................................24, 27, 37

*United States v. Fairchild Industries, Inc.*
766 F. Supp. 405, 408 (D. Md. 1991) ..................................................43

*United States ex rel. Ackley v. International Business Machines Corp.*
110 F. Supp. 2d 395, 406 (D. Md. 2000) ..............................................44

*Vakharia v. Little Co. of Mary Hospital & Health Care Ctr.*
2 F. Supp. 2d 1028 (N.D. Ill. 1998) ....................................................44

*Vathekan v. Prince George's County*
154 F.3d 173, 178 (4th Cir. 1998) .......................................................27

*Waste Management Holdings, Inc. v. Gilmore*
252 F.3d 316, 348 (4th Cir. 2001) .......................................................43

*Wellingtonv. Daniels*
7171 F.2d 932, 936 (4th Cir. 1983) ......................................................38

*White v. Downs*
1997 WL 210858, *4 (4th Cir. April 30, 1997) .......................................39

*Williamson v. Virginia First Savings Bank*
26 F. Supp. 2d 798, 805 (E.D. Va. 1998) .............................................45

*Wilson v. Kittoe*
___ F.3d ___, 2003 WL 21693665, *3  (4th Cir. July 22, 2003).........24, 25, 27, 28

*Wilson v. Layne*
526 U.S. 603, 609 (1999)...................................................................25

*Withers v. Levine*
615 F.2d 158 (4th Cir. 1980) .................................................................................37

**OTHER AUTHORITIES AND RULES**

Baicker-McKee, et al., Federal Civil Rules Handbook
346 (Thompson-West 2003) ..................................................................................44

**RULES**

Rule 12(b)(6)...............................................................................................2, 23, 24

Rule 12(f) .............................................................................................................43

Federal Rule of Evidence 404(b) ...........................................................................45

Kristen M. Harkum, a minor, by and through her father and next friend, Joseph A. Harkum, Jr. ("Harkum"), Plaintiff, by her undersigned attorneys, respectfully submits this Consolidated Memorandum in Opposition to Defendants' Motions to Dismiss and Strike.[1]

## INTRODUCTION

This case involves the wanton and reckless shooting of an innocent citizen and the near shooting, terrorizing and traumatization of a totally blameless and innocent high school girl, who, because of the outrageous conduct by the Defendants in this case has had her young life shattered. As alleged in the Complaints of the Plaintiffs, sixteen-year old Kristen Harkum and her boyfriend, Joseph Schultz, were wantonly accosted by the Defendants, acting under the color of their authority as FBI agents. Joseph Schultz was shot in the face by Defendant Christopher Braga. Kristen Harkum, who was seated immediately next to Schultz, within the zone of danger of that wrongful shooting, was splattered with blood and glass, dragged out of the car, placed in custody, kept in custody for a significant period of time, including after the Defendants were told that they shot the wrong man and terrorized and traumatized by the unconstitutional breaches of her constitutional rights by the Defendants.

The conduct of the Defendants was altogether inexcusable and totally avoidable. This tragedy would never have occurred if it had not been for the FBI Agents' slipshod planning of the arrest of the getaway driver from a bank robbery, for their uncoordinated execution of an admittedly inadequate arrest plan, for their staffing of the arrest team

---

[1]    This case has been consolidated with *Joseph C. Schultz v. Christopher Braga, et al.*, Case No. JFM-03-CV-556. Each of the Defendants filed similar motions in the *Schultz* case. Kristen Harkum adopts and incorporates by reference the factual and legal arguments made by Mr. Schultz in responding to Defendants' motions.

with an Agent who had a known propensity for shooting unarmed persons, for their failure to take even the most minimal precautions to confirm whether the suspect who they were allegedly after was in the vehicle in which Ms. Harkum and Mr. Schultz were riding, for their utter lack of probable cause in stopping and seizing the vehicle and its occupants, which included Ms. Harkum, and for their use of unreasonable, deadly force in the process.   The Defendants' wholly unconscionable conduct violated Kristen Harkum's constitutional rights.

The Defendants refer to the near fatal incident as "regrettable" and a "lamentable mistake," while pointing fingers at each other for responsibility.   The wanton acts and reckless inactions of Braga, Hanburger, and Brosnan, however, were committed in concert, with each personally committing constitutional wrongs for which Kristen Harkum is entitled to damages.

Kristen Harkum and Joseph Schultz have asserted claims under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) for Defendants Braga, Hanbuger and Brosnan's violation of their rights under the Fourth Amendment.[2]   The allegations contained in the Complaint overcome Defendants' effort to hide and avoid accountability for their conduct behind the cloak of qualified immunity, to which they are not entitled. At this stage of the litigation, the Defendants arguments merely raise factual issues to be addressed during discovery and at trial.   As discussed below, viewing the well pleaded facts in the Complaint in a light most favorable to the Plaintiffs, Defendants' motions under Rule 12(b)(6) must be dismissed.

---

[2]     "The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations." *Correctional Services v. Malesko*, 534 U.S. 61, 70 (2001).

## THE FACTS ALLEGED IN THE COMPLAINT

### A.    Background

This case involves the second shooting in two years of an unarmed person by Defendant Christopher Braga ("Braga"), "under circumstances where no reasonable FBI agent would perceive it necessary or reasonable to do so." *See* Complaint at ¶ 10.[3]  In February 2000, Braga shot and killed "a partially clothed fugitive who was curled up in a fetal position on the floor of a closet in Laurel, Maryland." *Id.*  That shooting provides insight into Braga's state of mind when he stormed and fired into the automobile in which Kristen Harkum and Joseph Schultz  were occupants.   Contrary to Defendants' revisionist history, Braga's use of deadly force on these two occasions, the first of which caused "upset and concern" in the Baltimore Division of the FBI, and was fully known to the Defendants Hanburger and Brosnan, did not result in any precautions being taken to prevent such conduct from happening again to Kristen Harkum and Joseph Schultz. *See* Complaint at ¶ 14.

In the present case, Brosnan and Hanburger demonstrated their reckless and callous indifference to constitutional rights when, despite their knowledge of Braga's outrageous prior conduct, Brosnan actively sought out Braga as his first choice for the arrest team and both Brosnan and Hanburger intentionally failed to impose any controls upon Braga, or the other agents, as required by FBI policies and procedures. Their failure to impose the required controls led to the unconstitutional seizures, arrests and assaults upon Ms. Harkum and Mr. Schultz. *See id.* at ¶¶ 12-15, 25-27, 48.

---

[3]      Shootings by FBI Agents in the line of duty "are a rarity." *See* Complaint at ¶ 12.

The 2000 shooting by Braga was "widely discussed among the FBI Agents at the Baltimore, Annapolis and Calverton FBI offices." *See id.* at ¶ 14. FBI agents who had been at the apartment at the time, including Special Agent Stephen Stowe, who would later be standing next to Braga when Braga shot into Kristen Harkum's car, "made known" their "upset and concern over the circumstances of the killing." *Id.* "Brosnan and Hanburger...[were] fully familiar with Braga's conduct in the killing . . . and of Braga's propensity for unreasonable use of deadly force," yet they did nothing to prevent such conduct in the instant case. *Id.*[4]

All three of the Defendants shared the "unfortunate and pernicious mindset" that "no great harm attends a shooting by a law enforcement officer when the victim of the shooting is a criminal," and that, therefore, there is no need to be concerned about the Fourth Amendment rights of persons whom they were attempting to arrest, even should it turn out that those persons were innocents. *See id.* at ¶ 15. Defendants' indifference led to sixteen year old Kristen Harkum being arrested without probable cause and Braga shooting into the vehicle in which she was seated, terrorizing and traumatizing her and almost fatally wounding her boyfriend.

**B.    The February 2002 Bank Robbery**

On February 20, 2002, Ryan Grimes robbed an Allfirst Bank branch located in Pasadena, Maryland. Michael Blottenberger drove the getaway vehicle. *See id.* at ¶ 21. "On February 26th, Timothy King, a resident of Glen Burnie, telephoned the Anne Arundel County Police Department and "reported that Grimes and Blottenberger had

---

[4]     Despite the fact that an FBI Shooting Review Board "collected credible evidence that the killing of the fugitive was unjustified and objectively unreasonable," a local law enforcement officer later claimed to have found a shotgun elsewhere in the apartment, and, "on that pretext, the Shooting Review Board took no action." *See* Complaint at ¶ 15. "The agents who participated in the raid, and those with whom they shared their experience," however, "knew better." *See id.*

committed the robbery." *Id.* at ¶ 22. King and Blottenberger were fellow employees of a painting contractor, and Blottenberger lived in "the basement of King's home." *Id.* The Anne Arundel police "passed the information to Brosnan, the FBI Case Agent for the robbery investigation." *Id.*

Brosnan met with King on February 27th and enlisted his "assistance" in arresting Blottenberger. Thereafter, Brosnan and King "kept in close contact with one another." *Id* at ¶ 23. In the early morning hours of March 1st, King informed Brosnan that while having a beer at a tavern with Blottenberger; Blottenberger confessed his complicity in the robbery; and that Blottenberger, who had lived with King, left King's home "without taking any of his clothings or personal effects." *Id.* Two hours later "King provided Brosnan with two BB guns that he had retrieved from the basement" and Brosnan determined that the BB guns had been "used in the robbery." *Id.*[5]

Later that morning, King reported to Brosnan that Blottenberger had telephoned him to say that he intended to go to North Carolina to hide out with relatives, but that he "needed King to give him the clothes that he left behind and some money to make his escape." *Id.* at ¶ 24. Brosnan "instructed King to offer to assist Blottenberger" but "to stall" Blottenberger while the FBI planned the arrest. *Id.* When King informed Blottenberger "that he would meet and deliver the clothes and money to him," Blottenberger said that he would "call back between 4:00 and 4:30 p.m. with instructions" as to the place of the meeting. *Id.*

Brosnan decided "to have a team of arresting agents on the scene when King met with Blottenberger" and "to make the arrest while King was handing Blottenberger a

---

[5]     There is no evidence that any actual firearms were found or that the agents had any evidence that Blottenberger had any such weapons.

duffel bag containing Blottenberger's clothing." *Id.* The Agents planned to make "it appear that King was also being arrested so as to conceal the fact that King was the FBI informant." *Id.*

**C.      Brosnan's Selection of Braga As His First Choice for the Arrest Team**

Brosnan's "first step" in assembling the arrest team was to "telephone Braga" at the Calverton Resident Agency "and specifically enlist Braga's participation." *Id.* at ¶ 25. Special Agent Bradlee Sheafe, Stephen Stowe and Donald Kornek were also assigned to the team. *Id.* Braga, Sheafe and Stowe "were members" of the Baltimore Division "SWAT Team." *See id.*

**D.      Brosnan and Hanburger's Failure to Follow FBI Policies and Procedures Governing the Planning and Execution of Arrests That May Entail the Use of Force**

      **1.      FBI Policies and Procedures – Operations Plans and Limitations On the Use of Dynamic Vehicle Stops With Forcible Extraction**

Recognizing that "force might be required" to effect the arrest of a suspected bank robber, and that "force carries with it the risk of harm to innocent persons," the FBI has "adopted the policy that such arrests be planned carefully and thoroughly." *See* Complaint at ¶ 16.

On December 7, 2000, the Special Agent in Charge of the Baltimore Division (which includes the Annapolis and Calverton offices) "implemented" the policy "by requiring written Operations Plans for all pre-planned operations which involve the employment of SWAT resources or may entail the use of force in making an arrest." *Id.* at ¶ 17. As a part of that requirement, the Special Agent in Charge "promulgated a form Operations Plan which must be completed by the Case Agent and approved by high level

supervisors" *Id.* The FBI policy "requires [the Plan to contain] detailed information about the planned arrest" and "requires that the Case Agent set out," among other things: the "specific assignments for each team member;" the "weapons and communication that the arrest team will be using;" the "plan for execution of the arrest;" the "plan for communications among the members of the arrest team while the arrest is being executed;" and "the plan for a vehicle stop in the event that a vehicle stop is planned or anticipated as a contingency." *Id.*

The importance of setting forth in the Operations Plan "the plan for a vehicle stop in the event that a vehicle stop is planned or anticipated as a contingency" is underscored by the "well-established FBI practice and procedure" of confining "the use of dynamic vehicle stops accompanied by forcible extraction of the [vehicle] occupants to the most extreme cases such as hostage rescue missions." *Id.* at ¶ 19. In a "dynamic vehicle stop with forcible extraction" the arresting agents "intercept a moving vehicle..., rush the vehicle with drawn guns" and "forcibly remove the vehicle's occupants and throw them to the ground" *Id.* In "all other circumstances," the "accepted procedure" is "for the arresting agents not to rush the vehicle but to remain in a safe location from which they order the occupants to exit the stopped vehicle with hands in full view." *Id.* The restriction upon the "rush[ing] of a [stopped] vehicle with drawn guns" reflects "the understanding of the FBI that such a procedure "is extraordinarily hazardous to the persons being arrested" and that, in all but "the most extreme circumstances," it "is objectively unreasonable to effect an arrest by means of that procedure." *Id.*

FBI policy also requires that the approved Operations Plan provide the framework for the execution of the arrest. *See id.* at ¶ 17. Once the Operations Plan has been

approved, the Agent in Charge of the arrest team is required to "give a written or oral briefing to the entire arrest team." *Id.* at ¶ 18. In that briefing, he is "to cover all of the same subjects required to be covered in the Operations Plan." *Id.*

At the time Brosnan was planning Blottenberger's arrest, that there was another important reason, known to him, for why strict adherence to the FBI policy of requiring detailed instructions and assignments be given to the members of the arrest team in advance of the attempted arrest. Brosnan, and the other Defendants, had known for years that the FBI radio system was defective and that, careful advance planning, was a necessity in such operations. *Id.* at ¶ 20. "From at least April 1999," as the Complaint alleges, "Brosnan knew that the FBI radios were frequently inoperable and altogether unreliable and that, until the FBI revamped and replaced its existing radio communications network, there was a high risk of serious injury and loss of life during arrests . . . ." *Id.* at ¶ 20. "Other FBI agents, including Braga and Hanburger, were also aware of these deficiencies and dangers." *Id.*

### 2.   Brosnan and Hanburger's Deliberate Failure to Follow FBI Policies and Procedures

After Brosnan secured Braga's participation in the arrest team, Brosnan spoke to Eric Karandy, the acting head of the Annapolis Resident Agency to obtain Karandy's formal "authorization for Blottenberger's arrest." *Id.* at ¶ 24. At "Brosnan's request," Karandy "telephoned Special Agent George Layton, the acting head of the Calverton Resident Agency."

Layton "asked to speak to Brosnan" and "asked Brosnan for a copy of his Operations Plan." *Id.* "Brosnan admitted that he had none." *Id.* Brosnan "gave Layton verbal assurances, however, that he was intending to make only a static arrest, where

Blottenberger would be arrested while he was on foot and in the process of receiving his clothing [from the informant], and, further, that Brosnan would see to it that each SWAT Team member would be given his specific duties during the oral briefing." *Id.*   Layton "insisted that Brosnan prepare an Operations Plan and submit it for approval." *Id.*

Contrary to the assurances that he had given Layton, Brosnan left the Annapolis Resident Agency and, instead, "asked Karandy to take care of the Operations Plan and briefing." *Id.* at ¶ 24.   Karandy, in turn, asked Hanburger to brief the members of the arrest team.  Despite the fact that there was still no Operations Plan, Hanburger gave the semblance of a briefing. *Id.* at ¶ 28.

During the briefing, Hanburger gave the agents a photograph of Blottenberger and described him as 33 years old, 5'11" and 185 pounds.  Hanburger told the agents that the weapon used in the robbery was "a pellet gun," even though it was a BB gun; that Blottenberger was a drug addict who did not want to go back to jail; and that "King was going to meet with Blottenberger and give Blottenberger a duffel bag containing Blottenberger's clothes and some money." *Id.*   Hanburger also told the arrest team that they would communicate via the FBI radio and by Nextel telephones. *Id.*

Hanburger's briefing, however, failed to comply with pertinent FBI policy, in its failure to provide any information whatever as to what the various members of the arrest team were to do. *See id.* at ¶ 29.   While Hanburger has "acknowledged" in "a sworn statement" that he had "expected" that "Brosnan would make the routine identification" of Blottenberger that would trigger the arrest "and call it out to the rest of the arrest team," Hanburger did not share his "expectation" with the rest of the arrest team. *Id.* Hanburger "did not give any specific assignment to any member of the arrest team," and,

in direct violation of FBI requirements, he provided no guidance whatsoever for the execution of the arrest. *Id.*

It was not until after the briefing was completed that anyone paid any attention to the preparation of an Operations Plan. By that time, Hanburger and the SWAT Team members had already left Annapolis for a staging area in Glen Burnie to await word from King as to where Blottenberger wanted King to deliver the duffel bag containing Blottenberger's clothes. *See id.* at ¶ 30. Relying on Brosnan's representation that "the arrest of Blottenberger was intended only to be 'a static event' where Blottenberger would be seized while on foot," Karandy prepared an Operations Plan for Brosnan. *Id.*

"The Operations Plan [which was belatedly prepared] showed, on its face, that the Agents had given no thought to anything more than the most rudimentary seizure of Blottenberger as he stood with King and that they had not taken the trouble to plan for any eventuality." *Id.* While the Plan "designated Brosnan as the Agent in charge of the operation," with Hanburger as his alternate, the Plan "contained only blanks where information was to be inserted about the specific duties to be performed by members of the team or about any contingencies that might be expected to occur during the operation." *Id.* While the SWAT Team had left for the arrest armed with assault rifles, the Plan "stated that the only weapons that would be used in the arrest would be pistols." *Id.* Reflecting Brosnan's reckless disregard of the need to plan an arrest such as this, and his failure to provide anything but a sketchy idea of how the mission would be accomplished, "most of the form" was "not filled out." *Id.* at ¶ 31.

10

### E.    The Wait for Word From King

As soon as they left the Annapolis resident agency, all of the Agents "began experiencing" the radio problems "which they had anticipated." *Id.* at ¶ 32. Brosnan found that "he could only reach the other Agents," one at a time, "by means of the Nextel" telephones. *Id.* Special Agent Barry Mones joined Brosnan "as a passenger in Brosnan's vehicle" so that he could pass along Brosnan's communications with the arrest team via his Nextel. *Id.*

Brosnan "went to King's house" and Hanburger and the other members of the SWAT Team assembled at their staging location, a Days Inn in Glen Burnie to await "further word from King." *See id.* at ¶¶ 32 and 33. Two Anne Arundel Detectives, E. Hodges and S. Gall, joined the FBI Agents "to assist in the arrest of Blottenberger." *Id.* at ¶ 33. They "provided Hanburger with an Anne Arundel County radio so that he could communicate with them during the arrest operation." *Id.*

Shortly after 4:00 p.m., King telephoned Brosnan and told him that "Blottenberger had arranged to meet with King to take delivery of his clothes and to obtain money at the 7-11 convenience store located at Route 648 and Marley Neck Boulevard" in Anne Arundel County. *Id.* at ¶ 34. King stated that Blottenberger "might possibly be in a car driven by his girlfriend Lisa, who he described as being 5'11" tall and as having red hair." *Id.* King told Brosnan that "he did not know" what clothing Blottenberger was wearing but that Blottenberger "could be wearing a white baseball cap." *Id.* King said that he, too, was wearing "a white baseball cap" and that he "would be driving a green truck." *Id.* at ¶ 35. Brosnan and Mones "relayed King's information

to Hanburger by Nextel," and "Hanburger passed the information to the other members of the arrest team." *Id.*

### F.   The Surveillance At The 7-11 Store

Ignoring his duty to "provide coordination" for the efforts of the arrest team, including "directions for the surveillance" at the location of the intended arrest, Hanburger did not accompany "the four SWAT team members" to the 7-11 store, but, elected, instead, to meet up with Brosnan and to follow Brosnan and Mones as they followed King. *See id.* at ¶ 36. Without direction from either of the leaders of the arrest team, the other participants selected surveillance locations along Route 648 so distant from the 7-11 parking lot that none of them were able to identify persons entering and leaving the 7-11. *See id.* at ¶ 37.

Shortly after 5:30 p.m., King arrived at the 7-11 and "parked his truck at the front door of the 7-11." King "saw Blottenberger in a red Honda Civic being driven by Blottenberger's sister." *Id.* at ¶ 39. The Honda Civic drove past the 7-11 and proceeded in a southerly direction on Route 648. *See id.* at ¶¶ 40, 41. Before exiting his truck, "King tried to use his cell phone to telephone Brosnan" but found that the battery was dead. *Id.* at ¶ 39. Brosnan, who "had spent a good part of the day talking to King" and "wearing out King's cell phone battery," had not provided a Nextel or other "backup means of communication" to King. *Id.* at ¶ 38.

King "watched" as "Blottenberger's sister drove the Honda two blocks south of the 7-11, turned around" and "then came back." *Id.* at ¶ 40. The Honda Civic "drove past Sheafe and Braga twice." *Id.* When the vehicle "passed the agents the first time, Blottenberger, who was in the passenger seat, was within a few feet of Sheafe and Braga

and in full view." *Id.* After they passed Sheafe and Braga the second time, Blottenberger

and his sister "saw that the area . . . was swarming with late model, four-door sedans

occupied by middle aged men who looked like law enforcement agents." *Id.* at ¶ 41.

Concluding "that the FBI must be staking out the 7-11," they "left the area." *Id.* King

"ran into the 7-11 and frantically attempted to contact Brosnan" placing a 911 call to the

Anne Arundel County police. *Id.* at ¶ 42.

### G.     The Absence of Probable Cause

It was obvious to the Agents that the 7-11 store, located in a metropolitan area

near a large shopping center, was likely to be visited by a large number of ordinary

citizens and that it was essential that the Agents be able to discriminate between innocent

patrons of the convenience store, on the one hand, and Blottenberger, on the other. Since

the members of the arrest team had stationed themselves so far away from the 7-11 as to

be unable to identify persons entering and leaving the store, it was necessary for the

Agents to rely upon the duffel bag containing Blottenberger's clothes, as the identifying

circumstance and trigger for the arrest. This was precisely what Brosnan had planned

and explained to both Layton and Karandy. *See* Complaint at ¶¶ 26, 27, 30, 31.

Furthermore, as Hanburger admitted in his "sworn statement just days after the shooting,"

Hanburger understood that, if there was any question as to the identification of

Blottenberger, "Brosnan would make the positive identification and call it out to the rest

of the arrest team." *Id.* at ¶ 29.

Shortly after Blottenberger and his sister left the area, Kristen Harkum, who "was

returning home" from the nearby shopping mall, drove her car into the 7-11 parking lot

and parked in front of the 7-11 store. *See id.* at ¶¶ 40 to 43. Harkum "was driving a red

13

Pontiac Grand Am that her parents had given her as a 16th birthday present." *Id.* at ¶ 43. Kristen was accompanied by "her boyfriend," Joseph Schultz. *Id.* Kristen was 5'7" with brown hair. "Schultz, who is of slight build . . ., looked younger than his 20 years." *Id.* Schultz was wearing a white baseball cap. *Id.* Schultz got out of the car and went into the 7-11. *Id.*

As was obvious to anyone observing the scene, Harkum and Schultz drove up to the 7-11 "to get refreshments" for their ride home. They did nothing to suggest they were there to meet anyone or obtain a duffel bag of clothing from King. Upon entering the 7-11, Schultz "purchased a Slurpee and a snack for himself and a Mountain Dew for Harkum." *Id.* at ¶ 44. Schultz, made his purchase in a "different part" of the store from where King was standing, and he "stayed only as long as it took him to make the purchase." *Id.* From "their vantage point," Braga and the other Agents "saw that the white male had not spent any appreciable time in the 7-11 and that he came out with drinks in his hands. *Id.* at ¶ 45.

While the Agents could not identify the young man who had purchased the refreshments, all four of the SWAT Team members "took special notice of the fact that "the vehicle" in which he was riding "was a Pontiac Grand Am." *Id.* The Agents "notified Hanburger and Brosnan of the make and model of the vehicle." *Id.*

The "circumstances" of "Schultz's brief visit to the 7-11 were benign. The mere driving into the parking lot and purchase of a Slurpee and Mountain Dew did not give the Defendants probable cause to believe that Joseph Schultz was Blottenberger.

> The entire arrest team knew that the purpose of the planned meeting between King and Blottenberger was for King to give a duffel bag of clothes and money to Blottenberger and for Blottenberger and King both to be arrested while they were standing together on the parking lot of the

7-11. The young man who had been seen going into the 7-11 was also seen coming out <u>alone</u>. King did not come out of the 7-11 with the young man, and the focus of the young man's interest was obviously the two drinks that he held in his hands and not any duffel bag of clothes. Any objectively reasonable FBI agent would have known that, if the young man had been Blottenberger, he would have exited the 7-11 together with King and that he would have remained in front of the 7-11 while King retrieved the duffel bag from his truck and handed it to him.

Complaint at ¶ 46. (Emphasis added).[6]

Brosnan, who was the leader of the arrest team and charged with the decision of determining whether to make the arrest, rightly determined that the facts did not justify arresting the young man when he returned to his girlfriend's vehicle with refreshments. Accordingly, when Schultz got back into the Grand Am and closed the door, Brosnan refrained from giving any order to make an arrest.

After the Grand Am exited the parking lot, and turned east on Marley Neck Road, Brosnan gave specific instructions to the arrest team that, while they should "follow 'the Red Grand Am.'" Since Braga and the "arresting team 'did not know who was in the car,'" he told them, through Mones, that they "should 'just follow,' but not stop, the Pontiac." *Id.* at ¶ 48.

### H.   Hanburger's Instructions to Seize the Grand Am and Its Occupants, Notwithstanding the Receipt of Specific Information that Blottenberger Was in a Different Vehicle

As the "convoy of unmarked vehicles followed Kristen Harkum's Pontiac Grand Am," Hanburger received word from King that Blottenberger was not in the Grand Am, but, instead, was in a red Honda Civic. King telephoned the 911 operator "and had impressed the 911 operator with the urgent need to inform the FBI that Blottenberger and

---

[6]     Intuitively, the agents also knew that if the young man with the drinks in his hand was Blottenberger, and thought that he left the 7-11 quickly because he became "spooked" or King disclosed what was happening to him, the exit from the store would not have been with his hands full of refreshments, and the drive away from the area of the store would not have been so "normal."

his sister had not stopped at the 7-11 and that they were driving in a red Honda Civic." *Id.* at ¶ 50. The 911 operator "got in touch with Detectives Hodge and Gall," and, while King was still on the line, the 911 operator told the Anne Arundel County Detectives that Blottenberger was in his sister's car and that the car was a red Honda Civic." *Id.*

The Anne Arundel County officers understood immediately that Blottenberger was not in the Grand Am, but in a Honda Civic that had departed the area before the Grand Am had arrived at the 7-11. *Id.* "The Detectives remarked that they were familiar with the Honda Civic and had earlier seen the Honda Civic 'go by once or twice.'" *Id.*

The Detectives "called Hanburger on the County radio that they had previously given him, and they passed along the message." *Id.* Inextricably, rather than telling his team that the car they were following was the wrong car, which would have avoided this awful event, Hanburger kept the information to himself.

Agent Stowe, who was the passenger in the first FBI car behind the Pontiac Grand Am, informed the other Agents that the Pontiac "was not driving very fast" and was obviously not attempting to escape. *Id.* at ¶ 51. When Stowe saw that "the Pontiac would soon be approaching a red light," he "asked Hanburger if he wanted the members of the SWAT Team in the first two FBI vehicles to stop the Pontiac." *Id.* Hanburger "ordered the Agents to 'Take them down.'" *Id.* Hanburger "knew that Stowe was asking for permission to effect a dynamic stop with forcible extraction of the occupants, and by his response, he gave them the authority to do so. *Id.* This was so even though he knew it was the wrong car.[7]

---

[7]    "Any reasonable FBI Agent" either in Hanburger's position, or in the position of the Agents who received permission to "take them down," "would have...known...that a dynamic vehicle stop of the Pontiac with forcible extraction of the occupants was violative of FBI practice and procedure." Complaint at ¶¶ 53, 62.

Any "reasonable FBI agent in Hanburger's position would have known that there was no probable cause for a forced stop of the Pontiac Grand Am, or for the forcible extraction and seizure of the occupants." Any reasonable FBI agent would have known that "the seizure of the occupants that Hanburger was ordering and authorizing was violative of the constitutional rights" of the occupants of the vehicle. *Id.* at ¶ 52. In particular:

> Hanburger understood from the outset of the mission that it was Brosnan's function to identify Blottenberger. Hanburger knew that no one who participated in the surveillance of the 7-11, including Brosnan, had been able to identify the young man as Blottenberger. Hanburger also knew that Brosnan, the leader of the arrest team, had ordered that the Pontiac be followed but not stopped. While other Agents have since tried to make much of the fact that the young man seen exiting the 7-11 had been wearing a white baseball cap, Hanburger, significantly, has since admitted in a sworn statement that he knew only that the person who had left the 7-11, and was a passenger in the Pontiac, was a young white male and that, at the time he ordered and authorized the arrest, had not heard any radio or Nextel transmission in which any Agent had said that the young man was wearing any cap. Even more egregiously, Hanburger had just received word from King, as relayed by the Anne Arundel County Detectives, that Blottenberger was riding around in a Honda and, therefore, was not in the Pontiac that the FBI was following.

*Id.* (Emphasis added). The "rights of Harkum and Schultz to be free from seizure and arrest without probable cause, and the fact that the arrest ordered by Hanburger was without probable cause," were clear at the time. *Id.* at ¶ 52.

## I.   The Interception and Storming of the Pontiac

After "stopping for the red light," Kristen Harkum began to turn her Pontiac Grand Am "onto Fort Smallwood Road." *Id.* at ¶ 54. As she "was completing her turn," Agent Kornek, who was driving the first FBI vehicle immediately behind her, "moved out to the left" and "pulled alongside" her. Agent Stowe, who was in the passenger seat

of Kornek's vehicle, "brandished his automatic rifle and signaled to Harkum to stop." *Id.*
As "Harkum moved the Pontiac to the right and began stopping," Kornek "moved the
front" of the first FBI vehicle "past the Pontiac" and "angled the front right of his vehicle
in front of the left front of the Pontiac." *Id.* Agent Sheafe, who was driving the second
FBI vehicle with Braga in the passenger seat, "stopped behind the Pontiac." *Id.* at ¶ 54.

From the time that Kristen Harkum "drove away from the 7-11 until her Pontiac
was intercepted by the FBI Agents, "she drove the Pontiac in an altogether "reasonable
manner." She "made no effort to evade the vehicles that were intercepting her." *Id.* at ¶
55. Despite the fact that "the FBI vehicles were unmarked, and that the FBI Agents were
not wearing any distinctive clothing," Kristen "immediately obeyed Stowe's order to
stop." *Id.* No "objectively reasonable FBI Agent in the position" of Braga and the other
SWAT Team members "could have concluded otherwise." *Id.*

The four FBI Agents then initiated a forcible extraction. They "rushed out of the
vehicles, each with an automatic assault rifle, and stormed the Pontiac for the specific
purpose of forcibly extracting the occupants." *Id.* at ¶ 56. Agent Stowe "jumped out of
the passenger side of the first FBI vehicle, ran in front of the Pontiac while putting on his
body armor and took up a position" at the passenger door of the Pontiac "immediately
next" to Schultz. *Id.* at ¶ 57. Braga "ran from the passenger side of the second FBI
vehicle and stationed himself behind Stowe" *Id.* Kornek exited the driver's side of the
first FBI vehicle, ran behind that vehicle and stopped next to Harkum. *Id.*

**J.      Braga's Unwarranted Use of Deadly Force In Firing His Assault Rifle
         At The Vehicle**

"In their first round of orders, the three Agents shouted, 'Show me your hands,'
'show your hands,' 'keep your hands where we can see them' and the other words to the

same effect." *Id.* at ¶ 58. Stowe and Braga "aimed their assault rifles at . . . Schultz's head, and Kornek aimed his assault rifle at Harkum's head." *Id.*

Schultz, "who saw a rifle pointed at his head, made sure that he followed the instructions promptly." *Id.* He "put his hands in front of him, showing that he had nothing in them." *Id.* When "Stowe tried the door handle on the passenger side and Kornek tried the handle on the driver's side, they found that the doors were locked." *Id.* at ¶ 59. Braga and the other two Agents "then shouted at . . . Schultz and Harkum to 'Unlock the door' and to 'Open the door.'" *Id.*

Schultz was "carefully complying with the Agents' commands," and gave no reason for anyone to believe that he was doing otherwise, but Braga nevertheless opened fire, shooting into the Grand Am, striking Schultz. *Id.* at ¶ 60. If it had not been for the "fortuitous circumstance" that Braga's rifle bullet "came in contact with a part of the vehicle as it was traveling towards the interior of the Grand Am," "Braga would probably have blown off . . . Schultz's head." *Id.* at ¶ 60.[8] "Krissy could also have been shot with the bullet which Braga had fired, either after the bullet struck Schultz, [as it] or ricocheted off the part of the vehicle with which it came into contact." *Id.* The bullet which had been fired into the Pontiac Grand Am terrorized and traumatized Krissy, causing her to be splattered with blood and glass. *Id.*

Paragraph 61 of Plaintiff's Complaint details the aftermath of the illegal shooting:

> Braga's bullet entered Joseph Schultz's face, shattering his cheek and doing substantial damage to the inside of Joseph Schultz's face and mouth. As a result of the shooting, Krissy's face and body were showered

---

[8]     Agents Sheafe and Stowe "have subsequently admitted under oath that no more than five seconds passed between the time that they jumped out of their FBI vehicles and the time that Braga shot . . . Schultz." Complaint at ¶ 56. Sheafe was still in the process of exiting "from the driver's side of the second vehicle," so that he could "take up a position behind Kornek," when "he heard Braga shoot . . . Schultz." *Id.* at ¶ 57.

with Joseph Schultz's blood and shattered glass. Joseph Schultz, who was covered in blood, began rocking back and forth, holding his face screaming [in pain at the top of his voice.] Braga reached into the Pontiac Grand Am, unlocked the door and forcibly pulled Joseph Schultz from the vehicle. Braga threw Joseph Schultz to the ground and handcuffed him. Kornek forcibly removed Krissy from the driver's side of the Pontiac Grand Am and forcibly pushed her to the ground. Krissy was subsequently handcuffed and moments later, the Agents forced Krissy to bend over the trunk of the Pontiac Grand Am, when she saw Joseph Schultz on the ground, screaming in pain. Sixteen year old Krissy, as described by Kornek, was "crying hysterically."

No reasonable FBI Agent in Braga's position would have believed that the use of deadly force against the passengers in the Pontiac Grand Am was justified. Complaint at ¶ 63. As alleged in the Complaint:

> Any reasonable FBI Agent in Braga's position would have known that <u>the occupants in the Pontiac posed no threat, immediate or otherwise, to Braga or anyone else</u>. A reasonable FBI Agent in Braga's position could not have believed the occupants to be in possession of a weapon or otherwise to pose a threat to anyone at the time Braga shot into the Pontiac Grand Am and struck Joseph Schultz. Braga knew that neither Joseph <u>Schultz, nor Krissy were attempting to flee or to resist arrest</u>. Braga saw that Plaintiff Schultz's hands were in full view, that they were obviously empty and that Plaintiff <u>Schultz was following Braga's commands to the letter</u>. Plaintiff Schultz's right not to be subjected to deadly force, within the specific context of the facts of this case, was clearly established at the time, and it was clear to any reasonable FBI Agent in Braga's position that the use of deadly force, in the situation he confronted, was unlawful.

Complaint at ¶ 63. (Emphasis added).

### K.     The Defendants' Post Shooting Demonstration of Their Callous Indifference to Plaintiffs' Rights

Brosnan "arrived on the scene a few minutes after . . . Schultz was shot, blood and glass splattered onto Krissy Harkum and Krissy was forcibly extracted from the Pontiac Grand Am and taken into custody." *Id.* at ¶ 64. King, "who had seen the FBI vehicles leave the vicinity of the 7-11 . . ., decided to follow the FBI cars to see where they were traveling. *Id.* When King happened on the scene of the shooting, he stopped to speak to

Brosnan. *Id.* Not only was the man "lying in a pool of blood" someone other than Blottenberger, King exclaimed, "'It's not even the f------ car I told you about.'" *Id.* Brosnan "told King that he should not be concerned" because, "'This s--- happens every day.'" *Id.* at ¶ 65.

After Schultz was evacuated by helicopter to the Shock Trauma Center of the University of Maryland Medical Center. *Id.* at ¶ 66. Braga and the other three Agents who had stormed the Pontiac "convened in Hanburger's vehicle." *Id.* "The four Agents were seen laughing." *Id.*

### L.    Kristen Harkum's Injuries

As a "direct and proximate result of each of the Fourth Amendment violations" described in the Complaint, Kristen Harkum "suffered deprivation of her liberty, severe emotional trauma, psychological/psychiatric injury, unfathomable distress and permanent physical injuries resulting from this life altering event." Complaint at ¶ 67. Krissy suffers from clinical depression and anxiety for which she is receiving treatment. As a result of the severe emotional and psychological/psychiatric injuries which she incurred, Krissy was unable to go back to school, and instead had to finish high school being home schooled. She has developed eating disorders, sleep disorders, and has recurring dreams and nightmares about the events of March 1, 2002. She no longer is able to enjoy life as a normal teenager. The terrorizing and traumatizing events of March 1 have inalterably changed her life for the worse. Complaint at ¶ 67. *Id.*

**M.**   **The Counts of the Complaint**

Each of the three Defendants is named in a separate Count of the Complaint.

Count One, is against Braga, for violating Krissy's Fourth Amendment Rights when he

fired into the Pontiac Grand Am without justification and for his involvement in her

unlawful seizure and arrest. *Id.* at ¶¶ 69-70.  Count Two alleges that Hanburger violated

Krissy's Fourth Amendment rights when he ordered the seizure of the vehicle and, the

forcible extraction and arrest of its occupants, without probable cause to believe that the

male passenger in the Pontiac Grand Am was Blottenberger. *Id.* at ¶ 72-73.  He knew, or

and had information, that Blottenberger was in a different car and that the people in the

Pontiac Grand Am were innocent civilians.

Count Three alleges that Brosnan is liable because of the intentional acts he

committed and his intentional failure to take necessary corrective action out of deliberate

indifference to Kristen Harkum's Fourth Amendment rights.    Among other things,

Brosnan "placed" Braga, a person with a "known propensity for shooting unarmed

persons under circumstances where no reasonably objective FBI Agent would conclude

that it was reasonable or lawful to do so," in "a situation where he was likely to cause

constitutional injury," and, at the same time, "deliberately" failed to adhere to the FBI

policies and procedures that required him "to place appropriate and necessary controls

upon the members of the arrest team." *Id.* at ¶ 75.  Brosnan's various actions and

inactions, all of which were undertaken deliberately and with "reckless indifference" to

the Fourth Amendment rights of Kristen Harkum and Joseph Schultz created "a pervasive

and unreasonable risk of harm from deprivation" of the "Fourth Amendment right to be

free of unreasonable searches and seizures. *Id.* at ¶¶ 75, 76.  The deprivation of Kristen

Harkum's Fourth Amendment right, including her seizure and arrest without probable cause and the shooting by Braga into the Pontiac Grand Am without any justification, were "a direct and proximate result" of Brosnan's conduct. *Id.* at ¶ 75.

## RULE 12(b)(6) STANDARD

A motion to dismiss under Rule 12(b)(6) cannot be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her]to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The Federal Rules require that a complaint contain "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* at 47 (internal quotations omitted); *Comet Enterprises Ltd. v. Air-A-Plane Corp.*, 128 F.3d 855, 860 (4th Cir. 1997). A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations. *See Swierkiewicz v. Sorema*, N.A., 534 U.S. 506, 514.

In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations of the Complaint as true and construe the facts and reasonable inferences derived therefrom in the light most favorable to the Plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997). All doubts as to the whether the allegations properly state a claim must be resolved in favor of the Plaintiff. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999). The Court must, likewise, "disregard the contrary allegations of the opposing party." *Sensormatic Security Corp. v. Sensormatic Electronics Corp.*, 249 F. Supp. 2d 703, 707 (D. Md. 2003). Lastly, there is

23

no heightened pleading standard applicable to cases where qualified immunity may be asserted as a defense. *See Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001).[9]

## DEFENDANTS ARE NOT ENTITLED TO THE PROTECTION OF FEDERAL QUALIFIED IMMUNITY UNDER THE FACTS OF THIS CASE

Defendants Braga, Hanburger and Brosnan contend that they are entitled to dismissal of the Complaint based on qualified immunity. That assertion, however, must fail because Plaintiff Kristen Harkum has pled detailed and sufficient facts which overcome the qualified immunity claim behind which Defendants seek to hide. The seizure and arrest of the Plaintiffs and the shooting into Kristen Harkum's Pontiac Grand Am were committed without probable cause, were patently unreasonable and violated Kristen Harkum's Fourth Amendment Rights.

Qualified immunity, as its name implies, is not an absolute immunity, but is only applicable if certain criteria are met. Government officials performing discretionary functions are only "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999)(quotations omitted). "The burden of proof and persuasion with respect to a claim of qualified immunity is on the defendant official." *Wilson v. Kittoe*, ___ F.3d ___, 2003 WL

---

[9]     In Defendants' Motions, they make reference to facts and documents not contained within the four-corners of the Plaintiffs' Complaints. Inasmuch as Defendants have not moved for summary judgment, under the express language of Rule 12(b)(6), these references should be excluded. The items to which Defendants refer are not supported by affidavit and are not competent evidence. *See, e.g., Johnson v. Sullivan,* 764 F. Supp. 1053 1055-56 (D.Md. 1991). Moreover, to the extent that the Defendants may try in their reply memoranda to convert their motions into motions for summary judgment, the Plaintiffs have not had the opportunity to conduct discovery and develop admissible, competent evidence to counter Defendants' claims. Generally, a motion for summary judgment is only appropriate after the non-moving party has had an "adequate time for discovery." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Since the Defendants have not filed an answer and no discovery has taken place in this case, the Court's consideration of motions for summary judgment is inappropriate at this time. As discussed above, the only facts appropriate for consideration on a motion filed under Rule 12(b)(6) are those facts contained within the four corners of the Plaintiffs' Complaints.

24

21693665, *3  (4th Cir. July 22, 2003)(citing *Gomez v. Toledo*, 446 U.S. 635, 640-41

(1980)). [10]   In assessing a qualified immunity claim, the facts must be viewed in the light

most favorable to the party asserting the injury.  *See id.* at *3; *Jones v. Buchanan*, 325

F.3d 520, 523 (4th Cir. 2003).

In cases involving claims of qualified immunity, courts must first determine

whether the plaintiff has alleged the depravation of a constitutional right and, if so,

whether that right was clearly established at the time of the alleged violation.  *See Saucier*

*v. Katz*, 533 U.S. 194, 200-01 (2001); *Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir.

2002).

> For a constitutional right to be clearly established, its contours must be
> sufficiently clear that a reasonable official would understand that what he
> is doing violates that right.  This is not to say that an official action is
> protected by qualified immunity unless the very action in question has
> previously been held unlawful . . .; but it is to say that in light of pre-
> existing law the unlawfulness must be apparent.
>
> The standard is again one of objective reasonableness:  the "salient
> question" is whether "the state of the law" at the time of the events at issue
> gave the officer "fair warning" that his alleged treatment of the plaintiff
> was unconstitutional.  Officials can still be on notice that their conduct
> violates established law even in novel factual circumstances.

*Jones v. Buchanan*, 325 F.3d 520, 531 (4th Cir. 2003)(quotations and citations

omitted).

Once it is determined that an established constitutional right is at issue, the

next step of determining whether the law enforcement officer is entitled to

qualified immunity "is an objective one, dependant not on the subjective beliefs

of the particular officers at the scene, but instead on what a hypothetical,

---

[10]     In Defendant Hanburger's Motion, he incorrectly asserts that the Plaintiff bears the burden to
"overcome the doctrine of qualified immunity."  Hanburger at 25 n.19.  This assertion misstates the parties'
respective burdens of proof as shown by *Wilson v. Kittoe*, ___ F.3d ___, 2003 WL 21693665, *3 (4th Cir.
2003), and related cases.

reasonable officer would have understood under those circumstances." *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002); *see Milstead v. Kibler,* 243 F.3d 157, 161 (4th Cir.), *cert. denied*, 534 U.S. 888 (2001).

Kristen Harkum's right not to be subjected to seizure, arrest or unreasonable force without probable cause is a bright line right known to all law enforcement officers.  In her Complaint, she has pled facts which clearly show a violation of that right.

## SEIZURES UNDER THE FOURTH AMENDMENT

The Fourth Amendment to the Constitution of the United States provides, in part, that: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated."  As stated in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 392 (1971), "[a]n agent acting—albeit unconstitutionally—in the name of the United States possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own."  The strictures imposed by the Fourth Amendment are intended as "a limitation upon the exercise of federal power," and guarantee the citizens of the United States "the absolute right to be free from unreasonable searches and seizures carried out by virtue of federal authority."  *Id.*

A "seizure" occurs for the purposes of the Fourth Amendment when government agents by means of physical force or show of authority, in some way restrain the liberty of a citizen.  *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989).  An individual is seized when that person yields to any official "show of authority" that a reasonable person would interpret as a command to restrict his or her movement.  *See California v.*

*Hodari D.*, 499 U.S. 621, 627-28 (1991); *Kebe v. Brown*, 161 F. Supp. 2d 634, 639 (D. Md. 2001). "A seizure occurs even when an unintended person or thing is the object of the detention or taking." *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989). A Fourth Amendment seizure occurs whenever "there is a governmental termination of an individual's freedom of movement through means intentionally applied." *Vathekan v. Prince George's County*, 154 F.3d 173, 178 (4th Cir. 1998)(quoting *Brower*, *supra*)(emphasis in original). As stated in *Trulock v. Freeh*, 275 F.3d 391, 400 (4th Cir. 2001): "The threatening presence of several officers, the display of a weapon by an officer, some physical touching, or the use of words or a tone of voice suggesting that compliance with the officer's request might be compelled, can all translate into a seizure."

In the instant case, there can be no question that Kristen Harkum was seized and arrested. Her vehicle was forcibly stopped by FBI agents, who surrounded the Grand Am and then stormed it pointing weapons at its occupants. Complaint ¶¶ at 54-57. Braga fired his assault rifle into the vehicle while Kristen was innocently sitting inside it. Kristen was then forcibly extracted from the Grand Am and thrown to the ground. Complaint at ¶ 61. She was then handcuffed and forced to bend over the trunk of the Pontiac, while her bloody boyfriend lay on the ground. Complaint at ¶ 61.

## THERE WAS NO PROBABLE CAUSE TO JUSTIFY
## THE AGENTS' SEIZURE AND ARREST OF KRISTEN

Subject to limited exceptions, seizures subject to Fourth Amendment scrutiny are 'reasonable' only if based upon probable cause. *See Wilson v. Kittoe*, --- F.3d ---, 2003 WL 21693665, *4 (4th Cir. July 22, 2003); *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir. 1988)(probable cause is the sole Fourth Amendment standard for a warrantless

arrest); *see Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996). For the purposes of the Fourth Amendment, "probable cause" only exists when "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing in the circumstances shown that the suspect has committed, is committing, or is about to commit an offense." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)(quoting *Michigan v. De Fillippo*, 443 U.S. 31, 37 (1979)); *Figg*, 312 F.3d at 636; *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

> Whether probable cause exists in a particular situation therefore always turns on two factors in combination: the suspect's conduct as known by the officer, and the contours of the offense thought to be committed by that conduct. Probable cause therefore could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both.

*Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)(quoting *Michigan v. De Fillippo*, 443 U.S. 31, 37 (1979)); *Figg*, 312 F.3d at 636; *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Here, the events leading up to the seizure and arrest of the Plaintiffs, and the application of force against them, clearly show that the Defendants' actions were not based on probable cause, but rather were committed with reckless and callous indifference to Kristen Harkum's and Joseph Schultz's rights. Although, Defendants' assert that they had probable cause to arrest Michael Blottenberger, Defendants, had no probable cause to believe that Joseph Schultz was Michael Blottenberger or to believe that Blottenberger was in Kristen Harkum's vehicle.

There was nothing remarkable or identifying about Joseph Schultz or Kristen Harkum, as viewed by a reasonable officer, to justify their seizure. Kristen Harkum was

a sixteen-year old brunette,[11] driving a red Pontiac Grand Am, with twenty-year old, Joseph Schultz riding as a passenger. The two stopped at a public convenience store. Such stores, as a reasonable officer would know, have frequent traffic of customers moving in and out of the store purchasing goods.

The officers saw Schultz get out of the Pontiac Grand Am, enter the 7-11, and leave after purchasing refreshments. None of the officers viewed any interaction between Joseph Schultz and Timothy King.[12] King and Schultz did not leave the store together, or even separately, and walk to King's vehicle to retrieve the duffel bag, which was the planned event to trigger an arrest. There was no such interaction. When Schultz left the store, King remained inside, a fact which a reasonable officer should have perceived confirmed that Schultz was not the "suspect."

The fact that Schultz and King were merely in the 7-11 at the same time is not probable cause. The fact that agents did not observe any interaction between Schultz and King either within or outside the store, and saw no handoff, or attempted handoff of the duffel bag, as had been planned, clearly showed there was no probable cause. Schultz entered the 7-11, purchased items, and left the store as any ordinary customer would do. The fact that Schultz was wearing a baseball cap and riding with a woman would not lead a reasonable officer to conclude that probable cause existed to seize and arrest Schultz and Ms. Harkum.

An officer is not allowed to turn a blind eye, or willfully blind himself to facts which show the lack of probable cause. An officer "may not close his or her eyes to facts

---

[11]      Blottenberger's girlfriend, Lisa, was reported by King to Brosnan to have red hair. *See* Complaint at ¶ 34.

[12]      In the Complaint, it is alleged that Sheafe and Braga, and not Hanburger, observed that Schultz was wearing a white baseball cap. Hanburger, who ultimately makes the decision to "take down" Schultz and Harkum, was unaware of that fact until after the shooting. *See* Complaint at ¶ 52.

which would help clarify the circumstances of an arrest." *Sevigny v. Dicksey*, 846 F.2d

953, 957 n.5 (4th Cir. 1988)(quoting *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986));

*Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001).

There was simply no basis for the seizures and arrests here. The agents' conduct

in making no effort to arrest Schultz while he was at, or as he was leaving, the 7-11 is a

clear admission by them that no probable cause existed under the Fourth Amendment for

them to take such action.[13]

What followed after the Pontiac Grand Am left the 7-11, added no probable cause

to the otherwise innocent conduct which the agents had witnessed. The vehicle left the 7-

11 in a normal fashion. It was driven away from the area in a reasonable, normal manner.

Moreover, as Kristen Harkum drove the Grand Am in a non-suspicious manner,

Hanburger received information from King, through the Anne Arundel County officers

who were involved in the investigation, that Blottenberger never came into the 7-11 and

was driving a Honda Civic, not a Pontiac Grand Am, which the agents told Hanburger

was the type of car they were following. Hanburger knew, or should have known, as any

objectively reasonable officer would have known, that there was no probable cause to

stop the Pontiac Grand Am.

In Defendant Hanburger's Motion, he states there were "time exigencies" and that

he was "not required to allow a fleeing suspect to escape . . . ." *See* Hanburger

Memorandum at 7, 24. Yet, with the information then available to him, including that

---

[13]     Just before the vehicle was stopped, "the arrest team 'did not know who was in the car.'"
Complaint at ¶ 48. The Agents had an arrest photograph of Blottenberger and knew him to be thirty-three
years old. Schultz was twenty years old at the time of the shooting. Similarly, although King was available
to make an identification of Blottenberger, or confirm to the agents—after the man with the refreshments
and white hat left the 7-11—that the twenty year old Schultz was not the thirty-three year old
Blottenberger. No effort was made to contact King, who was still in the 7-11.

King said that Blottenberger was in a Honda Civic, there was no exigency that justified Hanburger in directing the agents to "take down" the Pontiac Grand Am and make a forcible extraction of its occupants.

There was nothing in what the agents observed with gave rise to probable cause to believe Blottenberger was in the Grand Am.  Neither Schultz nor Harkum acted in a suspicious or abnormal manner.  They were driving a different car then the one Hanburger was told Blottenberger was in.  *See* Complaint at ¶ 50.  The bare assertion of a false exigency does not justify the Defendants' conduct.  "'Exigency does not operate as an independent basis for a warrantless arrest. . . . Probable cause is the only and equally valid constitutional basis for an arrest with or without warrant." *See Sevigny v. Dicksey*, 846 F.2d 953, 957 n.6 (4th Cir. 1988).

Defendants place great reliance on *Hill v. California*, 401 U.S. 797, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971) for the claim that an arrest, supported by probable cause, of the wrong person, is protected by qualified immunity.  The facts in *Hill*, however, demonstrate that identity and probable cause are not separate issues.  In *Hill*, in contrast to the instant case, probable cause justified the officers' actions.

In *Hill*, it was alleged that Hill and three other men participated in a robbery.  *See id.* at 798.  Hill's accomplices admitted to the robbery to the police and implicated Hill, giving the police an address where one of the accomplices lived with Hill.  *See id.*  The accomplices also indicated that guns were used in the robbery and that they could be found at the referenced apartment.  *See id.* at 799.  Before going to the apartment, the investigating officers checked official records, verifying Hill's prior association with his accomplices, his age, his physical description, address and the make of his vehicle.  *Id.*

Upon arriving at the correct apartment, the officers found the door open, and a person in the apartment "who fit the description exactly of Archie Hill." *Id.* When asked by the officers, the person denied knowledge of any guns, despite the fact that there was a pistol in the room in plain view. Even though the person who was arrested turned out not to be Hill, the Supreme Court found that the arrest was supported by probable cause.

*Hill* provides the Defendants with no cover here. There was no such exacting detail and confirmation of facts by the instant Defendants. Nothing occurred at the 7-11 to justify Schultz's arrest. There was no greater probable cause at the time of the vehicle stop. To the contrary, by the time of the stop, Hanburger knew that Blottenberger was in a Honda Civic, not the Pontiac Grand Am which the arrest team was following. Moreover, there was nothing about the manner in which the Grand Am was being operated which was suspicious.

## EXCESSIVE FORCE UNDER THE FOURTH AMENDMENT

As detailed in Plaintiffs' Complaints, Defendants violated Kristen Harkum's rights by utilizing excessive force in seizing and arresting her and in firing a bullet from an assault rifle into her vehicle. A reasonable officer in the position of Defendant Braga would have known that neither Krissy nor Joe posed a threat of harm to the officers. The level of force applied by the officers, which violated the FBI policy on forcible extraction, was unjustified. The shooting was without a scintilla of justification.

Excessive force claims, are likewise analyzed under the Fourth Amendment and its "'reasonableness' standard." *See Graham v. Connor*, 490 U.S. 386, 395 (1989). The analysis of an excessive force claim requires careful attention to the facts and circumstances of each particular case, including: (a) the severity of the crime at issue; (b)

whether the suspect poses an immediate threat to the officers or others; and (c) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *See, e.g., Graham v. Connor*, 490 U.S. at 395; *Gary-Hopkins v. Prince George's County*, 309 F.3d 224, 230 (4th Cir. 2002); *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994).   To "assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Rowland v. Perry*, 41 F.3d at 173. The use of deadly force is only justified where a reasonable officer has "sound reason" to believe that a suspect poses a threat of serious physical harm to the officer or others. *Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002); *Gary-Hopkins*, 309 F.3d at 231.

The seizure of Kristen Harkum and Joseph Shultz without probable cause, using a dynamic vehicle stop, forcible extraction and firing a bullet into their vehicle, was a clear excessive and unreasonable use of force. Considering the factors in *Graham v. Connor*, 490 U.S. 386 (1989), the level of force used to stop the Plaintiffs was unjustified.[14]

## DEFENDANTS ARE NOT ENTITLED TO DISMISSAL OF KRISTEN HARKUM'S COMPLAINT

The Fourth Circuit, and this Court, have held that where the plaintiff pleads facts showing a constitutional violation, and defendants proffer a set of facts allegedly showing that they had probable cause for their conduct, a factual question exists which prevents

---

[14]     The factors in *Graham*, which involve weighing the severity of the crime and whether the suspect poses an immediate threat to the officers or others, did not justify Defendants' conduct here. Blottenberger was not the bank robber, but rather the suspected getaway driver. There was no indication that he and his accomplices were ever armed with anything more than the BB guns, which were retrieved by Brosnan. *See* Complaint at ¶ 23.   Moreover, applying the last factor in *Graham*, there was no indications that Krissy and Joe were attempting to flee the area of the 7-11 or that any activity of the Plaintiffs could reasonably be viewed by the Defendants as flight. Joseph Schultz purchased snacks and drinks for his girlfriend and himself, and Krissy drove down the highway at a reasonable pace, in a normal manner.  A dynamic vehicle stop with forcible extraction, threatening Schultz and Harkum with automatic rifles, and ultimately shooting into the vehicle, endangering both Plaintiffs, was not an objectively reasonable way to address the situation.

dismissal based on a claim of qualified immunity. *See, e.g., Jones v. Buchanan*, 325 F.3d 520 (4th Cir. 2003)(factual disputes between the parties prevented the court from granting summary judgment on the issue of qualified immunity)(Motz, J.); *Gary-Hopkins v. Prince George's County*, 309 F.3d 224, 230 (4th Cir. 2002)(upholding rejection of qualified immunity claim where the plaintiff's version of events was that the victim was standing still with his hands over his head and was not resisting arrest when he was shot by the officer); *Lewis v. Boucher*, 35 Fed. Appx. 64, 2002 WL 939556 (4th Cir. May 9, 2002)(factual dispute as to whether an unarmed motorist made a threatening gesture to an officer prior to shooting precluded judgment on the issue of qualified immunity); *Kane v. Hargis*, 987 F.2d 1005, 1008 (4th Cir. 1993)(issue of fact precluded summary judge on the issue of qualified immunity in an excessive force case where the reasonableness of the level of forced used was for the jury); *Coates v. Daugherty*, 973 F.2d 290, 293-94 (4th Cir. 1992)(evidence supported jury's finding that the defendant officers were not entitled to qualified immunity on permissible determination the officers lacked probable cause and that the events did not occur as the officers claimed they happened).

In *Goehring v. United States*, 870 F. Supp. 106 (D. Md. 1994) *appeal dismissed*, 96 F.3d 1438, 1996 WL 511429 (4th Cir. 1996), this Court, on a motion to dismiss or, in the alternative, for summary judgment,  denied qualified immunity to a postal inspector who shot an unarmed suspect during the course of a raid on the suspect's home.  The postal inspector, at the time of the execution of the warrant, was involved in an investigation which began with the interception of a parcel of hashish.  The defendant officer, Carr, contended that he and the other members of the drug search team witnessed the plaintiff, Goehring, accept the package of hashish, which was later delivered to his

34

home. *See id.* at 107-108. Carr further contended that he and the other officers knocked, announced "police," and proceeded to use a battering ram against the door, shattering the glass out of the plaintiff's front door. *See id.* at 108. Carr and approximately eight other agents rushed into the house, wearing jackets or vests identifying themselves as law enforcement officials. *Id.* In the home:

> Carr ran into the middle of the house, a room that the parties have described as the "piano room" because it contained a piano in it. Carr saw plaintiff standing approximately ten feet in front of him in the kitchen behind a 36 ½" counter . . . Although Carr acknowledges that he may have hollered "freeze" or "get down" when he entered the house, he has testified that he ordered plaintiff to raise his hands after confronting him. Plaintiff has testified that he was receiving conflicting instructions from various agents as to what to do and that he was terrified by what was occurring. In any event, plaintiff did not immediately raise his hands but stared blankly at Carr. He then ducked down behind the counter.

> Carr has testified that he heard some kind of noise while the plaintiff was behind the counter. Plaintiff denies that he did anything to cause any noise or that any noise was made. At this point Carr made up his mind that plaintiff was going for a gun and that he would shoot at plaintiff as soon as plaintiff arose. For his part, plaintiff decided to raise his hands in surrender. He put them above the counter, palms outstretched towards Carr. According to Carr's testimony, he fired his weapon at the "center of the mass." A .38 caliber bullet through plaintiff's forearm, four inches below the wrist and exited his forearm. The injury resulted in plaintiff having to undergo two hip graft surgeries.

*Id.* at 108. The Court, in weighing Carr's claims to qualified immunity, stated: "[I]t cannot be said that viewing the facts most favorably to plaintiff, a reasonable officer standing in the shoes of Carr could have believed that shooting plaintiff was objectively reasonable in light of the circumstances." *Id.* at 108-109. The Court stated:

> To state these facts is to negate the proffered defense. Defendants' theory seems to be that Carr's actions were entirely reasonable simply because plaintiff could have been reaching for a gun. That contention proves too much: all things are possible and if mere possibility is all that is required to establish a qualified immunity defense, law enforcement officials would have virtually unlimited license to use deadly force against meek and

35

vulnerable victims. Moreover, on the record in this case, even the possibility that Carr imagines was contradicted by the reality of that which he should have reasonably observed as plaintiff lifted his empty hands in the air from behind the counter.

*      *      *

. . . Any person (perhaps particularly one with any law enforcement experience) who has any sense of decency and any common sense knows that, viewing the evidence here most favorably to plaintiff, what happened was fundamentally wrong. To grant summary judgment to defendants would be to turn one of the most venerable of maxims upon its head. No longer would it be said that "the Government wins whenever justice is done;" rather we would be reduced to proclaiming that "justice is done when ever the Government wins."

Nothing is more illiberal or more offensive to true conservative principles than the doctrine that the State is paramount and that abuses of sovereign power are beyond redress. The doctrine is not embedded in the law of this or any other circuit. Carr's motion for summary judgment will therefore be denied.

*Id.* at 109.

In *Lynn v. O'Leary*, ____ F. Supp. 2d ____, 2003 WL 21251977 (D.Md. May 8, 2003). This Court examined competing factual claims in denying a motion to dismiss based on a claim of qualified immunity. The plaintiff in *Lynn* filed suit against several officers stemming from a search of Mr. Lynn while attempting to enter the Maryland House of Corrections ("MHC") to visit his son. *Id.* at *1. As Mr. Lynn was checking into MHC, one of the institution's K-9 officers indicated that his search dog gave a positive alert for drugs. *Id.* at *1. No drugs were found on Mr. Lynn or in the storage locker provided for him at MHC. Nonetheless, Mr. Lynn was taken to a side room and forcibly strip/cavity searched, which he alleged caused him extreme pain due to a medical condition. *See id.* at *2. Mr. Lynn's wife found him nearly unconscious and suffering from a contusion when she entered the side room. *Id.*

The defendant officers claimed that they had acted based on the alert of the search dog, suspecting drugs may be on Mr. Lynn's person. The Court, in denying the officers' claim of qualified immunity, determined that if Mr. Lynn's claims were proven to be true, they would establish a violation of Lynn's constitutional rights, including the right to be free from arrest without probable cause and the right to be free from excessive force. Since the rights were adequately pled, the Court denied Defendants' effort to have the complaint dismissed. "Under Lynn's version of the facts, the officers arrested and searched him without any basis for reasonable suspicion or probable cause. Accordingly, the officers are not entitled to **qualified immunity**." *Id.* at *5.

## SUPERVISORY LAIBILITY UNDER *BIVENS*

The claims against Hanburger and Brosnan are not based on respondeat superior, but rather on their personal conduct which resulted in the violations of Kristen Harkum's constitutional rights. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001); *DeVentura v. Keith*, 169 F. Supp. 2d 390, 395 (D. Md. 2001)("[L]iability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of rights.").

Supervisors, such as Brosnan and Hanburger, can be held liable for their direct participation in a constitutional violation or in supervising the perpetrators of the deprivation. As stated in *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994):

> The principle is firmly entrenched that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates. *See Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984), *cert. denied*, 470 U.S. 1035, 105 S. Ct. 1413, 84 L. Ed. 2d 796 (1985); *Orpiano v. Johnson*, 632 F.2d 1096 (4th Cir. 1980), *cert. denied*, 450 U.S. 929, 101 S. Ct. 1387, 67 L. Ed. 2d 361 (1981); *Withers v. Levine*, 615 F.2d 158 (4th Cir. 1980). In *Slakan*, we reasoned that liability is not premised upon *respondeat superior* but upon "a recognition that supervisory

indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan*, 737 F.2d at 372-73.

Recognizing that supervisory liability can extend "to the highest levels of state government," we have noted that liability ultimately is determined "by pinpointing the person in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." *Slakan*, 737 F.2d at 376. *See Spell v. McDaniel*, 591 F. Supp. 1090, 1109-10 (E.D.N.C. 1984)(determining issue on supervisory liability is whether defendant proximately caused a violation of the plaintiff's rights by doing something or failing to do something he should have done). We have also noted that this issue is ordinarily one of fact, not law. *Id. See Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir. 1981).

We have set forth three elements necessary to establish supervisory liability . . .: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

To satisfy the requirements of the first element, a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff. Establishing a "pervasive" and "unreasonable" risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury.

\*　　\*　　\*

Causation is established when the plaintiff demonstrates an "affirmative causal link" between the supervisor's inaction and the harm suffered by the plaintiff. *Slakan*, 737 F.2d at 376; *see Rizzo v. Goode*, 423 U.S. 362, 96 S. Ct. 598, 46 L. Ed. 2d 561 (1976). This concept encompasses cause in fact and proximate cause. In *Slakan*, we noted that the "proof of causation may be direct . . . where the policy commands the injury of which the plaintiff complains . . . [or] may be supplied by [the] tort principle that holds a person liable for natural consequences of his actions." *Slakan*, 737 F.2d at 376 (quoting *Wellington*, 7171 F.2d at 936).

*Stroud*, 13 F.3d at 798-99 (citations and footnote omitted).[15]

"Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990). "A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." *Id.* at 851-52.

### A.   Hanburger's Unwarranted Order To Seize The Pontiac Grand Am

As pled in the Complaint, there was no reasonable basis for Hanburger to order the agents who were following the Pontiac Grand Am to "take down" the vehicle and forcibly seize and extract its occupants.   No reasonable FBI agent under the circumstances, with the information which Hanburger had, could   have believed that there was probable cause to seize the vehicle and its occupants.

The information which the agents on surveillance at the 7-11 provided to Brosnan, which was communicated to Hanburger, was insufficient to provide probable cause for seizing the vehicle and the Plaintiffs. Complaint at ¶ 48. Thereafter, Hanburger was made aware that the vehicle was being driven in a normal fashion. Complaint at ¶ 51. Moreover, before ordering the agents to "take down" the Pontiac Grand Am, Hanburger received word from King, as relayed by the Anne Arundel County detectives, that Blottenberger was in a Honda. Complaint at ¶ 52. Hanburger was aware that the agents were following a Pontiac Grand Am. Complaint at ¶ 45. No reasonable FBI agent under the circumstances, with knowledge that no identification had been made of Blottenberger in the Pontiac Grand Am before it left the 7-11, that the Grand Am was not

---

[15]   Although many of the cases involving supervisory liability, such as *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), involve state actors under 42 U.S.C. §1983, the same constitutional liability is available under *Bivens*. *See White v. Downs*, 1997 WL 210858, *4 (4th Cir. April 30, 1997).

being driven in a suspicious manner, and that Blottenberger was in a Honda, not a Pontiac, would have directed the "take down" of the Pontiac Grand Am and the seizure, forcible extraction and arrest of its occupants.[16]

Hanburger personally directed the violations of Kristen Harkum's and Joseph Schultz's rights. He is personally responsible for those violations and the foreseeable consequence of his conduct.

**B.    Hanburger and Brosnan Are Also Liable For the Reckless and Indifferent Manner in Which They Supervised The Acts Which Resulted in the Violations of Kristen Harkum's Constitutional Rights**

Brosnan and Hanburger, through their deliberate, indifferent and reckless acts, set in motion a series of events that proximately resulted in the unwarranted seizure and arrest of Kristen Harkum and Joseph Schultz, including Braga's firing his assault rifle into the Grand Am occupied by Krissy and Joe. In their Complaints, Plaintiffs have provided detailed, fact-specific allegations that Hanburger and Brosnan were aware of Braga's prior unjustified fatal shooting of a nearly naked man, who posed no threat. *See* Complaint at ¶¶ 12-15. With knowledge of that prior shooting, Defendants Hanburger and Brosnan nonetheless allowed Braga to participate in a dynamic vehicle stop and forcible extraction of the Plaintiffs, while armed with an automatic rifle, without any controls in place to prevent a repeat of the February 2000 shooting.

In addition, the Defendants disregarded mandatory FBI procedures and practices, regarding pre-arrest procedures, which put members of the public, including the Plaintiffs, at an unreasonable and great risk of harm. Defendants failed to carefully and

---

[16]     Defendants' claim that the take down, seizure and arrest of the Grand Am and its occupants was reasonable because Schultz was wearing a white baseball cap at the time he entered the 7-11. That claim, which did not give rise to probable cause to "take down" the Grand Am is of no avail to Hanburger, because he had no knowledge of that fact at the time he ordered the seizure of the Grand Am. Complaint at ¶ 52.

thoroughly plan for the arrest as required by the FBI Manual of Investigative and Operational Guidelines("MIOG"). *See* Complaint at ¶ 16. There was no operating plan, even though the MIOG requires a written plan. The MIOG requires the case agent to provide a written plan which would include:

> the specific assignments for each team member; the weapons and ammunition that the arrest team will be using; the use of identifying clothing, such as FBI raid jackets, that the members of the arrest team will be wearing; the plan for execution of the arrest; the plan for communications among the members of the arrest team while the arrest is being executed; and the plan for a vehicle stop in the event that a vehicle stop is planned or anticipated as a contingency.

*Id.*

There was no plan in place for the dynamic stop of the "suspect's" vehicle. There was only a cursory briefing of the team. The agents were dispatched to the 7-11 with assault rifles with no clear plan for what they were to do. They were left totally unrestrained in the event that a vehicle stop became necessary. They were left to choose for themselves how to conduct the stop and to opt to forcibly extract the occupants, notwithstanding that such violated FBI policy.

The MIOG requires that an identification signal be used to positively identify the suspect and requires that the arrest team members be notified of the identification by a designated member. *Id.* at ¶ 17. This was not done. Because the supervising Defendants deliberately disregarded these mandatory FBI guidelines, the arrest team failed to positively identify the male person in the vehicle prior to the seizure of the Pontiac Grand Am, Krissy and Joe on Fort Smallwood Road. In fact, no identification was ever conveyed to the arrest team before the actual seizures and arrests took place.

The failure to identify Blottenberger was further compounded by the flawed FBI radio system and the lack of adequate communication between King and Brosnan. Hanburger and Brosnan were aware of the faulty radio system and knew, as all agents knew, that the problem created a greater need for good prior planning, which was not done.

Defendants Brosnan and Hanburger also failed to set out specific assignments for members of the arrest team. The life threatening implications of this failure are clear from the allegations in the Complaint. *See* Complaint at ¶¶ 58-60. Due to the speed and violence associated with a dynamic vehicle stop with forced extraction, which the FBI considers to be "extraordinarily hazardous to the persons being arrested," proper prior planning would have required a plan to stop the vehicle without forcible extraction. This was not a "hostage rescue mission" and should not have been treated as such. *Id.* at ¶ 19.

Defendants' deliberate failure to prepare for the contingency of a vehicle stop, although required by FBI policy, permitted the arrest team to intentionally and unnecessarily endanger the Plaintiffs. Defendants failure placed Braga at the window of the Grand Am with an assault rifle, which was objectively unreasonable, without any means of controlling what could happen in that circumstance. Braga's shooting into the vehicle was a direct foreseeable result of the Defendants deliberate and reckless indifference to the rights and lives of the Plaintiffs. At a minimum, Hanburger and Brosnan allowed and endorsed the wild west manner in which the seizing agents acted, which they knew would pose a pervasive and unreasonable risk of constitutional injury to the Plaintiffs. Plaintiff Harkum may recover damages against both Hanburger and

42

Brosnan for the violation of her rights.  *Shaw v. Stroud, supra.*  13 F.3d 791 (4th Cir. 1994)

### DEFENDANT BRAGA'S MOTION TO STRIKE SHOULD BE DENIED

Defendant Braga has also moved to strike portions of the Complaint pursuant to Rule 12(f) of the Federal Rules of Civil Procedure as irrelevant, unnecessary and designed to prejudice the Defendants.  Specifically, Braga seeks to have Paragraphs 10 to 13 of the Schultz Complaint stricken in their entirety, or in the alternative, that specific allegations in the paragraphs related to Braga's prior shooting and its aftermath should be stricken.[17]  The paragraphs contain the facts relating to Braga's fatal shooting of an unarmed man in February 2002 and are directly relevant to and necessary under Plaintiffs' *Bivens* claims against Braga and the other Defendants.  They are also necessary to the punitive damages claims in this case.

A motion to strike under Rule 12(f) is viewed with disfavor by the courts as a "drastic remedy" and "because it is often sought by the movant simply as a dilatory tactic."  *Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 348 (4th Cir. 2001); *see, e.g., National Credit Union Admin. v. First Union Capital Markets Corp.*, 189 F.R.D. 158, 162 (D. Md. 1999); *United States v. Fairchild Industries, Inc.*, 766 F. Supp. 405, 408 (D. Md. 1991)("A motion to strike is a drastic remedy and is therefore not favored."); *North Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 200 F. Supp. 2d 551, 554 (E.D.N.C. 2001).

The party moving to strike bears the burden of proof.  *See All American Insurance Co. v. Broeren Russo Construction, Inc.*, 112 F. Supp. 2d 723, 729 (C.D. Ill. 2000)("A

---

[17]    Paragraphs 10 to 13 of the Schultz Complaint are identical to Paragraphs 12 to 15 of Harkum Complaint.

movant bears the burden of demonstrating that the challenged allegations are so unrelated to plaintiff's claim as to be devoid of merit, unworthy of consideration and unduly prejudicial."); *Vakharia v. Little Co. of Mary Hospital & Health Care Ctr.*, 2 F. Supp. 2d 1028 (N.D. Ill. 1998). Moreover, the moving party must make two showings: (1) that the challenged allegations are clearly unrelated to the plaintiff's claims, and (2) the moving party must demonstrate some prejudice if those allegations are permitted to remain in the pleading. *See United States ex rel. Ackley v. International Business Machines Corp.*, 110 F. Supp. 2d 395, 406 (D. Md. 2000); Baicker-McKee, *et al.*, Federal Civil Rules Handbook 346 (Thompson-West 2003). Consequently, a motion to strike ordinarily "will be denied unless the matter under challenge has 'no possible relation to the controversy and may prejudice the other party.'" *United States ex rel. Ackley v. International Business Machines Corp., supra*; *Maryland State Conference of NAACP Branches v. Maryland Dep't of State Police*, 72 F. Supp. 2d 560, 569 (D. Md. 1999)("Taking the time to determine whether a particular sentence or paragraph has 'no possible relation to the controversy' is not warranted.").

Defendant Braga's Motion to Strike fails on the both prongs of the test. First, Braga's unprovoked and reckless shooting in February 2000, demonstrates that his shooting into the Pontiac Grand Am in March 2002 was not a one time unfortunate incident, but rather the act of a person who has a callous indifference for the safety and rights of others. It demonstrates that Braga's shooting into the Grand Am was not a mistake, but rather the manner in which he deals with such situations. Secondly, the allegations are also relevant to the claims against the Defendants Hanburger and Brosnan as the events relate to their knowledge of Defendant Braga's propensity to shoot unarmed

44

citizens in the course of his duties.  This knowledge and the factual underpinnings of the prior shooting are directly relevant to all of the Defendants' deliberate indifference and callous disregard of constitutional rights.  The prior shooting is admissible under FRE 404(b) and is probative evidence which establishes Defendants' liability.  It is a proper and necessary part of the Plaintiffs' Complaints.

In *Morton v. Town of Wagram*, 2001 WL 68232 (M.D.N.C Jan. 19, 2001), a defendant-police officer in a wrongful shooting case, sought to strike portions of the plaintiff's complaint that related to a prior shooting as conclusory, inflammatory and irrelevant.  *See id.* at *1.  The District Court denied the motion to strike noting the relevance of the evidence in light of the plaintiff's allegations of negligent training and supervision by other senior officers.  *See id* at *2; *see also Williamson v. Virginia First Savings Bank*, 26 F. Supp. 2d 798, 805 (E.D. Va. 1998)(in a Title VII action, request to strike portions of compliant containing references to defendants comments about employees as "luscious women officers" relevant to plaintiff's gender discrimination charge was not justified).  As in *Morton*, Plaintiffs' claims regarding a prior shooting are neither irrelevant nor unduly prejudicial, but rather show Braga's state of mind, intent and absence of mistake in shooting into the Grand Am and Brosnan's and Hanburger's liability for failing to take appropriate steps to prevent that from happening.

Defendant Braga has argued, in the alternative, that certain terms should be stricken from the Complaint, including that there was a "whitewash" of the shooting investigation by the Shooting Review Board and that the prior shooting amounted to an "execution."  These references are fair characterizations of conduct which is directly relevant to this case.  Even if couched in different phraseology, the facts are relevant and

proper for the trier of fact's consideration.  The Court should not strike any portion of the Complaint at this stage of the litigation.  Defendant Braga's Motion to Strike must be denied.

## CONCLUSION

Plaintiff Kristen M. Harkum's Complaint states a viable claim for relief under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  The well-pled facts alleged in the Complaint do not supply Defendants Braga, Hanburger and Brosnan with a basis to assert a qualified immunity defense.  Accordingly, Defendants' motions to dismiss must be denied.

_____/s/_____

Steven A. Allen (Federal Bar No. 00607)
Robert S. Campbell (Federal Bar No. 25731)
HODES, ULMAN, PESSIN & KATZ, P.A.
901 Dulaney Valley Road, Suite 400
Towson, Maryland  21204
(410) 339-6769
(410) 825-2493 (FAX)

Attorneys for Plaintiff,
Kristen M. Harkum

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of August, 2003, a copy of the foregoing was electronically filed with the U.S. District Court for the District of Maryland and hand delivered on August 5, 2003, to:

Andrew C. White, Esquire
Susan Q. Amiot, Esquire
Law Offices of Andrew C. White, LLC
201 North Charles Street
Suite 2600
Baltimore, Maryland  21201
**Counsel for Defendant Christopher Braga**

Andrew Jay Graham, Esquire
John A. Bourgeois, Esquire
Stuart M.G. Seraina, Esquire
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland  21202-3201
**Counsel for Defendant, Lawrence S. Brosnan**

David B. Irwin, Esquire
Vicki L. Dexter, Esquire
Irwin, Green & Dexter, L.L.P.
301 W. Pennsylvania Avenue
Towson, Maryland  21204
**Counsel for Defendant, Henry F. Hanburger**

Arnold M. Weiner, Esquire
David M. Kowitz, Esquire
Weiner & Weltchek
2330 West Joppa Road
Suite 300
Lutherville, Maryland  21093
**Counsel for Plaintiff, Joseph C. Schultz**

_____
Steven A. Allen